IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **JINKO SOLAR CO., LTD.**, *et al.*, | Consol. Court No. 15-00080 |
| **Plaintiff**, | |
| **YINGLI GREEN ENERGY AMERICAS, INC.**, *et al.*, | Before: Hon. Donald C. Pogue, Senior Judge |
| **Plaintiff-Intervenors**, | |
| v. | |
| **UNITED STATES**, | |
| **Defendant**, | |
| and | |
| **SOLARWORLD AMERICAS, INC.**, *et al.*, | |
| **Defendant-Intervenors**. | |

## ORDER

Upon consideration of the motion of SolarWorld Americas, Inc. ("SolarWorld") for judgment on the agency record, and all other papers and proceedings herein, it is hereby

**ORDERED** that SolarWorld's motion for judgment on the agency record is granted; and it is further

**ORDERED** that the Department of Commerce's final results in the antidumping duty investigation on *Crystalline Silicon Photovoltaic Products from the People's Republic of China* are unsupported by substantial record evidence and otherwise contrary to law; and it is further

**ORDERED** that this action is remanded to the Department of Commerce for proceedings consistent with this Court's opinion.

Consol. Court No. 15-00080
Page 2

**SO ORDERED.**

_____
Hon. Donald C. Pogue, Senior Judge

Dated: _____, 2016
      New York, New York

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **JINKO SOLAR CO., LTD.**, *et al.*, |
| **Plaintiff,** |
| **YINGLI GREEN ENERGY AMERICAS, INC.,** *et al.*, |
| **Plaintiff-Intervenors,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant,** |
| **and** |
| **SOLARWORLD AMERICAS, INC.,** *et al.*, |
| **Defendant-Intervenors.** |

Court No. 15-00080

Before: Hon. Donald C. Pogue, Senior Judge

## SOLARWORLD'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to U.S. Court of International Trade Rule 56.2, SolarWorld Americas, Inc. ("SolarWorld") hereby moves for judgment upon the agency record with respect to the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty investigation on *Crystalline Silicon Photovoltaic Products from the People's Republic of China*. The final determination was signed by Commerce on December 15, 2014 and published in the *Federal Register* on December 23, 2014. *Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final deter. of sales at less than fair value).

SolarWorld respectfully moves, for the reasons explained in the brief accompanying this motion, that this Court find that Commerce's final determination in the above-referenced antidumping duty investigation are unsupported by substantial record evidence and otherwise

Court No. 15-00080

contrary to law. SolarWorld further moves that the Court remand these results to Commerce for disposition consistent with the Court's final opinion.

Respectfully submitted,

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

*Counsel to SolarWorld Americas, Inc.*

March 21, 2016

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

JINKO SOLAR CO., LTD., *et al.*,

                      **Plaintiff,**

YINGLI GREEN ENERGY AMERICAS, INC., *et al.*,

                      **Plaintiff-Intervenors,**

          **v.**

UNITED STATES,

                      **Defendant,**

          **and**

SOLARWORLD AMERICAS, INC., *et al.*,

                      **Defendant-Intervenors.**

Court No. 15-00080

Before: Hon. Donald C. Pogue,
Senior Judge

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information removed
from pages 26-29.**

## SOLARWORLD'S BRIEF IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000

*Counsel to SolarWorld Americas,
Inc.*

March 21, 2016

Table of Contents

Page

I.      INTRODUCTION .................................................................................... 1

II.     RULE 56.2 STATEMENT ....................................................................... 1

        1.      Whether Commerce's determination to rely upon Mustek's
                financial statements as the source of surrogate financial ratios was
                supported by substantial evidence and otherwise lawful? ............... 1

        2.      Whether Commerce's determination to utilize South African data
                classified under HTS subheading 7604.29.65 as a surrogate to
                value respondents' aluminum frames was supported by substantial
                evidence and otherwise lawful? ...................................................... 2

        3.      Whether Commerce's determination to utilize South African data
                for imports classified under HTS subheading 8548.10 as a
                surrogate to value respondents' scrap solar cells was supported by
                substantial evidence and otherwise lawful? ..................................... 2

        4.      Whether Commerce's determination not to apply facts available in
                calculating the adjustment to respondent Trina's indirect selling
                expenses for quality insurance payments was reasonable and
                otherwise lawful? ........................................................................... 3

        5.      Whether Commerce's determination to offset the respondents'
                dumping margins to account for export subsidies found in the
                companion countervailing duty investigation, to which Commerce
                applied adverse facts available, was reasonable and lawful? ......... 3

III.    STATEMENT OF FACTS ........................................................................ 4

        A.      Facts Relevant to the Selection of Surrogate Values ..................... 4

        B.      Facts Relevant to Trina's Indirect Selling Expenses Calculation ... 6

        C.      Facts Relevant to the Export Subsidy Offset ................................. 6

IV.     STANDARD OF REVIEW ...................................................................... 7

V.      ARGUMENT ........................................................................................ 8

        A.      Commerce's Determination to Rely on Mustek's Financial Statements for
                the Surrogate Financial Ratios Was Unsupported by Substantial Evidence
                and Unlawful ................................................................................... 8

        1.      Legal Framework ............................................................................ 8

        2.      Mustek's Financials Were Not the "Best Available Information" 10

                a.      Unlike Other Companies with Financials on the Record,
                        Mustek Is Not a Producer of Identical or Comparable
                        Merchandise ....................................................................... 10

                b.      Unlike Other Financials on the Record, Mustek's
                        Financials Were Not Contemporaneous with the POI ....... 14

c.      Unlike Other Financials on the Record, Mustek's Financials Lacked the Requisite Specificity to Serve as the Surrogate Financial Ratios................................................15

3.      Commerce's Disregard of More Representative Financial Statements Due Solely to Evidence of Countervailable Subsidies Was Improper ..........................................................17

B.      Commerce's Selection of Surrogate Values for Other Inputs Was Unsupported by Substantial Evidence and Unlawful ...............................18

C.      Commerce's Failure to Apply Facts Available to Calculate Trina's Unreported Quality Insurance Expenses Was Unreasonable and Unlawful 26

D.      Commerce's Determination to Offset Respondents' AD Cash Deposit Rates to Account for Export Subsidies Calculated in the CVD Investigation Based on Adverse Facts Available Was Unreasonable and Unlawful .................................................................................30

VI.      CONCLUSION .....................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Chia Far Indus. Factory Co. v. United States,*
    28 CIT 1337 (2004) ........................................................................34

*Citrosuco Paulista, S.A. v. United States,*
    12 CIT 1196 (1988) .......................................................................35

*Consol. Bearings Co. v. United States,*
    348 F.3d 997 (Fed. Cir. 2003) .....................................................13

*De Cecco Di Filippo v. U.S.,*
    216 F.3d 1027 (Fed. Cir. 2000) ...................................................37

*Dorbest Ltd. v. United States,*
    30 CIT 1671 (2006) .......................................................................28

*Dupont Teijin Films USA, LP v. United States,*
    27 CIT 962 (CIT 2003)..................................................................36

*Dupont Teijin Films v. United States,*
    896 F.Supp.2d 1302, 37 CIT __ (2013)......................................23

*Gallant Ocean (Thailand) Co. Ltd. v. United States,*
    602 F.3d 1319 (Fed. Cir. 2010) ...................................................37

*Goldlink Indus. Co. v. United States,*
    30 CIT 616 (2006) .........................................................................24

*Longkou Haimeng Mach. Co., Ltd. v. United States,*
    33 CIT 603 (2009) ..........................................................15, 23, 29

*MacLean-Fogg Co. v. United States,*
    100 F. Supp. 3d 1349, 1355-1356 (CIT 2015) ...............*passim*

*Max Fortune Indus. Co. v. United States,*
    35 Int'l Trade Rep. (BNA) 1384 (CIT 2013) ...........................34

*Mid Continent Nail Corp. v. United States,*
    999 F. Supp. 2d 1307 (CIT 2014).........................................15, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................13, 24

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006) ...................................................................13

*NMB Sing. Ltd. v. United States*,
  557 F.3d 1316 (Fed. Cir. 2009) ...................................................................13

*Rhone Poulenc v. United States*,
  899 F.2d 1185 (Fed. Cir. 1990) ...............................................................23, 37

*Shanghai Foreign Trade Enters. Co. v. United States*,
  28 CIT 480 (2004) ....................................................................................30, 35

*SKF USA Inc. v. United States*,
  254 F.3d 1022 (Fed. Cir. 2001) ...................................................................35

*SKF USA, Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001) ...................................................................13

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
  298 F.3d 1330 (Fed. Cir. 2002) ...................................................................12

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) .........................................................................12

19 U.S.C. § 1677a(c)(1)(C) .............................................................................35

19 U.S.C. § 1677b(c)(1) ............................................................................*passim*

19 U.S.C. § 1677e(a)(2) ...........................................................................33, 34

19 U.S.C. § 1677f(i)(3)(A) ..............................................................................13

**REGULATIONS**

19 C.F.R. § 351.307(d) ...................................................................................34

19 C.F.R. § 351.402(b) ...................................................................................33

19 C.F.R. § 351.408(c)(4) ..........................................................................14, 16

**ADMINISTRATIVE MATERIALS**

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*,
  79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014) .............................................9

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*,
  79 Fed. Reg. 76,962 (Dep't Commerce December 23, 2014) ................................36

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014) .........................................9

*Certain New Pneumatic Off-the-Road Tires From China,* 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) ...................................................................................................34

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China,* 75 Fed. Reg. 57,449, 57,452 (Dep't Commerce Sept. 21, 2010) .............................................34

*Certain Stilbenic Optical Brightening Agents From China,* 77 Fed. Reg. 17,436 (Dep't Commerce Mar. 26, 2012).......................................................................................22

*Chlorinated Isocyanurates From China,* 80 Fed. Reg. 4,539 (Dep't Commerce Jan. 28, 2015) ....................................................................................................................22

*Chlorinated Isocyanurates From China,* 79 Fed. Reg. 4,875 (Dep't Commerce Jan. 30, 2014)....................................................................................................................22

*Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China,* 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012)..............16

*Crystalline Silicon Photovoltaic Products From the People's Republic of China,* 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015)...........................................................6

*Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) ..........................................................6

*Diamond Sawblades and Parts Thereof From China,* 80 Fed. Reg. 32,344 (Dep't Commerce June 8, 2015).....................................................................................21

*Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From China,* 77 Fed. Reg. 27,425, 27,426 (Dep't Commerce May 10, 2012) ..................................................37

*Oil Country Tubular Goods from Saudi Arabia,* 79 Fed. Reg. 41,986 (Dep't Commerce July 2014) ...................................................................................................15

*Wooden Bedroom Furniture From China,* 79 Fed. Reg. 51,954 (Dep't Commerce Sept. 2, 2014) ....................................................................................................................19

*Xanthan Gum From China,* 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013) ....................23

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 11 of 47

Consol. Ct. No. 15-00080                          **NON-CONFIDENTIAL VERSION**

## I.   INTRODUCTION

On behalf of SolarWorld Americas, Inc. ("SolarWorld"), we submit the following brief in support of SolarWorld's motion for judgment on the agency record.

## II.   RULE 56.2 STATEMENT

### A.   Administrative Decision Under Review

The administrative determination challenged in this case is the final determination of the U.S. Department of Commerce ("Commerce") in the antidumping duty ("AD") investigation of *Crystalline Silicon Photovoltaic Products from the People's Republic of China*. The determination was signed on December 15, 2014 and published in the *Federal Register* on December 23, 2014. *Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014). *See also* Memorandum to Paul Piquado from Christian Marsh, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value* (Dec. 15, 2014), PR 817 ("I&D Memo").[1] The AD order was published on February 18, 2015. *Crystalline Silicon Photovoltaic Products From the People's Republic of China*, 80 Fed. Reg. 8,592 (Dep't Commerce Feb. 18, 2015).

### B.   Issues Presented

#### 1.   Whether Commerce's determination to rely upon Mustek's financial statements as the source of surrogate financial ratios was supported by substantial evidence and otherwise lawful?

No.  Commerce's reliance on Mustek's financial statements as the source of the surrogate financial ratios in the underlying investigation was unsupported by substantial evidence and

---

[1]     Documents in the public administrative record are identified in this brief by name and date, followed by "PR" and the corresponding record number. Documents in the confidential administrative record are identified by name and date, followed by "CR" and the corresponding record number.

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 12 of 47

Consol. Ct. No. 15-00080                          NON-CONFIDENTIAL VERSION

unlawful, as Mustek's financials could not reasonably be found to constitute the best available information to value respondents' overhead, selling, general and administrative ("SG&A") and profit expenses, as required by law. Mustek's financial statements did not cover production of comparable merchandise, were not contemporaneous with the period of investigation, and failed to contain specific data on selling, general and administrative expenses. Multiple Thai financial statements addressed all of these deficiencies, but Commerce erred in refusing to use them solely due to evidence of countervailable subsidies.

> **2.    Whether Commerce's determination to utilize South African data classified under HTS subheading 7604.29.65 as a surrogate to value respondents' aluminum frames was supported by substantial evidence and otherwise lawful?**

No.  Commerce's decision to value respondents' aluminum frames for solar modules using HTS heading 7604, rather than HTS heading 7616, was unreasonable and contrary to law. Commerce erred by failing to give appropriate weight to extraordinarily relevant record evidence – two U.S. Customs and Border Protection ("CBP") rulings on products aluminum frames for solar modules, both of which found 7604 inappropriate to classify the frames.  Commerce also failed to appropriately consider evidence showing that HTS heading 7604 described unfinished aluminum articles, improperly finding such evidence irrelevant.    Further, Commerce unreasonably concluded that respondents' aluminum frames were "profiles" covered under HTS heading 7604, when they did not meet the heading's definition of "profiles," as they were not of a uniform cross section along their whole length.

> **3.    Whether Commerce's determination to utilize South African data for imports classified under HTS subheading 8548.10 as a surrogate to value respondents' scrap solar cells was supported by substantial evidence and otherwise lawful?**

No.  Commerce erred by valuing scrap solar cells claimed by the respondents as an offset with a surrogate value for battery cells under HTS heading 8548 rather than as polysilicon with

less than 99.99% purity under HTS heading 2804, with the effect of significantly overvaluing the scrap cells. Commerce provided insufficient justification for its selection of HTS heading 8548, noting only that the description referred to "cells." Commerce also failed to rationally justify its decision not to select SolarWorld's proposed HTS number, which reflected polysilicon – the primary raw material input into solar cells and the raw material that is reclaimed when solar cells are scrapped.

> **4.    Whether Commerce's determination not to apply facts available in calculating the adjustment to respondent Trina's indirect selling expenses for quality insurance payments was reasonable and otherwise lawful?**

No. Commerce failed to apply facts available to calculate Trina's indirect selling expenses, despite respondent Trina's failure to timely report key information regarding those expenses and its failure to provide full information on such expenses even at verification. The statute directs Commerce to apply facts otherwise available when the respondent fails to report certain factual information, as Trina did in the underlying case, and thus the agency was required to do so here. Its determination to accept the information provided by Trina for the first time only when specifically asked at verification also was an arbitrary departure from Commerce's established practice of not accepting new factual information at verification.

> **5.    Whether Commerce's determination to offset the respondents' dumping margins to account for export subsidies found in the companion countervailing duty investigation, to which Commerce applied adverse facts available, was reasonable and lawful?**

No. Commerce erred by offseting the respondents AD duty cash deposit rates to account for export subsidies found in the companion countervailing duty investigation, which were calculated based on adverse facts available. Commerce's decision to apply the export subsidy offset neutralized the effect of applying adverse facts available and thus did not implement the purpose of the adverse inferences statute, rendering it unreasonable and unlawful.

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 14 of 47

Consol. Ct. No. 15-00080                          NON-CONFIDENTIAL VERSION

## III.   STATEMENT OF FACTS

On December 31, 2013, Plaintiff filed a petition with Commerce and the International Trade Commission alleging that the U.S. solar industry was materially injured or threatened with material injury by reason of dumped and subsidized imports of crystalline silicon photovoltaic ("solar") products from China and dumped imports of solar products from Taiwan. *See* Petition for the Imposition of Antidumping and Countervailing Duties, *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* vol. I (Dec. 31, 2013), PR 1-10/CR 1-11 ("Petition") at 1.

On January 29, 2014, Commerce published notices of initiation of the investigations, including an AD investigation on solar products from China. *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China and Taiwan,* 79 Fed. Reg. 4,661 (Dep't Commerce Jan. 29, 2014).   On July 31, 2014, Commerce published its preliminary determination in the AD investigation. *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed. Reg. 44,399 (Dep't Commerce July 31, 2014).   On December 23, 2014, Commerce published its final determination in the AD investigation. *Crystalline Silicon Photovoltaic Products from the People's Republic of China,* 79 Fed. Reg. at 76,970.

Based in part on the findings described below, Commerce calculated final dumping margins of 78.42 percent for respondent Renesola, 26.71 percent for respondent Trina, 52.13 percent for the separate rate respondents, and 165.04 percent for the China-wide rate. *Id.* at 76,973.

### A.   Facts Relevant to the Selection of Surrogate Values

In the underlying investigation, SolarWorld argued that Commerce should select Thailand, not South Africa, as the surrogate country, in part due to the lack of a South African

company that was a suitable source of surrogate financial ratios.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Case Brief of Solar World Americas, Inc.* (Oct. 16, 2014) PR 795/CR 974 ("SolarWorld Case Brief") at 28-32.   In the preliminary determination, however, Commerce selected South Africa as the surrogate country and utilized the financial statements of South African company Mustek Limited ("Mustek") to value respondents' overhead, SG&A and profit.  *See* I&D Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 44,399 PR 698 ("Prelim I&D Memo") at 10.

In its case brief and other comments, SolarWorld argued that Mustek was not an appropriate source of surrogate financial ratios, as it was not a producer of identical or comparable merchandise, but was a mere computer assembler.  *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Products from the People's Republic of China: Comments on Surrogate Values* (June 4, 2014), PR 524/CR 491 ("SolarWorld Surrogate Value Comments") at 2-4; SolarWorld Case Brief at 38-44.   Moreover, Mustek's financial statement was not contemporaneous with the period of investigation ("POI") and did not contain separate line items for SG&A expenses.  *See id.* at 43.   However, Commerce relied on Mustek's financials for the surrogate financial ratios in the final determination.  I&D Memo at Comment 2.

SolarWorld further argued that Commerce should utilize HTS heading 7616 as the surrogate to value respondents' aluminum frames.  *See* SolarWorld Case Brief at 44-45. However, in the final determination, Commerce determined that HTS heading 7604 was the best information available with which to value the aluminum frames.  *See* I&D Memo at Comment 9.

With regard to the surrogate value for scrap solar cells claimed by respondents as an offset, SolarWorld argued that Commerce should value the goods as polysilicon of less than

99.99 percent purity, classifiable under HTS subheading 2804.69. *See* SolarWorld Case Brief at

45-46.   However, Commerce determined that HTS subheading 8548.10 provided the best

available information with which to value respondents' scrap solar cells. *See* I&D Memo at

Comment 10.

### B.   Facts Relevant to Trina's Indirect Selling Expenses Calculation

SolarWorld also argued that Commerce should include respondent Trina's payments for

quality insurance in its reported indirect selling expenses and should base part of this adjustment

on facts available, due to Trina's failure to report relevant information. *See* SolarWorld Case

Brief at 15-17.  In the final determination, however, Commerce disagreed that the application of

facts available was appropriate.   Finding that the required information was available on the

record, Commerce used Trina's expenses, which were reported for the first time only when

specifically requested at verification, in calculating its cost of quality insurance during the POI.

*See* I&D Memo at Comment 12.

### C.   Facts Relevant to the Export Subsidy Offset

Finally, in its case brief, SolarWorld argued that Commerce should not offset the

respondents' dumping margins to account for export subsidies found in the companion

countervailing duty ("CVD") investigation, which were calculated based on adverse facts

available ("AFA"). *See* SolarWorld Case Brief at 46-51.  SolarWorld noted that it was likely

that Commerce would apply AFA to calculate the export subsidy conferred by the EX-IM Bank

Buyer's Credit program, and that Commerce should not offset the final dumping margins by the

AFA subsidy rate attributable to that program, as it would neutralize the effect of the AFA. *See*

*id.*

However, in the final determination, Commerce determined that it would "offset the AD

cash deposit rate by the export subsidy rate calculated in the concurrent CVD investigation,"

citing agency practice.  I&D Memo at Comment 3.  *See also* Memorandum for The File, from Thomas Martin, re:  *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Double Remedies Calculation* (Mar. 5, 2015), P.R. 840 ("Double Remedies Calculation Memo").   As a result, for example, the combined AD/CVD margin for Trina, a mandatory respondent in both the AD and CVD investigations, was reduced by 12.28 percent, and the combined AD/CVD margin for most of the "separate rate" respondents was reduced by 11.43 percent.  Double Remedies Calculation Memo at Attachment 1.

## IV.   STANDARD OF REVIEW

The Court reviews Commerce's determinations in an AD investigation to determine whether they are supported by substantial record evidence and otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce's determinations are not supported by substantial evidence where the agency fails to provide "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" in light of the record, including whatever "fairly detracts from the substantiality of the evidence."  *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (citations omitted).   Commerce must "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice{s} made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).   This requires that the Court ask whether the agency's determinations are reasonable given the record as a whole.  *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006).

Where the statute leaves the agency with a measure of discretion, the Court reviews decisions for abuse of discretion.   An abuse of discretion occurs where a decision is based on an erroneous interpretation of law, on factual findings that are unsupported by substantial evidence,

or represent an unreasonable judgment in weighing relevant factors. *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355-1356 (CIT 2015).

Moreover, "an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) (internal quotation omitted).   If Commerce provides "no reasonable explanation" for changing a practice that it has "consistently followed," such a change is unacceptable agency practice. *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003).

Commerce is also required by law to include in its final results "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A).  *See also NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1319 (Fed. Cir. 2009).

## V.   **ARGUMENT**

### A.   **Commerce's Determination to Rely on Mustek's Financial Statements for the Surrogate Financial Ratios Was Unsupported by Substantial Evidence and Unlawful**

Commerce's reliance on Mustek's financial statements for the surrogate financial ratios in this investigation was unsupported by substantial evidence and unlawful, as Mustek's financials could not reasonably be found to constitute the best available information to value respondents' overhead, SG&A and profit expenses, as required by law.

#### 1.   **Legal Framework**

In non-market economy ("NME") cases, Commerce calculates the normal value of subject merchandise "on the basis of the value of the factors of production ("FOPs") utilized in producing the merchandise," "to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1).  Commerce

calculates the "amount for general expenses and profit" from the financial ratios of a selected surrogate company and applies this amount to value respondents' overhead, SG&A and profit. Pursuant to Commerce's regulations, surrogate financial ratios are calculated, to the extent possible, from publicly available financial statements of producers of identical or comparable merchandise. 19 C.F.R. § 351.408(c)(4).

In circumstances where, as here, Commerce determines the normal value of subject merchandise according to specialized NME, "Commerce is no less obligated to determine margins as accurately as possible…. Congress directed generally that the valuation of {FOPs} shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate." *Baoding Mantong Fine Chemistry Co. v. United States*, 113 F. Supp. 3d 1332, 1337 (CIT 2015) (emphasis in original) (internal citation omitted). *See also* 19 U.S.C. § 1677b(c)(1).

In choosing the "best available information" to serve as the surrogate, Commerce typically weighs "1) the similarity of the potential surrogate companies' business operations and products to the respondent's business operations and products; 2) the extent to which the financial data of the surrogate company reflect sales in the home market and do not reflect sales to the United States; {} 3) the contemporaneity of the data to the POI . . . {and 4)} the extent to which the customer base of the surrogate and the respondent were similar." I&D Memorandum accompanying *Oil Country Tubular Goods from Saudi Arabia,* 79 Fed. Reg. 41,986 (Dep't Commerce July 2014) at 17. "Commerce consistently takes the position that the greater the similarity in business operations and products, the more likely that there is a greater correlation in the profit experience of the companies." *Mid Continent Nail Corp. v. United States*, 999 F. Supp. 2d 1307, 1324 (CIT 2014) (internal quotation omitted). *See also Longkou Haimeng Mach.*

*Co., Ltd. v. United States*, 33 CIT 603, 613 (2009) ("{A} surrogate value must be as representative of the production process in the NME country as is practicable, if it is to achieve the statutory objective of assigning dumping margins as accurately as possible").

### 2.    Mustek's Financials Were Not the "Best Available Information"

In this case, to the extent that the agency followed its typical practice at all, it misapplied these factors and unreasonably relied solely on the financial statements of computer assembler Mustek for the surrogate financial ratios. *See* I&D Memo at 35-37. Commerce had six financial statements on the record, for Mustek and five Thai companies, including Hana Microelectronics ("Hana") and KCE Electronics Public Company Limited ("KCE"). Letter from Arent Fox LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China; Comments on Surrogate Country and Surrogate Values* (May 23, 2014) PR 459-469/CR 435-448 ("Trina Surrogate Submission") at Exhibit 10; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Products From the People's Republic of China: Comments on Surrogate Country and Surrogate Values* (May 23, 2014), PR 452 ("SolarWorld May Surrogate Submission") at Exhibit 11; Letter from Wiley Rein LLP to Sec'y Commerce, re: *Crystalline Silicon Photovoltaic Products from the People's Republic of China: Submission of Surrogate Values* (June 24, 2014), PR 585-593/CR 556-564 ("SolarWorld June Surrogate Submission") at Exhibit 12. Given the record information and the factors typically considered by Commerce, Mustek's financial statements alone could not reasonably be considered the "best available information" to value respondents' overhead, SG&A and profit.

a.    <u>Unlike Other Companies with Financials on the Record, Mustek Is Not a Producer of Identical or Comparable Merchandise</u>

First, Mustek's business operations and products are significantly different from those of respondents. As such, Mustek could not reasonably be considered a "producer{} of identical or

comparable merchandise".  *See* 19 C.F.R. § 351.408(c)(4); SolarWorld Surrogate Value Comments at 2-4.  As Commerce recognized, Mustek is a "computer assembler."  I&D Memo at Comment 2.  *See also* Trina Surrogate Submission at 5, Exhibit 10.  In fact, Mustek does not even produce computers; it merely assembles them from prefabricated components supplied by other producers.  *See* SolarWorld Surrogate Value Comments at 3.  Assembly is far different from manufacturing.   Chinese solar producers are large, integrated companies, producing multiple different products – solar wafers, cells and modules.  Mustek also licenses software and distributes operating system technology packages, *see* Trina Surrogate Submission at Exhibit 10, p. 16, which, of course, does not involve any "production" of tangible goods.

In addition to the fact that Mustek is not a "producer" of computers, it is not a producer of products comparable to subject merchandise.  While the statute does not define "comparable merchandise," Commerce typically considers whether the products have similar production processes, end uses and physical characteristics.  *See, e.g.*, I&D Memorandum accompanying *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled into Modules, from the People's Republic of China*, 77 Fed. Reg. 63,791 (Dep't Commerce Oct. 17, 2012) ("*Solar I I&D Memo*") at 13.

Computers, like those assembled by Mustek, are not comparable to crystalline silicon photovoltaic cells and modules.  Clearly, their end uses and physical characteristics are vastly different.  There was no record information showing that the market dynamics for the sale of computers and information technology software are at all similar to those for subject merchandise.  Record evidence also revealed the extreme dissimilarities between the solar production process and the assembly of computers, as discussed further below.  In contrast, Hana and KCE are both producers and assemblers of circuit boards – products comparable to solar

products, as Commerce previously found. *See Solar I* I&D Memo at 12-16. Indeed, Commerce had relied on the financial statements of both Hana and KCE to calculate the surrogate financial ratios in the *Solar I* investigation. *See id.*

Commerce's contrary conclusion in this investigation rested on a mistaken conclusion that "the panel assembly stage of manufacturing, which involves assembling cells, wires, junction boxes and other parts into panels, is more comparable to the assembly of computers, which involves assembling circuit boards, wires, junction boxes and other partes into a computer, than it is to circuit board manufacturing, which involves attaching and connecting electronic components and etching conductive tracks, pads and other features from copper sheets and laminating them onto a non-conductive substrate."[2] I&D Memo at 36-37.

Commerce's conclusion focused on a single step of the solar production process – module production. This exclusive focus was inappropriate, because the full production process for subject merchandise involves multiple highly technical steps, including melting high-purity polysilicon, converting it into ingots, slicing them into wafers and converting wafers into functional solar cells – all prior to module assembly. *See* Petition at Exhibit I-8; SolarWorld Case Brief at 40-41. However, even focusing only on the module assembly process, such operations are not comparable to Mustek's unsophisticated computer assembly, and certainly are more comparable to circuit board manufacturing than to computer assembly. Indeed, the

---

[2]      Commerce later stated that circuit board production is not "necessarily more similar to panel assembly than is computer assembly." I&D Memo at 37. Thus, it is unclear whether Commerce found computer assembly to be more similar than circuit board manufacturing to solar panel assembly, or whether it considered them to be of approximately equal similarity. However, whether Commerce's concluded that computer assembly is <u>more similar</u> to solar panel assembly than circuit board manufacturing, or <u>not "necessarily" less similar</u> to solar panel assembly than circuit board manufacturing, the conclusion was unreasonable and unsupported.

similarities identified by Commerce in *Solar I* between solar production and circuit board manufacturing remain true for module assembly alone.  Commerce previously found:

> Printed circuit boards and {subject} merchandise... are both manufactured by high technology industries and involve putting together a variety of sensitive components onto a single base or board using both robotics and manual labor in clean room environments. Moreover, there are similar inputs in the two production processes such as the use of silicon base materials, various types of joining parts that are soldered on the base material to facilitate the flow of electricity, and the use of etchants and chemicals to prepare the base surfaces.

*Solar I* I&D Memo at 13.

In the underlying investigation, this continued to be the case.  Subject products and printed circuit boards – like those manufactured by Hana and KCE – are "manufactured by high technology industries and involve putting together a variety of sensitive components onto a single base or board using both robotics and manual labor in clean room environments." *See id.* *See also* SolarWorld May Surrogate Submission at Exhibit 11, Company Profile.  In addition, solar modules and printed circuit boards use "similar inputs... such as... silicon base materials, various types of joining parts that are soldered on the base material to facilitate the flow of electricity, and the use of etchants and chemicals to prepare the base surfaces." *Solar I* I&D Memo at 13.  Indeed, in module assembly, solar cells are soldered together into strings using metal connectors, laminated onto glass, framed and affixed with a junction box.  *See* Petition at 16 and Exhibit I-8.  There is no evidence that Mustek's computer assembly involves any of these same inputs or processes.

In sum, there is no indication on the record that Mustek's assembly process even approaches the level of complexity involved in the state-of-the-art production of subject merchandise and circuit boards.  In fact, photographs in Mustek's financials depict workers in t-shirts using bare hands and screwdrivers to assemble together pre-fabricated parts and assemblies.  *See* Trina Surrogate Value Submission at Exhibit 10, p. 32 and Tech Financials

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 24 of 47

Consol. Ct. No. 15-00080                                  NON-CONFIDENTIAL VERSION

article.  There is no evidence that Mustek performs critical functions such as foil etching, soldering or any other operation that requires the level of precision and delicate care and the clean room environment involved in solar module and circuit board production.  Given these facts, and Commerce's findings in *Solar I*, Commerce's conclusion that computer assembly was more comparable than circuit board manufacturing to subject production was unreasonable and unsupported by record evidence, undermining Commerce's selection of Mustek's financials as the source of surrogate financial ratios.

> b.     Unlike Other Financials on the Record, Mustek's Financials Were
>        Not Contemporaneous with the POI

The choice of Mustek was also improper because Mustek's financial statements were not contemporaneous with the POI.  As Commerce has explained, "the contemporaneity of financial statements is one of the key elements {it} considers in selecting surrogate financial statements. It is {Commerce's} practice to reject less contemporaneous financial statements when usable more contemporaneous statements are available."  I&D Memorandum accompanying *Wooden Bedroom Furniture From China*, 79 Fed. Reg. 51,954 (Dep't Commerce Sept. 2, 2014) at 29.

In this case, however, Commerce declined to follow that practice.  Mustek's financials covered July 2012 – June 2013, *see* Trina's Surrogate Submission at Exhibit 10, while the POI covered April 2013 – September 2013.  Thus, Mustek's financial statements included data from nine months that were not part of the POI (July 2012 – March 2013), and failed to include data for three of the six months in the POI (July 2013 – September 2013).  By contrast, the financials of Hana and KCE – producers of comparable merchandise – covered calendar year 2013 and thus the entire POI.  SolarWorld May Surrogate Submission at Exhibit 11; SolarWorld June Surrogate Submission at Exhibit 12.  Thus, Mustek's financials were also inferior to Hana's and KCE's in terms of contemporaneity.

        c.      <u>Unlike Other Financials on the Record, Mustek's Financials
Lacked the Requisite Specificity to Serve as the Surrogate
Financial Ratios</u>

Third, Mustek's financial statements lacked the necessary specificity for Commerce to reasonably rely upon them as a surrogate value. Namely, the financials did not contain separate line items for SG&A expenses – one of the three most critically important elements of surrogate financial ratios. Rather, Mustek's financials included a line item for "distribution, administrative, and other operating expenses." Trina's Surrogate Submission at Exhibit 10, p. 1. There was no record evidence to demonstrate that these "distribution, administrative, and other operating expenses" were equivalent to the SG&A expenses typically measured by Commerce. As SolarWorld noted, "the term 'distribution' could equally refer to selling expenses or to overhead expenses. The term 'other operating expenses' could also refer to selling expenses, to direct operating costs, or to overhead expenses." SolarWorld Case Brief at 43. With those items grouped together in one category, it was impossible to assess what types of expenses were included in the line item.

In response, Commerce stated only that: "{t}he term 'distribution' is used elsewhere in the Mustek financial statement in conjunction with customer service and support of resellers, and thus is a selling expense," citing two pages of Mustek's financials. I&D Memo at 37. A handful of references made by Mustek to its "distribution network" does not demonstrate what the company included in its "distribution, administrative, and other operating expenses." Commerce further stated that "'{o}perating expenses,' particularly in the context of this line item, refers to non-manufacturing expenses not directly related to production." *Id.* Commerce cited nothing to support this assertion, and did not otherwise refer to any evidence to explain this interpretation of Mustek's use of the term "operating expenses." *See id.* As such, it was entirely unclear what was included in the "distribution, administrative, and other operating expenses" line

item.  Mustek's financials thus lack the specificity needed to serve as the basis for surrogate

financial ratios, and Commerce's reliance on them was inappropriate.

Commerce's disregard of the lack of specificity in Mustek's financials was also contrary

to its past practice, as the agency has frequently found that the specificity of the data in financial

statements, including presence of specific line items for SG&A expenses, is critically important

in selecting the best information available to serve as surrogate financial ratios.  For example, in

a recent administrative review of *Chlorinated Isocyanurates From China*, "Commerce

determined that the... financial statement of {a particular company} constituted the best

available information to calculate financial ratios, because it was the only financial statement on

the record that included specific line items for SG&A expenses." *Juancheng Kangtai Chem. Co.

v. United States*, 37 IRTD 2011 (CIT 2015) at 10 (affirming Commerce's surrogate financial

ratio selection) (emphasis added).  *See also* I&D Memorandum accompanying *Diamond

Sawblades and Parts Thereof From China*, 80 Fed. Reg. 32,344 (Dep't Commerce June 8, 2015)

at 51 ("The level of specificity of the line items in Trigger's financial statements and the

deficiencies in other financial statements (e.g., the lack of specificity of the line items in Tyrolit's

financial statements)... makes Trigger's financial statements, which are contemporaneous with

the {period of review}, the only suitable financial statements available... to calculate the

financial ratios"); I&D Memorandum accompanying *Chlorinated Isocyanurates From China*, 80

Fed. Reg. 4,539 (Dep't Commerce Jan. 28, 2015) at 12; I&D Memorandum accompanying

*Certain Stilbenic Optical Brightening Agents From China*, 77 Fed. Reg. 17,436 (Dep't

Commerce Mar. 26, 2012) at 9 (rejecting six out of seven financials on the record because they

did "not contain the details required to calculate surrogate overhead and/or SG&A ratios").

Despite the long-recognized importance of financial statements' specificity and detail to the

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 27 of 47

Consol. Ct. No. 15-00080                              NON-CONFIDENTIAL VERSION

"best available information" analysis, here, Commerce disregarded the lack of specificity in Mustek's financials and improperly decided to rely upon them alone as the source of surrogate financial ratios.

### 3.   Commerce's Disregard of More Representative Financial Statements Due Solely to Evidence of Countervailable Subsidies Was Improper

As Mustek's financial statements did not reflect production operations similar to the respondents, were not contemporaneous with the POI, and lacked specificity with regard to SG&A expenses, Commerce's sole apparent reason for relying on Mustek's financials was its finding that the other statements reflected countervailable subsidies (under a program that Commerce had only recently found to be *per se* countervailable). *See* I&D Memo at 35-36. But Commerce's "practice is not to rely on financial statements where there is evidence that the company received countervailable subsidies <u>and there is other, more reliable and representative data on the record</u> for purposes of calculating the surrogate financial ratios." I&D Memorandum accompanying *Chlorinated Isocyanurates From China*, 79 Fed. Reg. 4,875 (Dep't Commerce Jan. 30, 2014) at Comment 1 (emphasis added). *See also Solar I* I&D Memo at 12. In other words, evidence in a financial statement suggesting the receipt of countervailable subsidies is not an absolute bar to usage of that statement as the source of surrogate financial ratios. Rather, when the remaining financials on the record are otherwise inappropriate, Commerce has relied upon financials with evidence of countervailable subsidies as the surrogate financial ratio source. *See, e.g.*, I&D Memorandum accompanying *Xanthan Gum From China*, 78 Fed. Reg. 33,350 (Dep't Commerce June 4, 2013) at Comment 2. *See also Dupont Teijin Films v. United States*, 896 F.Supp.2d 1302, 1310-11, 37 CIT __, __ (2013) ("Commerce could have reasonably concluded that {a financial statement showing evidence of countervailable subsidies} would be

the best available information if the other financial statements on the record were even more distorted").

However, in this case, Commerce disregarded the distortions in Mustek's financial statements and relied on them alone, solely because the Thai financial statements on the record showed some evidence of countervailable subsidies.[3]   It was unreasonable for Commerce to decide that Mustek's financials were the "best available information" to measure respondents' financial ratios, rather than the contemporaneous and specific financials of comparable producers Hana and KCE or, at least, a combination of all three statements.   This resulted in the application of inappropriately low overhead, SG&A and profit rates in respondents' margin calculations, contrary to Commerce's obligation to assign dumping margins as accurately as possible. *Longkou Haimeng Mach. Co.*, 33 CIT at 613; *Rhone Poulenc v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

**B.   Commerce's Selection of Surrogate Values for Other Inputs Was Unsupported by Substantial Evidence and Unlawful**

**1.   Aluminum Frames**

As noted above,  in valuing FOPs, Commerce must use the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate."   19 U.S.C.  § 1677b(c)(1).   Commerce's practice is "to select, to the extent practicable, surrogate values which are publicly available, product-specific, representative of a broad market average, tax-exclusive, and contemporaneous with the POI."   Memorandum from

---

[3]   While Commerce does not explicitly rely on the fact that Mustek was located in South Africa, the primary surrogate country, as a reason to rely exclusively on its financials, such reasoning, to the extent it occurred, would also have been unreasonable.   "Commerce's preference for valuing all FOPs from a single surrogate country 'to the extent possible' has not been held unreasonable, but 'to the extent possible' must still yield to reason and the sourcing of particular surrogate values from outside the primary surrogate country if the record so compels." *Juancheng Kangtai.*, 37 IRTD at 23.

Jeff Pedersen, Through Howard Smith, to The File, re: *Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Factor Valuation Memorandum* (July 24, 2014), PR 704 ("Prelim Surrogate Value Memo") at 2. While the agency enjoys discretion in selecting surrogate values, *see, e.g.*, *Goldlink Indus. Co. v. United States*, 30 CIT 616, 619 (2006), its decision must be reasonable given the record as a whole and it must articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choices made." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Commerce's decision to value respondents' aluminum frames for solar modules using HTS heading 7604, rather than HTS heading 7616, was unreasonable and unlawful.[4]

First, Commerce's decision failed to give appropriate weight to extraordinarily relevant record evidence – namely, U.S. Customs and Border Protection ("CBP") rulings. CBP examines goods that are entered into the United States and is charged with identifying the proper classification of goods based upon their physical form and use, as it has done with regard to aluminum frames for solar panels. *See* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Petitioner's Pre-Preliminary Determination Comments* (July 7, 2014), PR 658/CR 627 ("SolarWorld Pre-Prelim Comments") at 25. In 2011, CBP issued Ruling N139353 in response to a request from a Chinese solar producer, concluding that "{t}he applicable subheading for the aluminum frames for solar panels" is 7616.99.5090. SolarWorld Surrogate Value Comments at Exhibit 4. Two years later, CBP issued Ruling N238208, classifying an aluminum frame set that

---

[4]     SolarWorld acknowledges that the Court affirmed Commerce's valuation of aluminum frames for solar modules with HTS heading 7604 in the *Solar I* proceeding. *See Jiangsu Jiasheng Photovoltaic Tech. Co., Ltd. v. United States*, 28 F.Supp.3d 1317 (CIT 2014). However, especially given the different facts and evidence on the record of this investigation, SolarWorld continues to believe that Commerce's use of HTS heading 7604 was unsupported by substantial evidence and unlawful.

was a finished product and ready for use in the production of solar modules under HTS number 8541.90.0000.[5]   SolarWorld June Surrogate Submission at Exhibit 14.   Thus, CBP twice concluded that HTS heading 7604 was inappropriate for classification of the identical product at issue here – aluminum frames for solar modules – and that an HTS heading reflecting a more sophisticated product was required.

SolarWorld acknowledges that "{t}he fact that Commerce has at times found support for its surrogate value choices in Customs classification rulings does not lead to the conclusion that Commerce must follow such rulings in every case." *Jiangsu Jiasheng*, 28 F.Supp.3d at 1336. But in this particular instance, the CBP rulings at issue are directly on point, telling the agency how the exact products in question are in fact classified upon export.   It is difficult to imagine any more relevant and conclusive piece of evidence.   While Commerce may not be required to follow CBP rulings in every case, Commerce is required to use the "best available information." *See* 19 U.S.C. § 1677b(c)(1).   Given the uniquely dispositive nature of the CBP rulings on the record, Commerce erred in not relying on them.

Second, Commerce did not appropriately consider evidence detracting from its conclusion, including numerous CBP rulings classifying unfinished aluminum articles under HTS heading 7604.   *See* SolarWorld June Surrogate Submission at Exhibit 14.   While HTS heading 7604 may not explicitly specify whether it contains "finished or unfinished aluminum profiles," *see Jiangsu Jiasheng*, 28 F.Supp.3d at 1337; I&D Memo at 49, the only relevant record evidence indicated that the HTS heading refers to unfinished articles.   While SolarWorld provided significant evidence showing that unfinished articles are classified under 7604, there

---

[5]      As this ruling was issued in February 2013, it was not on the record of the investigation considered by the Court in *Jiangsu Jiasheng*.

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 31 of 47

Consol. Ct. No. 15-00080                    NON-CONFIDENTIAL VERSION

was <u>no</u> record evidence to indicate that any finished articles, such as aluminum frames for solar panels, are classified under this HTS number.

Given this evidence demonstrating that HTS heading 7604 is specific to <u>unfinished</u> articles, Commerce's conclusion that "Petitioner's assertion that respondents' aluminum frames are finished articles is not relevant to our decision" was unreasonable.   I&D Memo at 49. Commerce should have evaluated the substantial evidence showing that the respondents' aluminum frames were finished articles, which demonstrated that classification of the finished frames under HTS heading 7604, for unfinished articles, was improper.   *See* SolarWorld Surrogate Value Comments at Exhibit 4 (noting CBP's finding that "{t}here is no further processing to the aluminum frames. They are just snapped together"); SolarWorld Pre-Prelim Comments at 24-26.

Commerce's own factual findings further confirmed the other record evidence regarding the finished nature of respondents' aluminum frames.   Specifically, the respondents did not report using corner keys for their aluminum frames, and Commerce found that photographs of Trina's frames did not show any such corner keys.   *See* I&D Memo at 50.   To the extent that the respondents' aluminum frames actually functioned without corner keys, this further demonstrates the extent of the further processing and finishing that the frames had already undergone, leaving them as fully ready-to-use, finished articles – far more processed than the aluminum "profiles" classified under HTS heading 7604.   Commerce's finding that the finished nature of the aluminum frames was irrelevant to its decision, and its failure to consider the substantial evidence on this point, was unreasonable and unlawful.

Third, Commerce reached an unreasonable conclusion that respondents' aluminum frames were "profiles" covered under HTS heading 7604.   As SolarWorld argued, respondents'

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 32 of 47

Consol. Ct. No. 15-00080                              NON-CONFIDENTIAL VERSION

aluminum frames did not meet the definition of the heading's aluminum "profiles." *See* I&D Memo at 47.   Indeed, the explanatory notes to Chapter 76 define "profiles," such as the profiles included under 7604, as "rolled, extruded, drawn, forged or formed products, coiled or not, of a uniform cross section along their whole length." SolarWorld's Surrogate Value Comments at Exhibit 4 (emphasis added).   Aluminum frames for solar modules are <u>not</u> of a uniform cross section along their whole length.   *See, e.g.*, *id.*   Commerce essentially ignored this key fact, stating that "{j}ust because certain aluminum frames purchased by respondents contain corners, we do not believe this would necessarily change their classification as aluminum profiles." I&D Memo at 49.   This is speculation, and it is incorrect.   The definition in the HTS itself clearly requires "profiles" to have a uniform cross section, rendering Commerce's unsupported "belief" to the contrary unreasonable.

In sum, Commerce's valuation of aluminum frames using HTS heading 7604 failed to rely on the "best available information" on the record.   Commerce also failed to evaluate relevant evidence and based its determination on mistaken and unreasonable factual conclusions, rendering its determination unsupported by substantial evidence and unlawful.

## 2.    Scrap Solar Cells

Commerce erred by valuing scrap solar cells for which respondents claimed an offset with a surrogate value for battery cells, with the effect of significantly overvaluing the scrap cells.   As noted above, in making its surrogate value selection, Commerce is required to select "the best available information regarding the values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1).   Here, however, no reasonable mind could conclude that Commerce chose the best available information to value scrap solar cells. *See, e.g.*, *Dorbest Ltd. v. United States*, 30 CIT 1671, 1676-77 (2006).

In the underlying investigation, Commerce inexplicably valued respondents' scrap solar cells using HTS subheading 8548.10, I&D Memo at Comment 10, which includes "waste and scrap of primary cells, primary batteries and accumulators; spent primary cells, and spent primary batteries." *See* SolarWorld Case Brief at 45.   Indeed, the entire HTS heading 8548 reflects <u>batteries</u> and <u>battery</u> parts, including battery "cells." *See* HTS, attached at **Exhibit 1** (referring to "{w}aste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries; electrical parts of machinery or apparatus, not specified or included elsewhere in this chapter").

Subheadings under HTS 8548 contain further breakouts for, *e.g.*, "{s}pent primary cells, spent primary batteries and spent electric storage batteries {f}or recovery of lead," including "{l}ead-acid storage batteries, of a kind used for starting engines." *Id.*   The notes to the HTS further clarify that 8548 is specific to batteries, stating that "{f}or the purposes of heading 8548, 'spent primary cells, spent primary batteries and spent electric storage batteries' are those which are neither usable as such because of breakage, cutting up, wear or other reasons, nor capable of being recharged." *Id.*

Simply put, HTS heading 8548 has nothing at all to do with photovoltaic products, including scrap solar cells. *See* SolarWorld Case Brief at 45.   Of course, batteries are produced using a significantly different manufacturing process with completely different raw material inputs than are solar cells.   Commerce's reliance on this HTS category to value scrap solar cells was, therefore, wholly inappropriate.   "{A} surrogate value must be as representative of the production process in the NME country as is practicable, if it is to achieve the statutory objective of assigning dumping margins as accurately as possible." *Longkou Haimeng Mach. Co.*, 33 CIT at 613.   Utilizing an HTS subheading for spent battery cells to value scrap solar cells for which

Case 1:15-cv-00080-CRK    Document 42    Filed 03/21/16    Page 34 of 47

Consol. Ct. No. 15-00080                    NON-CONFIDENTIAL VERSION

the respondents claimed an offset is by no means "as representative of the {subject} production process… as is practicable." *Id.*

SolarWorld proposed a surrogate value which was significantly more representative of the scrap product in question – HTS subheading 2804.69, specific to polysilicon of less than 99.99 percent purity. *See* SolarWorld June Surrogate Submission at Exhibit 4; SolarWorld Case Brief at 45-46. In rejecting SolarWorld's proposed surrogate value, Commerce characterized SolarWorld's assertion that scrap solar cells would not be contained under HTS heading 8548 as "unsupported," noting that SolarWorld had not provided "evidence" to show that the heading would not include scrap solar cells. I&D Memo at 51. Yet the fact that HTS heading 8548 would not include scrap solar cells is abundantly clear from the plain language of the HTS itself. As described above, HTS heading 8548 is specific to <u>batteries</u>. Any reasonable reading of the HTS language provides sufficient "evidence or basis for finding that imports under HTS subheading 8548.10 would not include scrap solar cells." *Id.* at 51.

Indeed, Commerce's only support for its use of 8548.10 is that the agency was "trying to value scrapped solar cells and subheading 8548.10 contains only scrapped materials, including scrapped cells." *Id.* The inclusion of the word "cell" in the subheading description is an insufficient basis for choosing it to value scrapped solar cells. The word "cell" has a wide variety of meanings, and Commerce was unable to explain why the "cells" referenced in HTS subheading 8548.10 were at all relevant to solar cells in particular.

Commerce's reasons for rejecting SolarWorld's proposed HTS subheading to value scrap solar cells were similarly unpersuasive. In rejecting subheading 2804.69, for polysilicon of less than 99.99 percent purity, Commerce concluded, somehow, "that the description of the HTS category for primary cells (HTS subheading 8548.10) is more similar to solar cells than the HTS

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 35 of 47

Consol. Ct. No. 15-00080                            NON-CONFIDENTIAL VERSION

category for polysilicon (HTS subheading 2804.69), which is only specific to one raw material contained in the solar cell – polysilicon – and is also not specific to scrap materials." *Id.* This conclusion was unreasonable.

First, the fact that HTS subheading 2804.69 captures polysilicon of <u>less than 99.99 percent purity</u> accounts for the "scrap" nature of the scrap solar cells, as polysilicon, when initially introduced into solar production, must be of "ultra-high" (greater than 99.99 percent) purity. *See, e.g.*, Petition at 13; *Certain Crystalline Silicon Photovoltaic Products from China and Taiwan*, Inv. Nos. 701-TA-511 and 731-TA-1246-1247 (Final), USITC Pub. 4519 (Feb. 2015), P.R. 844 at I-26. Moreover, Commerce ignored that polysilicon is not just "one raw material" in solar cells – it is by far the predominant raw material in solar cells, and the raw material that is reclaimed when solar cells are scrapped. *See, e.g.*, Petition, Vol. I at 11-15, 56, 58-59, Exhibits I-1B, I-1P and I-8. Thus, Commerce rejected HTS subheading 2804.69 because it was only specific to <u>one</u> (*i.e.*, the primary) raw material contained in a solar cell. Yet it utilized HTS subheading 8548.10, referencing no evidence that products under 8548.10 had <u>any</u> raw material whatsoever in common with solar cells. *See Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 1352 (2004) (Commerce's determination was not supported by substantial evidence when "Commerce summarily discarded the alternatives as flawed but did not evaluate the reliability of its own choice").

As such, HTS subheading 8548.10 was not the "best available information" on the record with which to value scrap solar cells, and Commerce's use of it was unreasonable, unsupported by substantial evidence and unlawful.

**NON-CONFIDENTIAL VERSION**

### C.   Commerce's Failure to Apply Facts Available to Calculate Trina's Unreported Quality Insurance Expenses Was Unreasonable and Unlawful

Despite respondent Trina's failure to timely report key information regarding its quality insurance expenses and its failure to provide full information on such expenses even at verification, Commerce refused to apply facts available to calculate the indirect selling expenses, determining instead to accept unreliable new factual information provided for the first time at verification, which was, in fact, created only for the purposes of verification.

At its U.S. verification, Trina revealed for the first time that it had purchased quality insurance during the POI, [

]. Memorandum to The File, Through Howard Smith, from Jeff Pedersen and Patrick O'Connor, re: *Verification of Trina Solar (U.S.) Inc. in the Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China* (Sept. 26, 2014), PR 759/CR 952 ("Trina CEP Verification Report") at 2, 24.   Trina officials noted as a "minor correction" that the company had failed to include these expenses in reporting its indirect selling expenses. *Id.*; [


]. Trina then reported the pro-rated portion of its quality insurance expenses relating to the period from [

].

Trina CEP Verification Report at 2, 24; Trina CEP Verification Exhibits at Exhibit 1.   Only this portion of quality insurance expenses was reported by Trina as a minor correction prior to verification. *See* Trina CEP Verification Exhibits at Exhibits 1 and 15.   As supporting

Business Proprietary Information
Has Been Deleted

documentation, Trina provided [                     Business Proprietary Information
                                                    Has Been Deleted

]. *Id.* at Exhibit 15.

When Commerce verifiers noticed that the costs incurred by Trina U.S. for this warranty

insurance was only related to the [                    ], they "questioned company officials regarding

whether Trina U.S. had a similar type of insurance coverage for the first part of the POI."  Trina

CEP Verification Report at 24.   Only then did the Trina officials reveal that [

]. *Id.*  Trina

officials claimed that the monthly cost of the [

]. *Id.*  Thus, as SolarWorld noted in its case brief, although

the [

], *see* Trina CEP Verification Exhibits at

Exhibit 15, p. 7, Trina claimed that [

]. *See*

SolarWorld Case Brief at 16.   As supporting documentation for this [

], Trina provided [

]. Trina CEP Verification Exhibits at Exhibit 15, p. 11.   In other words,

Trina failed to provide [

]. *See id.* at Exhibit 15; SolarWorld Case Brief at 17.

Due to these glaring failures by Trina and discrepancies on the record, Commerce erred

in finding that there was "no reason to resort to facts available" and accepting Trina's proffered

monthly quality insurance expenses for [                    ] to calculate

Trina's indirect selling expenses.  *See* I&D Memo at 53; Memorandum to The File, Through

27

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 38 of 47

Consol. Ct. No. 15-00080                          NON-CONFIDENTIAL VERSION

Howard Smith, from Jeff Pedersen, re: *Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Final Analysis Memorandum for Changzhou Trina Solar Energy Co., Ltd.* (Dec. 15, 2014), PR 822/CR 982-983 at 5. Rather, as SolarWorld argued, Commerce was required to apply facts available to calculate the [                                                    ], such as the [                                                    ], which were at least reported as a minor correction prior to verification and were accompanied by supporting documentation (*i.e.*, the insurance policy). *See* SolarWorld Case Brief at 15-17.

According to the statute, Commerce shall use facts otherwise available if a party: (i) withholds requested information, (ii) fails to provide such information by the appropriate deadlines or in the form and manner requested, (iii) significantly impedes a proceeding; or (iv) provides the requested information, but the information is incapable of being verified.  19 U.S.C. § 1677e(a)(2).  As Commerce acknowledged, all quality insurance expenses were required to be included in Trina's indirect selling expenses adjustment and thus were required to be reported by the respondent in its questionnaire responses.  *See* I&D Memo at 53; 19 C.F.R. § 351.402(b). Yet Trina withheld this information, "failed to provide {it} by the appropriate deadline{}," in so doing "impede{d} a proceeding" and, finally, when specifically asked by Commerce at verification, "provide{d} the requested information," but with supporting documentation that was "incapable of being verified." *See* 19 U.S.C. § 1677e(a)(2).  As such, Commerce was required to apply facts otherwise available, and its finding that there was "no reason to resort to facts available" was unreasonable and contrary to the statute.

In addition, Commerce's determination to accept the quality insurance premium amounts provided by Trina for the first time only when specifically asked at verification was contrary to

Business Proprietary Information
Has Been Deleted

its established practice of not accepting new factual information at verification. As Commerce's own regulations explain, the purpose of verification is to "verify the accuracy and completeness of submitted factual information." 19 C.F.R. § 351.307(d). *See also, e.g., Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China*, 75 Fed. Reg. 57,449, 57,452 (Dep't Commerce Sept. 21, 2010); I&D Memorandum accompanying *Certain New Pneumatic Off-the-Road Tires From China*, 80 Fed. Reg. 20,197 (Dep't Commerce Apr. 15, 2015) at 33 (Commerce "has previously declined to accept unreported sales information identified at verification and instead relied upon FA or AFA as appropriate"). The Court has repeatedly upheld Commerce's policy of refusing to accept new information submitted for the first time at verification. *See, e.g., Chia Far Indus. Factory Co. v. United States*, 28 CIT 1337, 1344 (2004) ("Commerce made clear that 'verification is not intended to be an opportunity for submitting new factual information'… This instruction is customary and consistent with Commerce's usual practice") (internal citation omitted); *Max Fortune Indus. Co. v. United States*, 35 Int'l Trade Rep. (BNA) 1384 (CIT 2013).

Indeed, even in its verification agenda, Commerce explained that "verification is not intended to be an opportunity for submission of new factual information. New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or, (3) the information corroborates, supports, or clarifies information already on the record." Letter to Changzhou Trina Solar Energy Co., Ltd., re: *Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: U.S. Verification Agenda* (July 31, 2014), PR 726 at 2. Trina's quality insurance premiums for [

] do not fall into any of these three categories. Thus, Commerce's acceptance and

Business Proprietary Information Has Been Deleted

use of the information was contrary to its established practice, without adequate explanation. *See Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209 (1988); *Shanghai Foreign Trade Enters.*, 28 CIT at 488.

### D. Commerce's Determination to Offset Respondents' AD Cash Deposit Rates to Account for Export Subsidies Calculated in the CVD Investigation Based on Adverse Facts Available Was Unreasonable and Unlawful

Commerce's determination to offset respondents' AD cash deposit rates to account for export subsidies calculated based on AFA in the companion CVD investigation was unreasonable and inconsistent with law, as it had the result of neutralizing the effect of the adverse inferences.

In an administrative review, the statute requires Commerce to offset AD cash deposit rates by the *ad valorem* rate of any export subsidies calculated in a concurrent CVD review. 19 U.S.C. § 1677a(c)(1)(C). Commerce is not required to do so in an original investigation. *See* I&D Memo at 39 ("Congress in the statute is silent as to the application of subsidy offsets during an investigation"). Although the statute's silence gives the agency a certain amount of discretion to interpret the law, *see, e.g., SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001), Commerce's discretion is not unfettered. Commerce is still required to act reasonably and in a manner that is otherwise consistent with law. *See, e.g., MacLean-Fogg Co.*, 100 F. Supp. at 1355-1356 (CIT 2015) ("Commerce's discretion is bounded at the outer limits by the obligation to carry out its statutory duty of determining dumping margins as accurately as possible") (internal quotations omitted). In this case, Commerce erred in offsetting respondents' AD cash deposit rates for export subsidies calculated in the companion CVD investigation, when those subsidy calculations were based on AFA, as the offset had the unreasonable effect of neutralizing the AFA applied in the CVD case.

Commerce has explained "that in parallel AD and CVD investigations, if {Commerce} finds that a respondent received the benefits of an export subsidy program, it is presumed the subsidy contributed to lower-priced sales of subject merchandise in the United States market." I&D Memo at 38. The offset is designed to prevent the "double application" of duties when the subsidies and dumping are related. *Id. See also Dupont Teijin Films USA, LP v. United States*, 27 CIT 962, 964 (CIT 2003).

This basic economic theory does not hold when the relevant export subsidy rates were calculated based on AFA, such as the rate for the EX-IM Buyer's Credit program, an export subsidy program in the companion CVD investigation to the instant case. *See* I&D Memorandum accompanying *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, 79 Fed. Reg. 76,962 (Dep't Commerce December 23, 2014) (final affirmative countervailing duty deter.) at 10-11, 91-94. Due to a failure to cooperate, Commerce applied AFA and found that the respondents benefited from the program at the rate of 10.54 percent, the highest rate determined for a similar program in a prior China proceeding. *Id.* However, Commerce then increased the respondents' U.S. prices by the amount of the export subsidy cash deposit rate, noting simply that it "adheres to this practice regardless of whether the export subsidy rate is based on AFA." *See* I&D Memo at 39.

Commerce's determination to apply the export subsidy offset undercut the purpose of the AFA statute in general, and the purpose of applying AFA to the EX-IM Buyer's Credit program in this case. It is well recognized that the purpose of applying an adverse inference in the face of non-cooperation is to provide respondents with an incentive to participate in investigations. *See, e.g., Gallant Ocean (Thailand) Co. Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010). Because the accuracy and effectiveness of Commerce's investigations rely on voluntary

Case 1:15-cv-00080-CRK   Document 42   Filed 03/21/16   Page 42 of 47

Consol. Ct. No. 15-00080                                NON-CONFIDENTIAL VERSION

cooperation, the use of AFA is perhaps the only effective means of obtaining true and accurate information in trade proceedings, which is necessary for the agency to calculate dumping margins as accurately as possible. *See Rhone Poulenc*, 899 F.2d at 1191. Thus, the duty impact must be sufficiently adverse to "induce respondents to provide the {agency} with complete and accurate information in a timely manner." *See Gallant Ocean*, 602 F.3d at 1323; *Floor-Standing, Metal-Top Ironing Tables and Certain Parts Thereof From China*, 77 Fed. Reg. 27,425, 27,426 (Dep't Commerce May 10, 2012). Thus, an AFA rate must include a "built-in increase intended as a deterrent to non-compliance." *F.lli De Cecco Di Filippo v. U.S.*, 216 F.3d 1027, 1032 (Fed. Cir. 2000).

In this case, because Commerce offset the AD cash deposit rate by the amount of the export subsidy cash deposit rate that was calculated based on total AFA, there was, in effect, no adverse effect on the respondents. Commerce responded to SolarWorld's argument on this point that the offset would "not have the effect of neutralizing the adverse inference applied to the respondents," but would only "ensure{} that the adverse inference used to calculate the export subsidy rate is applied to the respondents only once (*i.e.*, as a CVD and not through potentially higher AD duties)." I&D Memo at 39. The agency is wrong. By adjusting the AD cash deposit rate by the AFA export subsidy rate, while one duty rate (the CVD rate) was increased by the AFA, the other duty rate (the AD rate) was simultaneously decreased, neutralizing the effect of the adverse inference on the respondents' overall AD/CVD margins.

As a result of Commerce's determination to apply the export subsidy offset in this case, the application of AFA failed to provide the intended incentive for cooperation and failed to ensure that the respondents did not achieve a more favorable result from their failure to

cooperate than they would have if they cooperated fully.  As such, Commerce's determination was unreasonable and contrary to law.

## VI.    <u>CONCLUSION</u>

SolarWorld respectfully requests that the Court find that the portions of Commerce's final determination described above are unsupported by substantial evidence and inconsistent with law and should be remanded for redetermination consistent with the Court's opinion.

Respectfully submitted,

Timothy C. Brightbill, Esq.
Laura El-Sabaawi, Esq.

**WILEY REIN LLP**

1776 K Street, NW
Washington, DC 20006
(202) 719-7000

March 21, 2016                          *Counsel to SolarWorld Americas, Inc.*

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for SolarWorld's Brief in Support of Its Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2010), is 9,987 words.

(Signature of Attorney)

Timothy C. Brightbill
(Name of Attorney)

SolarWorld Americas, Inc.
(Representative Of)

March 18, 2016
(Date)

# EXHIBIT 1

**(Excerpts of the Harmonized Tariff
Schedule of the United States)**

## Harmonized Tariff Schedule of the United States (2016)
Annotated for Statistical Reporting Purposes

Notes (con.)

7.  Heading 8537 does not include cordless infrared devices for the remote control of television receivers or other electrical equipment (heading 8543).

8.  For the purposes of headings 8541 and 8542:

    (a)  "Diodes, transistors and similar semiconductor devices" are semiconductor devices the operation of which depends on variations in resistivity on the application of an electric field;

    (b)  "Electronic integrated circuits" are:

        (i)  Monolithic integrated circuits in which the circuit elements (diodes, transistors, resistors, capacitors, inductances, etc.) are created in the mass (essentially) and on the surface of a semiconductor or compound semiconductor material (for example, doped silicon, gallium arsenide, silicon germanium, iridium phosphide) and are inseparably associated;

        (ii)  Hybrid integrated circuits in which passive elements (resistors, capacitors, inductances, etc.), obtained by thin- or thick-film technology, and active elements (diodes, transistors, monolithic integrated circuits, etc.), obtained by semiconductor technology, are combined to all intents and purposes indivisibly, by interconnections of interconnecting cables, on a single insulating substrate (glass, ceramic, etc.). These circuits may also include discrete components;

        (iii)  Multichip integrated circuits consisting of two or more interconnected monolithic integrated circuits combined to all intents and purposes indivisibly, whether or not on one or more insulating substrates, with or without leadframes, but with no other active or passive circuit elements.

    For the classification of the articles defined in this note, headings 8541 and 8542 shall take precedence over any other heading in the Nomenclature, except in the case of heading 8523, which might cover them by reference to, in particular, their function.

9.  For the purposes of heading 8548, "spent primary cells, spent primary batteries and spent electric storage batteries" are those which are neither usable as such because of breakage, cutting up, wear or other reasons, nor capable of being recharged.

Subheading Note

1.  Subheading 8527.12 covers only cassette players with built-in amplifier, without built-in loudspeaker, capable of operating without an external source of electric power and the dimensions of which do not exceed 170 mm x 100 mm x 45 mm.

Additional U.S. Notes

1.  For the purposes of headings 8501 and 8503, 746 watts (W) is taken to be equivalent to 1 horsepower (hp).

2.  For the purposes of subheading 8516.72, the term "toasters" includes toaster-ovens which are designed essentially for toasting bread but can also bake small items, such as potatoes.

3.  For the purposes of headings 8517 and 8525 the term "transceivers" refers to combinations of radio transmitting and receiving equipment in a common housing, employing common circuit components for both transmitting and receiving, and which are not capable of simultaneously receiving and transmitting.

4.  For the purposes of 8529.90.03, 8529.90.06, 8529.90.33, 8529.90.36, 8529.90.43, 8529.90.46, 8529.90.88 and 8529.90.89:

    (a)  Each subassembly that contains as a component, or is covered in the same entry with, one or more of the following television components, viz.,

        tuner, channel selector assembly, antenna, deflection yoke, degaussing coil, picture tube mounting bracket, grounding assembly, parts necessary for fixing the picture tube or tuner in place, consumer-operated controls or speaker,

        shall be classified in subheading 8529.90.03, 8529.90.33, 8529.90.43 or 8529.90.88, as appropriate; and

    (b)  Each subassembly shall be counted as a single unit, except that two or more different printed circuit boards or ceramic substrates covered by the same entry and designed for assembly into the same television models shall be counted as one unit.

5.  Picture tubes imported in combination with, or incorporated into, other articles are to be classified in subheadings 8540.11 through 8540.12, inclusive, unless they are--

    (a)  incorporated into complete television receivers, as defined in additional U.S. note 6 below;

    (b)  incorporated into fully assembled units such as word processors, ADP terminals, or similar articles;

# Harmonized Tariff Schedule of the United States (2016)
Annotated for Statistical Reporting Purposes

XVI
85-87

| Heading/ Subheading | Stat. Suf- fix | Article Description | Unit of Quantity | Rates of Duty | | |
|---|---|---|---|---|---|---|
| | | | | General | Special | 2 |
| 8547 | | Insulating fittings for electrical machines, appliances or equipment, being fittings wholly of insulating material apart from any minor components of metal (for example, threaded sockets) incorporated during molding solely for the purposes of assembly, other than insulators of heading 8546; electrical conduit tubing and joints therefor, of base metal lined with insulating material: | | | | |
| 8547.10 | | Insulating fittings of ceramics: | | | | |
| 8547.10.40 | 00 | Ceramic insulators to be used in the production of spark plugs for natural gas-fueled, stationary, internal combustion engines............................ | No............ | 3% | Free (A, AU, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| 8547.10.80 | 00 | Other.................................. | No............ | 3% | Free (A, AU, B, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 60% |
| 8547.20.00 | 00 | Insulating fittings of plastics................. | No............ | Free | | 30% |
| 8547.90.00 | | Other.................................. | ............... | 4.6% | Free (A, AU, B, BH, CA, CL, CO, E, IL, JO, KR, MA, MX, OM, P, PA, PE, SG) | 45% |
| | 10 | Other insulating fittings................ | No. | | | |
| | | Electrical conduit tubing and joints therefor, of base metal lined with insulating material: | | | | |
| | 20 | Conduit tubing................. | kg | | | |
| | | Joints: | | | | |
| | 30 | Threaded.................. | kg | | | |
| | 40 | Other...................... | kg | | | |
| 8548 | | Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries; electrical parts of machinery or apparatus, not specified or included elsewhere in this chapter: | | | | |
| 8548.10 | | Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary batteries and spent electric storage batteries: | | | | |
| | | Spent primary cells, spent primary batteries and spent electric storage batteries: | | | | |
| 8548.10.05 | | For recovery of lead................ | ............... | Free | | 11.5% |
| | 40 | Lead-acid storage batteries, of a kind used for starting engines............... | No. kg | | | |
| | 80 | Other........................ | No. kg | | | |
| 8548.10.15 | 00 | Other.......................... | kg............ | Free | | Free |
| | | Other: | | | | |
| 8548.10.25 | 00 | For recovery of lead................ | No............ kg | Free | | 11.5% |
| 8548.10.35 | 00 | Other.......................... | kg............ | Free | | Free |
| 8548.90.01 | 00 | Other.............................. | X............ | Free | | 35% |