Slip Op. 17-62

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **JINKO SOLAR CO., LTD. ET AL,** | |
| **Plaintiffs and Consolidated Plaintiff,** | |
| **and** | |
| **YINGLI GREEN ENERGY AMERICAS, INC. ET AL.,** | |
| **Plaintiff-Intervenors,** | **Before: Claire R. Kelly, Judge** |
| **v.** | **Consol. Court No. 15-00080** |
| **UNITED STATES,** | **PUBLIC VERSION** |
| **Defendant,** | |
| **and** | |
| **SOLARWORLD AMERICAS, INC. ET AL.,** | |
| **Defendant-Intervenors and Consolidated Defendant-Intervenors.** | |

## OPINION AND ORDER

[Sustaining in part and remanding in part the Department of Commerce's final determination in its antidumping investigation of certain solar panels from the People's Republic of China.]

Dated: May 18, 2017

Alexander Hume Schaefer and Hea Jin Koh, Crowell & Moring, LLP, of Washington, DC, for Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import and Export Co., Ltd., and JinkoSolar (U.S.) Inc.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 2 of 44

Consol. Ct. No. 15-00080                                                Page 2
**PUBLIC VERSION**

Timothy C. Brightbill and Laura El-Sabaawi, Wiley Rein, LLP, of Washington, DC, for Consolidated Plaintiff and Defendant-Intervenor SolarWorld Americas, Inc.

Neil R. Ellis, Richard L.A. Weiner, Brenda Ann Jacobs, and Rajib Pal, Sidley Austin, LLP, of Washington, DC, for Plaintiff-Intervenors Yingli Green Energy Americas, Inc., Yingli Green Energy Holding Co., Ltd., and Canadian Solar Inc.

Justin Reinhart Miller, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, and Tara Kathleen Hogan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With them on the brief were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Robert E. Kirschman, Jr., Director, and Reginald T. Blades, Jr., Assistant Director.  Of counsel on the brief was Rebecca Cantu, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

Francis J. Sailer, Andrew Thomas Schutz, Brandon Michael Petelin, and Mark E. Pardo, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Defendant-Intervenors Hanwha Solarone (Qidong) Co., Ltd. and Hanwha Solarone Hong Kong Limited.

Kelly, Judge:  Before the court in this consolidated action are motions for judgment on the agency record arising from the final affirmative determination of the U.S. Department of Commerce ("Commerce") in its antidumping investigation of certain solar panels from the People's Republic of China ("PRC" or "China").  See Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) ("Final Results") and accompanying Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value, Dec. 15, 2014, ECF No. 34-5 ("Final Decision Memo").

Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import and Export Co., Ltd., and JinkoSolar (U.S.) Inc. (collectively "Jinko Solar"), mandatory respondents in this investigation, challenge Commerce's determination to treat Jinko Solar and certain additional companies as a single entity.  See Mem. of Points & Auths. in Supp. of Jinko's Mot. for J. on the Agency R., Mar. 18, 2016, ECF No. 39 ("Jinko Br."); see also Mot. of

Consol. Pl.-Intervenor Canadian Solar Inc. for J. on the Agency R. 2, Mar. 18, 2016,

ECF No. 37 (adopting the arguments presented by Jinko Solar); Mot. of Pl.-Intervenors

Yingli Green Energy Holding Co., Ltd. and Yingli Green Energy Americas, Inc. for J. on

the Agency R. 2, ECF No. 38 (adopting the arguments presented by Jinko Solar).[1]   In

addition, Consolidated Plaintiff SolarWorld Americas, Inc. ("SolarWorld"), the domestic

industry petitioner, challenges Commerce's choices of certain surrogate input and offset

values, the agency's determination to accept a respondent's evidence of quality insurance

expenses, and the agency's decision to offset the respondents' antidumping (or "AD")

cash deposit rate by the amount of estimated countervailing duties assessed for the

subject merchandise in the parallel countervailing duty ("CVD") investigation.  SolarWorld

Br. in Supp. of its Rule 56.2 Mot. for J. on the Agency R., Mar. 21, 2016, ECF No. 41

("SolarWorld Br.").

For the reasons that follow, the court sustains: 1) Commerce's decision to value

respondents' general expenses and profit using Mustek's financial statements; 2)

Commerce's determination that import data for articles covered under subheading 7604,

Harmonized Tariff Schedule ("HTS"), constitutes the best available information for valuing

respondents' aluminum frames; 3) Commerce's determination to accept, for purposes of

adjusting Trina Solar's U.S. prices, the information provided by Trina Solar during

verification related to quality insurance expenses covering the entire period of

investigation ("POI"); and 4) Commerce's determination to offset respondents'

---

[1]  Jinko Solar was an individually-investigated ("mandatory") respondent, while the other respondent Plaintiffs received the "all others" rate. See Final Results, 79 Fed. Reg. at 76,974. Because the "all others" rate was calculated by averaging the dumping margins of the two mandatory respondents, id., a change to Jinko Solar's rate would result in a correlative change to the "all others" rate for the other respondent Plaintiffs, who have adopted Jinko Solar's arguments in this action and present no separate arguments of their own.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 4 of 44

Consol. Ct. No. 15-00080                                                    Page 4
**PUBLIC VERSION**

antidumping duty cash deposit rate by the full amount of an export subsidy calculated based on adverse facts available ("AFA") in the companion countervailing duty investigation.  The court remands to Commerce for reconsideration or further explanation of: 1) the decision to collapse the ReneSola entities with the Jinko entities and treat these companies as a single entity, and 2) the decision to value respondent Changzhou Trina Solar Energy Co., Ltd.'s solar modules by-products using South African import data within subheading 8548.10, HTS.

## BACKGROUND

On January 22, 2014, in response to a petition filed by domestic producer SolarWorld, Commerce initiated an antidumping duty investigation on imports of crystalline silicon photovoltaic cells, whether or not assembled into modules, from China for the period of April 1, 2013 through September 30, 2013.  See Certain Crystalline Silicon Photovoltaic Products From China and Taiwan, 79 Fed. Reg. 4,661 (Jan. 29, 2014) (notice of initiation of AD duty investigation); see Petition for the Imposition of Antidumping and Countervailing Duties Pursuant to Sections 701 and 731 of the Tariff Act of 1930, As Amended, PD 1–10, bar codes 3171232-01–10 (Dec. 31, 2013).

Commerce published the preliminary affirmative determination on July 24, 2014, finding that subject imports were, or were likely to be, sold in the United States at less than fair value.  See Certain Crystalline Silicon Photovoltaic Products From the [PRC]: Affirmative Preliminary Determination of Sales at Less Than Fair Value, 79 Fed. Reg. 44,399 (July 31, 2014) ("Prelim. Results"), and corresponding Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Crystalline Photovoltaic Products from the [PRC] at 1, PD 698, bar code 3217803-01 (July 24, 2014)

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 5 of 44

Consol. Ct. No. 15-00080                                                     Page 5
**PUBLIC VERSION**

("Prelim. Decision Memo").  Commerce selected Changzhou Trina Solar Energy Co., Ltd.

("Trina Solar") and Renesola Jiangsu Ltd. as mandatory respondents for individual

examination in this investigation.  Prelim. Results; see Section 777A of the Tariff Act of

1930, as amended, 19 U.S.C. § 1677f-1(c)(2)(B) (2012).[2]   Commerce preliminarily

selected South Africa as the primary surrogate country, and calculated mandatory

respondents' dumping margins using South African data to value factors of production

and offsets for calculating respondents' normal value.  Prelim. Decision Memo at 22; [AD]

Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC]:

Factor Valuation Memorandum, PD 704, bar code 3218533-01 (Jul. 24, 2014) ("Prelim.

Surrogate Value Memo").   Commerce used financial statements of South African

computer assembly company Mustek for valuing respondents' financial ratios, Prelim.

Surrogate Value Memo at 8–9; import data corresponding to South African subheading

7604.29.65, HTS, to value respondents' aluminum frames input, id. at 3–4; and import

data corresponding to South African subheading 8548.10, HTS, to value respondent Trina

Solar's by-product offset for scrap solar modules.  See [AD] Duty Investigation of Certain

Crystalline Silicon Photovoltaic Products from the [PRC]: Preliminary Analysis

Memorandum for Changzhou Trina Solar Energy Co., Ltd., Attach. II, All Input Prices,

July 24, 2014, ECF No. 97-14.  Commerce also preliminarily determined that mandatory

respondent Renesola Jiangsu Ltd. is affiliated with Renesola Zhejiang, Jinko Solar, and

Jinko Solar I&E pursuant to 19 U.S.C. § 1677(33)(F), and that these entities should be

treated as a single entity for the AD investigation, pursuant to 19 C.F.R. § 351.401(f).

Memorandum Pertaining to ReneSola and Jinko Solar Affiliation and Single Entity Status

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 6 of 44

Consol. Ct. No. 15-00080                                                                Page 6
PUBLIC VERSION

at 7, PD 542, bar code 3207993-01 (June 6, 2014) ("Affiliation and Collapsing Memo");

see 19 C.F.R. § 351.401(f) (2014).[3]

On December 15, 2014, Commerce published the final affirmative determination.

Final Results, 79 Fed. Reg. at 76,970.   Commerce continued to use the same data

sources to calculate surrogate values for respondents' general expenses and profit, see

Certain Crystalline Silicon Photovoltaic Products from the [PRC]: Factor Valuation

Memorandum at 1, PD 827, bar code 3249189-01 (Dec. 15, 2014) ("Final Surrogate Value

Memo"), aluminum frames, Final Decision Memo at 48–50, and the by-product value of

Trina Solar's scrap solar modules.   Id. at 50–51.   Commerce also continued to find the

Renesola entities to be affiliated with the Jinko Solar entities, and continued to treat these

companies as a single entity.   Id. at 62–67.   In the final determination, based on findings

at verification related to Trina Solar U.S.'s quality insurance expenses covering the POI,

Commerce made adjustments to the U.S. export price for indirect selling expenses.   Id.

at 52–54.   Commerce also offset the antidumping cash deposit rate by the export subsidy

rate calculated in the concurrent countervailing duty investigation, as is the agency's

general practice.   Id. at 38–39.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) (2012), and 28

U.S.C. § 1581(c) (2012). Commerce's antidumping determinations must be in accordance

with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i) (2012).

---

[3] Further citations to the Code of Federal Regulations are to the 2014 edition.

# DISCUSSION

## I.  Affiliation & Collapsing

### A.  Commerce's Affiliation Determination

Jinko Solar challenges Commerce's threshold determination that Renesola Jiangsu Ltd. and Renesola Zhejiang Ltd. (collectively "ReneSola") are affiliated with Jinko Solar Co., Ltd., and Jinko Solar Import and Export Co., Ltd. through common control by the Li family grouping.[4]   Jinko Br. 8–10.   Jinko claims no record evidence reflects any potential for Li family members to act in concert.   See id.   Defendant responds that Commerce's determination is supported by substantial evidence because record evidence established that the Li family owns the largest ownership interest in both sets of entities and that Li family members served, directly or indirectly, as managers or board members of all four companies.   Def.'s Mem. Opp. Pls.', Pls.-Intervenors', and Def.-Intervenors' Rule 56.2 Mots. J. Upon Agency R. Confidential Version 10–13, Sept. 23, 2016, ECF No. 58 ("Def.'s Resp. Br.").   Commerce's determination that the Jinko entities are affiliated with the ReneSola entities through common control by the Li family grouping is supported by substantial evidence.

The statute defines affiliated persons through the following categories:

(A) Members of a family, including brothers and sisters (whether by whole or half blood), spouse ancestors, and lineal descendants.
(B) Any officer or director of an organization and such organization.
(C) Partners.
(D) Employer and Employee.

---

[4] After determining that the Jinko entities and the ReneSola entities are affiliated under the common control of the Li family, Commerce collapsed these entities, which has the effect of treating the sales of all entities as sales of the same entity for purposes of Commerce's dumping margin calculation.  See Final Decision Memo at 62; see also 19 C.F.R. § 351.401(f)(1) (2014); 19 U.S.C. §§ 1675(a)(2)(A)(ii), 1677b(a).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 8 of 44

Consol. Ct. No. 15-00080                                                          Page 8
**PUBLIC VERSION**

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

(G) Any person who controls any other person and such other person.

19 U.S.C. §§ 1677(33)(A)–(G).  A person is considered to control another person "if the person is legally or operationally in a position to exercise restraint or direction over the other person."[5]  Id.  Commerce's regulations incorporate the statutory definition of "affiliated persons" and further clarify the non-exhaustive list of considerations Commerce shall take into account in assessing whether control over another person exists as an element of affiliation.  19 C.F.R. § 351.102(b)(3).  In evaluating whether control exists under the statute, Commerce will consider, among other factors, "[c]orporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships."  Id.  However, Commerce "will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of subject merchandise."  Id.

Here, Commerce adequately supports its determination that the role of members of the Li family grouping in both the Jinko entities and the ReneSola entities creates a potential for the family to act in concert with respect to manipulating pricing, production, and cost of subject merchandise.  See Final Decision Memo at 63.  Initially, Commerce supports its determination by finding that Mr. Li Xianshou, Mr. Li Xiande (a brother of Mr. Li Xianshou), Mr. Li Xianhua (another brother of both Mr. Li Xianshou and Mr. Li Xiande), and Mr. Chen Kangping (a brother-in-law of Mr. Li Xianshou) are members of the Li family

---

[5] A "person" is defined in Commerce's regulations as including "any interested party as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b)(37).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 9 of 44

Consol. Ct. No. 15-00080                                                          Page 9
**PUBLIC VERSION**

grouping.  Affiliation and Collapsing Memo at 7.  Commerce concluded that the Jinko

entities and the ReneSola entities are under the common control of the Li family grouping

by reviewing the control exercised by various members of the Li family.  Final Decision

Memo at 63.  Specifically, Commerce found that the Li family grouping "indirectly

control[s] these companies through their ownership of the largest interests in the parent

companies, Renesola Ltd. and JinkoSolar Holding Co. Ltd ("Jinko Holding"),"[6] and

through the management and board memberships held in all four companies by members

of the Li family, which create the potential to impact decisions concerning production,

pricing, or cost of subject merchandise within the companies.[7]  Affiliation and Collapsing

---

[6] Commerce found that "Mr. Li Xianshou owned 30.75 percent of Renesola Ltd. during the period of investigation ("POI"), the largest percentage of shares held by any investor.  Affiliation and Collapsing Memo at 6 (citing Jinko Solar Section A Questionnaire Response at Ex. A.13, PD 527–531, bar codes 3207683-01–05 (June 6, 2014) ("Jinko Solar Sec. A Resp.")).  Commerce further found that Renesola Ltd. wholly owned Renesola Zhejiang Ltd., which wholly owned Renesola Jiangsu Ltd.  Id. (citing Jinko Solar Sec. A. Resp. at 7).

Commerce found that "Mr. Li Xiande, Mr. Li Xianhua, and Mr. Chen Kangping collectively owned 36 percent of Jinko Holding during the POI," representing the largest ownership interests in that entity.  Id. (citing Jinko Solar Separate Rate Application at Ex. 6, PD 239–243, bar codes 3191404-01–03 (Mar. 28, 2014) ("Jinko Solar SRA")).  Commerce further found that JinkoSolar Holding Co., Ltd. wholly owned Jinko Solar Technology Limited.  Id. (citing Jinko Solar SRA at 10).  Jinko Solar Technology Solar Technology Limited wholly owned Jinko Solar Co., Ltd., which wholly owned Jinko Solar Import and Export Co., Ltd.  Id. (citing Jinko Solar SRA at 10).

[7] Commerce reviewed the management positions held by Li family members in the Renesola entities and the Jinko entities.  See Affiliation and Collapsing Memo at 7–8, 10.  Reviewing the Renesola entities, Commerce noted that Mr. Li Xianshou is the Chief Executive Officer ("CEO") and a board member of both Renesola Ltd. and Renesola Zhejiang Ltd. with the ability to hire management such as the general manager that is the top manager of Renesola Jiangsu Ltd.  Id. at 7, 10.  According to Commerce, the same individual has "substantial influence over major corporate decisions regarding mergers, consolidation, the sale of all company assets, and the election of directors" at the ReneSola entities.  Id. at 7–8.  Commerce found that Renesola Jiangsu Ltd. does not have its own directors, but rather is managed directly by the leadership of Renesola Ltd., of which Mr. Li Xianshou is the founder, CEO, and a board member.  See id. at 10.

Commerce also reviewed the management positions held by Li family members in the Jinko entities.  See id. at 8.  Commerce noted that Mr. Li Xiande, Mr. Li Xianhua, and Mr. Chen

(footnote continued)

Case 1:15-cv-00080-CRK  Document 101  Filed 05/26/17  Page 10 of 44

Consol. Ct. No. 15-00080                                                         Page 10
**PUBLIC VERSION**

Memo at 7–8.  Commerce reasonably concluded based on the Li family grouping's large shareholdings and numerous senior management positions in the ReneSola and Jinko entities during the POI that the ReneSola and Jinko entities are under common control. See Final Decision Memo at 63.  Commerce likewise reasonably concluded that those shareholdings and management positions create the potential to impact decisions concerning the production, pricing, or cost of subject merchandise.  See id. at 64.

Jinko Solar contends Commerce improperly concluded that the Li familial relationships alone create a potential to impact decisions concerning production, pricing or, the cost of subject merchandise.  Jinko Br. 8.  Commerce's affiliation determination does not rely exclusively on the relationship between Li family members.  Commerce highlighted that the Li family members hold ownership shares in the Jinko and ReneSola parent companies and also held senior management and board position roles within the companies, including CEO of Renesola Zhejiang, Ltd. and Chairman, Vice General Manager, and CEO of Jinko Solar Co., Ltd. and Jinko Solar Import and Export Co., Ltd., which had influence and decision making responsibilities within those companies.  See Affiliation and Collapsing Memo at 7–8.

Jinko highlights the absence of corporate entity overlap, franchise or joint venture agreements between the companies, or shared debt financing.  See Jinko Br. 10. Although Commerce's regulation provides that it will consider all these factors, the regulation does not require an affirmative finding on all of these factors to support

_____

Kangping are Chairman, Vice General Manager, and CEO, respectively, of both Jinko Solar Co., Ltd. and Jinko Solar Import and Export Co., Ltd.  Id.  Commerce further found that these individuals collectively act as a management team in charge of production and marketing of solar cells and modules, and make decisions regarding mergers, consolidations, the sale of all company assets, the election of directors, and dividend policy in both entities.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 11 of 44

Consol. Ct. No. 15-00080                                                    Page 11
**PUBLIC VERSION**

affiliation.  See 19 C.F.R. § 351.102(b)(3).  It is reasonably discernible that Commerce concluded that the Li family members' roles in senior management and board positions together with their shareholdings are sufficient to create a potential to impact the companies' pricing, cost, and production decisions without looking at joint venture agreements and debt financing.[8]  See Final Decision Memo at 63.  By pointing to the shareholdings, board memberships, and significant managerial roles played by members of the Li family grouping in both the Jinko entities and the ReneSola entities Commerce's has supported it affiliation determination with substantial evidence.

Jinko also argues that the record does not support the notion that the Li family grouping acts in concert.  Jinko Br. 8–10.  Specifically, Jinko claims that the absence of managerial overlap between the ReneSola entities and the Jinko entities renders Commerce's determination that the shareholdings, board memberships, and management positions held by Li family members creates the potential for manipulation of pricing, production, or cost of subject merchandise unreasonable.[9]  See id. at 9–10.

---

[8] Jinko's contention that Commerce's practice of using aggregated indicia of control to find that a family grouping's relationships with either company has the potential to impact pricing, production, and cost of subject merchandise without finding that the companies also had franchise and joint venture agreements, and debt financing amounts to an "irrebuttable presumption" is similarly unfounded.  See Jinko Solar Co. Ltd's Reply Mem. Further Supp. Mot. Summ. J. Agency R. 3, Oct. 26, 2016, ECF No. 66.  Here, there is unrefuted evidence of significant shareholdings, board memberships, and management positions held by Li family members.  See Affiliation and Collapsing Memo at 7–8, 10.  Moreover, Jinko does not argue that it is unreasonable to determine that a family grouping creates the potential to impact pricing, production or costs, but only that it is unreasonable to find that the family grouping is sufficient to find the family actually controls the entities.  See Jinko Solar Co. Ltd's Reply Mem. Further Supp. Mot. Summ. J. Agency R. 2–3, Oct. 26, 2016, ECF No. 66.

[9] Jinko contends that the corporate and family groupings are insufficient to reasonably conclude that the Jinko and ReneSola entities are under common control of the Li family grouping because Jinko and ReneSola entities compete against each other in the marketplace.  See Jinko Br. 10.  It is reasonably discernible that Commerce concludes that the notion that the companies may compete does not detract from the potential for the Li family grouping to impact decisions concerning pricing, production, and cost of subject merchandise.  See Final Decision Memo at 63.  Commerce's conclusion is reasonable.

Jinko cites no authority requiring Commerce to identify overlap of individual managers to find that a family grouping that holds important management positions and significant shareholdings creates the potential to impact decisions.  Where there is a family grouping at issue, Commerce's practice is to "consider[ ] the control factors of individual members of the group (e.g., stock ownership, management positions, board membership) in the aggregate."   See Affiliation and Collapsing Memo at 7 (citing Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea, 69 Fed. Reg. 26,361 (Dep't Commerce May 12, 2004) (final results and rescission in part of antidumping duty administrative review and accompanying Issues and Decision Memorandum for the 2002-2003 Administrative Review of the Antidumping Duty Order on Certain Cut-to-Length Carbon-Quality Steel Plate Products from the Republic of Korea: Final Results at 3, A-580-836, (May 12, 2004), available at http://ia.ita.doc.gov/frn/summary/korea-south/04-10773-1.pdf (last visited May 15, 2017); Chlorinated Isocyanurates From the People's Republic of China, 74 Fed. Reg. 68,575 (Dep't Commerce Dec. 28, 2009) (final results of June 2008 through November 2008 semi-annual new shipper review) and accompanying Issues and Decision Memorandum for June 2008 through November 2008 Semi-Annual New Shipper Review of Chlorinated Isocyanurates from the People's Republic of China at 10, A-570-898, (Dec. 17, 2009), available at http://ia.ita.doc.gov/frn/summary/prc/E9-30687-1.pdf (lasted visited May 15, 2017)).  Commerce found that the Li family grouping is in a position to impact decisions of both the Jinko and ReneSola companies through the ownership stakes and key management positions held by the Li family grouping.  See Affiliation and Collapsing Memo at 7–8.  Even if no individual member of the Li family controls both the ReneSola entities and the Jinko entities, the aggregated shareholdings,

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 13 of 44

Consol. Ct. No. 15-00080                                                    Page 13
PUBLIC VERSION

management positions, and board memberships are sufficient to support a reasonable inference that these relationships allow the Li family grouping to potentially exercise restraint or direction over both sets of entities.

### B. Commerce's Determination to Collapse the Affiliated Entities

Jinko challenges Commerce's decision to collapse ReneSola with Jinko Solar Co., Ltd., and Jinko Solar Import and Export Co., Ltd. and treat them as a single entity for purposes of this investigation.[10]  Jinko Br. 8–13.  Jinko argues that there is no overlap in ownership by any individual member or company, no overlap of individuals in management or corporate governance roles, and that the transactions between the companies are not significant enough to create a significant potential for manipulation.[11]  See id. at 11–13.  Defendant responds citing Commerce's findings on the significant ownership of the Li family grouping, the significant management positions held by members of the Li family in each of the ReneSola and Jinko entities, and the significant transactions between the two sets of companies.  Def.'s Resp. Br. 15–18.  The court

---

[10] If affiliated producers and exporters are collapsed, those companies may be considered a single entity.  Collapsing entities allows sales of one collapsed entity to be considered sales of the other for purposes of Commerce's dumping margin calculation.  See 19 C.F.R. § 351.401(f)(1) (2014); 19 U.S.C. §§ 1675(a)(2)(A)(ii), 1677b(a).

[11] Commerce found that "[t]he Renesola and Jinko groups of companies . . . each include producers of similar and identical merchandise."  Memorandum re: Affiliation and Single Entity Status at 8, PD 542, bar code 3207993-01 (June 6, 2014).  Commerce found that Renesola Zhejiang Ltd. produces and sells wafers and solar cells, which are necessary components in the manufacture of certain solar products and similar products.  Id.  Commerce also found that Jinko Solar Co., Ltd. produces and sells wafers, solar cells and modules, among other intermediary products used in the production of solar cells and modules.  Id.  Finally, Commerce found that Jinko Solar Co., Ltd. produces the merchandise sold by Jinko Solar Import and Export Co., Ltd. during the period of investigation.  Id.  Jinko does not challenge Commerce's determination that the Jinko entities and the ReneSola entities have production facilities for similar or identical products under 19 C.F.R. § 351.401(f)(1).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 14 of 44

Consol. Ct. No. 15-00080                                                    Page 14
**PUBLIC VERSION**

remands Commerce's determination to collapse the ReneSola companies for further

explanation or reconsideration.

The statute does not address the consequences of finding entities affiliated in

terms calculating the dumping margin.  See 19 U.S.C. § 1675(a)(2)(A)(ii); 19 U.S.C.

§ 1677b)(a).  Commerce's regulations permit it to

> treat two or more affiliated producers as a single entity where those
> producers have production facilities for similar or identical products that
> would not require substantial retooling of either facility in order to restructure
> manufacturing priorities . . . and [Commerce] concludes that there is a
> significant potential for the manipulation of price or production.

19 C.F.R. § 351.401(f)(1).  The non-exhaustive list of factors Commerce may consider in

assessing whether there is a "significant potential for manipulation of price or production"

for collapsing affiliated producers include:

> (i)     The level of common ownership;
> (ii)    The extent to which managerial employees or board members of one
>         firm sit on the board of directors of an affiliated firm; and
> (iii)   Whether operations are intertwined, such as through the sharing of
>         sales information, involvement in production and pricing decisions,
>         the sharing of facilities or employees, or significant transactions
>         between the affiliated producers.

19 C.F.R. § 351.401(f)(2).

Commerce's decision to collapse the ReneSola entities with the Jinko entities is

not supported by substantial evidence because the common ownership, the shared

management of these companies, and intertwined operations is insufficient to reasonably

support Commerce's conclusion.   As already discussed, Commerce found significant

common ownership by the Li family grouping of both the Jinko and ReneSola entities.

See Affiliation and Collapsing Memo at 6.  Although Commerce purports to conclude that

managerial employees or board members of the ReneSola entities sit on the board of

directors of the Jinko entities, or vice versa, the evidence relied upon by Commerce only

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 15 of 44

Consol. Ct. No. 15-00080                                                                 Page 15
**PUBLIC VERSION**

demonstrates that members of the Li family grouping sat on the boards of both entities.

See Affiliation and Collapsing Memo at 10.  The affiliation statute is sufficiently broad that

Commerce can consider a family grouping's collective indicia of control, including the

collective board memberships and managerial positions held by a family grouping, see

19 U.S.C. §§ 1677(33)(A), (F), but Commerce's collapsing regulation calls upon it to

consider overlap of individual board member between collapsed entities.[12]  See 19 C.F.R.

§ 351.401(f)(2)(ii).   The factors enumerated in 19 C.F.R. § 351.401(f)(2) are non-

exhaustive, and nothing precludes Commerce from considering that members of a family

---

[12] Commerce found that there is overlap in the directors and management of the ReneSola entities and the Jinko entities when the Li family is viewed as a single person.  See Affiliation and Collapsing Memo at 10.  However, the language of 19 C.F.R. § 351.401(f)(2)(ii) is specific, and the regulation explicitly calls upon the agency to assess the extent to which individual managerial employees or board members of one firm sit on the board of directors of an affiliated firm.  See 19 C.F.R. § 351.401(f)(2)(ii).  Commerce's regulation has defined the inquiry under 19 C.F.R. § 351.401(f)(2)(ii) much more narrowly than the statute does to require Commerce to compile a list of managers or board members on one firm and compare them to the board of directors of an affiliated firm.  See 19 C.F.R. § 351.401(f)(2)(ii).  In contrast, the affiliation statute, which considers family members to be affiliated persons and allows persons to be affiliated through common control by the same person, see 19 U.S.C. §§ 1677(33)(A), (F).  This statutory language leaves Commerce discretion to define "persons" broadly to include "any interested party as well as any other individual, enterprise, or entity, as appropriate."  19 C.F.R. § 351.102(b)(37).

Defendant argues that Commerce may treat a family as a single unit for purposes of evaluating 19 C.F.R. § 351.401(f)(2)(ii).  See Def.'s Resp. Br. 16–17 (citing Zhaoqing New Zhongya Aluminum Co., Ltd. v. United States, 39 CIT __, __, 70 F. Supp. 3d 1298, 1309 (2015)).  However, in Zhaoqing, the court held that overlapping boards of directors are not required to support a collapsing determination because the list of factors in 19 C.F.R. § 351.401(f)(2) is non-exhaustive.  See id.  SolarWorld cites Catfish Farmers of America v. United States, 33 CIT 1258, 1266, 641 F. Supp. 2d 1362, 1372 (2009) and Zhaoqing, arguing that the Court has found that managerial overlap among a family grouping can support a finding that there is significant potential for manipulation.  SolarWorld Americas, Inc. Br. Resp. Mem. Supp. Rule 56.2 Mots. Pls. and Pl.-Intervenors 16, Sept. 23, 2016, ECF No. 58.  In neither Catfish Farmers nor in Zhaoqing does the holding sustaining Commerce's determination rest entirely upon a family grouping holding managerial positions in both entities.  See Zhaoqing, 39 CIT at __, 70. F. Supp. 3d at 1305–6 (where Commerce also found common ownership among the family grouping and significant transactions because of evidence of some transactions between a sibling and a spouse of a sibling combined with an adverse inference based on the company's failure to cooperate); Catfish Farmers, 33 CIT at 1265–66, 641 F. Supp. 2d at 1362–72 (where Commerce also found large family shareholdings and that the companies had a past arrangement whereby one affiliate processed subject merchandise of the other for export to the United States, which Commerce found evidenced future potential for manipulation).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 16 of 44

Consol. Ct. No. 15-00080                                                Page 16
**PUBLIC VERSION**

unit sit on the boards of two sets of entities as reflecting a potential for manipulation. 19 C.F.R. § 351.401(f)(2)(i)–(iii). On remand, if Commerce wishes to rely upon board memberships and management positions held by a family grouping, it must so state and explain how this factor creates a significant potential for the manipulation of price or production or reconsider its determination.

Further, Commerce has not sufficiently explained how the raw material purchases, accounts receivable, and other transactions between the ReneSola entities and the Jinko entities support Commerce's conclusion that the companies had intertwined operations during the POI. Commerce found that Renesola Ltd.'s 2012 and 2013 consolidated financial statements report "significant raw material purchases and accounts receivable from [Jinko Solar Co., Ltd.] and its affiliates." Final Decision Memo at 66 (citing Renesola Ltd. Sec. A. Resp. Part 6 at Ex. A.11 at F-34, CD 357, bar code 3197707-06 (Apr. 24, 2014) ("ReneSola 2012 Consol. Fin. Sts."); Renesola Verification Exhibits Part 95 at Ex. II-2 at F-36, CD 928, bar code 3222969-95 (Aug. 21, 2014) ("Renesola 2013 Form 20-F"); Jinko Solar Co., Ltd.'s Separate Rate Application at Ex. 5 at F-33–34, CD 123–131, bar codes 3191372-01–05, 3191379-01–03 (Mar. 28, 2014) ("Jinko Holding Consol. Fin. Sts."). However, the value of the sales, purchases of raw materials, and accounts receivable between the Renesola entities and the Jinko entities [[        ]] from 2012, prior to the POI, to 2013.[13]  <u>Compare</u> Renesola 2012 Consol. Fin. Sts. at F-34 with

---

[13] Specifically, Commerce relies upon the fact that Renesola Ltd.'s 2012 and 2013 financial statements report significant raw material purchases and accounts receivable from Jinko Solar and its affiliates. <u>See</u> Final Decision Memo at 66. Commerce references these transactions in more detail in its Affiliation and Collapsing Memo. <u>See</u> Affiliation and Collapsing Memo at 11. Commerce reviews that

(footnote continued)

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 17 of 44

Consol. Ct. No. 15-00080                                                    Page 17
**PUBLIC VERSION**

Renesola 2013 Form 20-F at F-36.  Commerce does not explain why the change in level

of transactions between the two entities does not affect its determination that the two

entities' operations were intertwined.  <u>See</u> Affiliation and Collapsing Memo at 10 (citing

and reviewing only the extent of 2012 sales between Renesola and its affiliates and Jinko

and affiliates, purchases of raw materials between Renesola and its affiliates and Jinko

and its affiliates, and accounts receivable between Renesola and its affiliates and Jinko

and its affiliates); Final Decision Memo at 66 (citing ReneSola 2013 Consol. Fin. Sts. At

F-34, Renesola 2013 Form-20-F at F-35, Jinko Holding 2012 Consol. Fin. Sts. at F-33–

---

> Renesola Ltd. reported that in 2012 (the fiscal year closest to the POI for which there is information on the record) it and its affiliated sold $59.5 million worth of goods to Jinko Solar and its affiliates, purchased $85.1 million of raw materials from [Jinko Solar Co., Ltd.] and its affiliates, had accounts receivable from [Jinko Solar Co., Ltd.] and its affiliates of $5,479 588, and accounts payable to Jinko Solar and its affiliates of $16,277,011.

<u>Id.</u>  However, in 2013 Renesola Ltd. reported [[                ]] of raw material purchases from Jinko Solar Co., Ltd. and its affiliates, [[            ]] of accounts receivable to Jinko Solar Co., Ltd. and its affiliates, and accounts payable to Jinko Solar Co., Ltd. and its subsidiaries of [[                ]].  <u>See</u> Renesola 2013 Form 20-F at F-36.  Commerce does not recognize or attach any significance to the [[          ]] in these amounts.  <u>See</u> Final Decision Memo at 66; Affiliation and Collapsing Memo at 11.

      Commerce also references the fact that the fiscal year 2012 Jinko Holding financial statements "reported significant raw material purchases and accounts receivable from[ ] Renesola Ltd. and its affiliates."  Final Decision Memo at 66.  Commerce likewise reviews these transactions in more detail in its Affiliation and Collapsing Memo, stating that

> Jinko Holding reported that in 2012, it and its affiliates sold [Renminbi ("RMB")] 150,705,597 worth of goods and services to Renesola Ltd. and its affiliates, purchased RMB 266,714,991 of raw materials from Renesola Ltd. and its affiliates, had accounts receivable from Renesola Ltd. and its affiliates of RMB 105,531,368, and accounts payable to Renesola Ltd., and its affiliates of RMB 30,045,245.

Affiliation and Collapsing Memo at 11.  In 2013, Jinko Holding reported that it and its affiliates sold RMB 29,021,348 worth of goods and services to Renesola Ltd. and its affiliates, purchased RMB 20,854,435 of raw materials from Renesola Ltd. and its affiliates, had accounts receivable from Renesola Ltd. and its affiliates of RMB 56,990,772, and accounts payable to Renesola Ltd. and its affiliates of RMB 28,611,284.  <u>See</u> Jinko Holding Consol. Fin. Sts. at F-33–34.  Commerce does not recognize or make note of the fact that, for the nine months ended September 30, 2013, most of the numbers cited also [[          ]].  <u>See</u> Final Decision Memo at 66; Affiliation and Collapsing Memo at 11.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 18 of 44

Consol. Ct. No. 15-00080                                                    Page 18
**PUBLIC VERSION**

34).    Moreover, Jinko highlights that Renesola Ltd.'s 2013 consolidated financial

statements, which show that the company reported raw material purchases and accounts

receivable with Jinko entities that only account for a de minimis level of activity relative to

the companies' overall operations.[14]  See Jinko Solar Co. Ltd.'s Reply Mem. Further

Supp. Mot. Summ. J. Agency R. 4–5, Oct. 26, 2016, ECF No. 66 ("Jinko Reply Br.").  This

evidence undermines the reasonableness of Commerce's determination that the

transactions between the Renesola entities and the Jinko entities during the POI are

significant, but Commerce offers no explanation or acknowledgment of a disparity

between the extent of transactions during the POI and transactions outside the POI.  See

Final Decision Memo at 66.  On remand, Commerce must explain why it is reasonable to

conclude that the totality of the circumstances creates a significant potential for

manipulation in light of the concerns highlighted here.

Defendant implies that significant transactions between Renesola Ltd and Jinko

entities from outside the POI lend further support to Commerce's determination because

Commerce may consider "both actual manipulation in the past and the possibility of future

manipulation, which does not require evidence of actual manipulation during the [POI]."

Def.'s Resp. Br. 18 (citing Dongkuk Steel Mill Co. v. United States, 29 CIT 724, 733

(2005)).    However, the record before the Dongkuk court demonstrated substantial

evidence of actual manipulation before the period under consideration, including sharing

a number of common directors and officers and transfer of senior managers between the

---

[14] Specifically, Jinko notes that Renesola Ltd.'s consolidated financial statements "reported raw
material purchases of $2,302,375 from Jinko which only accounts for 0.16% of the
$1,416,371,905 total cost of revenue reported.  [Renesola Ltd.] also reported accounts receivable,
or revenue, in the amount of $180,102 from Jinko which accounts for 0.01% of its total revenue
reported."  Jinko Solar Co. Ltd.'s Reply Mem. Further Supp. Mot. Summ. J. Agency R. 4–5, Oct.
26, 2016, ECF No. 66 (citing Renesola 2013 20-F at F-6, F-36).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 19 of 44

Consol. Ct. No. 15-00080                                                              Page 19
**PUBLIC VERSION**

two companies, sale of raw material to each other and sharing of customer information in connection with those sales, the companies' shared interest in a freight provider servicing both, and the value of services received during the period of review.  See Dongkuk, 29 CIT at 728.   The court, in Dongkuk, does not suggest that, absent evidence of actual manipulation, Commerce can infer future potential for manipulation.  See id. at 733.  The court cannot say that past significant transactions could not demonstrate a future significant potential for manipulation.   However, the intent to rely upon past transactions to show future manipulation is not reasonably discernible from Commerce's determination because Commerce does not acknowledge that the information from outside the POI is relied upon to support an inference of future potential for manipulation.   See Final Decision Memo at 66 (reviewing the extent of transactions between the companies for fiscal years 2012 and 2013); Affiliation and Collapsing Memo at 11 (reviewing the extent of transactions between the companies for fiscal year 2012).  Moreover, Commerce does not rely on past transactions to infer future potential manipulation or explain why such a practice is reasonable based on the record before it.  See Final Decision Memo at 66. On remand, if Commerce relied upon such an inference, Commerce must say so and explain why such an inference is reasonable based on the record before it.

## II.  Surrogate Financial Statements

SolarWorld challenges as unreasonable Commerce's choice to use surrogate financial statements from South African computer assembly company Mustek to calculate respondents' general expenses and profit as part of its normal value calculation. SolarWorld Br. 8–18.    Specifically, SolarWorld contends that Mustek's financial statements did not constitute the best available information because Mustek is not a

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 20 of 44

Consol. Ct. No. 15-00080                                                    Page 20
**PUBLIC VERSION**

producer of sufficiently comparable merchandise,[15] the statements were not sufficiently

contemporaneous with the POI, and the statements lacked necessary specificity.  Id. at

10–17.  Defendant responds that substantial evidence supports Commerce's decision

that Mustek's financial statements constituted the best available information as each of

the Thai companies with statements on the record received countervailable subsidies,

Mustek is a producer of comparable merchandise, and the statements are sufficiently

specific and contemporaneous.[16]  Def.'s Resp. 20–27.  For the reasons that follow,

---

[15] In arguing that Mustek is not a producer of comparable merchandise, SolarWorld contends both that computers are not comparable to crystalline silicon photovoltaic cells because they have dissimilar production processes, end uses, and physical characteristics, and that Mustek is not a "producer" of computers, but rather is an "assembler" of computers.  SolarWorld Br. 10–11.

[16] Defendant also references the fact that the Mustek financial statements were the only financial statements on the record from the primary surrogate country, emphasizing that Commerce has a preference for using surrogate values from the primary surrogate country where possible.  Def.'s Resp. 20–21.  Commerce stated in the Preliminary Surrogate Value Memo, the findings of which were adopted in the Final Surrogate Value Memo, that "Mustek's financial statements are the only financial statements on the record of this investigation from the chosen surrogate country, South Africa."  Prelim. Surrogate Value Memo at 8–9; Final Surrogate Value Memo at 1.  These statements imply that the Mustek data was selected as financial surrogate values in part because the data was from the primary surrogate country, which raises concerns about circular reasoning because South Africa was selected as the primary surrogate country in part because reliable financial statements existed on the record from South Africa.  See Final Decision Memo at 35–37.  However, in the Prelim. Surrogate Value Analysis Memo, Commerce also emphasized other reasons why the Mustek data was selected, including that the Mustek "statements are complete, cover a period contemporaneous with the POI, are from a South African assembler of comparable merchandise (computers), and are from a company that earned a before-tax profit in 2013," and emphasizing that there was no evidence of countervailable subsidies in Mustek's financial statements.  Prelim. Surrogate Value Analysis Memo at 8–9.  The Final Decision Memo does not indicate that the Mustek statements were used in part because South Africa was the primary surrogate country, emphasizing that the statements were superior to the Thai statements on the record which contained evidence of subsidies.  Final Decision Memo at 35–36.  Further, Defendant clarified at oral argument that the decisions to select South Africa as primary surrogate country and to use the Mustek financial statements as financial surrogate values were made simultaneously, based on the same consideration of data availability and reliability: lacking usable Thai financial data and possessing usable South African financial data, Commerce determined South Africa was a better primary surrogate country; the statements from South Africa were used because they were superior to the Thai statements on the record.  Oral Arg. 00:33:30–00:34:13, Feb. 28, 2017, ECF No. 89.

**PUBLIC VERSION**

Commerce's decision to value respondents' general expenses and profit using Mustek's

financial statements is reasonable.

Commerce determines whether a company is engaged in dumping by comparing

the normal value of the subject merchandise with the actual or constructed export price

of the merchandise.  19 U.S.C. § 1677b(a).  The normal value of the merchandise is the

price of the merchandise when sold for consumption in the exporting country.  19 U.S.C.

§ 1677b(a)(1)(B).  However, when the exporting country is, like China, an NME country,

Commerce calculates the normal value for subject merchandise from an NME country by

valuing inputs including the factors of production ("FOPs") utilized in producing the

merchandise and "an amount for general expenses and profit."  19 U.S.C. § 1677b(c)(1).

Commerce selects a surrogate value for each of these inputs from a source in a market

economy country that is economically comparable to the NME country and a significant

producer of the merchandise in question.  19 U.S.C. §§ 1677b(c)(4)(A)–(B); 19 C.F.R.

§ 351.408(b).  Commerce calculates the amount for general expenses and profit using

publicly available financial data from a producer of identical or comparable merchandise.

19 C.F.R. § 351.408(c)(4).

Commerce values each of these inputs using "the best available information

regarding the values of such factors in a market economy country or countries considered

to be appropriate."[17]  19 U.S.C. § 1677b(c)(1); see 19 C.F.R. §§ 351.408(a)–(c).  With

---

[17] Commerce has a regulatory preference to value all inputs using data from a single surrogate
country.  See 19 C.F.R. § 351.408(c)(2) ("[Commerce] normally will value all factors in a single
surrogate country").  Defendant notes that this practice is followed "unless the specific data for an
input is not available or unreliable in that surrogate country."  Def.'s Resp. 21 (quoting Dept. of
Commerce, Final  Results of Redetermination Pursuant to Court Remand, Elkay Mfg. Co. v United
States, A-570-983, at 19; citing Clearon Corp. v. United States, 35 CIT 1013 (2013) (sustaining
Commerce's preference for valuing surrogate values from a single surrogate country).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 22 of 44

Consol. Ct. No. 15-00080                                                    Page 22
**PUBLIC VERSION**

"best available information" not defined in the statute, Commerce has discretion to

determine what data constitutes the best available information for valuing the inputs.

QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford

Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).  The agency makes

this determination by considering the data's "quality, specificity, and contemporaneity."[18]

Final Decision Memo at 34.

Here, Commerce evaluated Mustek's financial statements as part of its selection

of South Africa as the primary surrogate country,[19] Final Decision Memo 33–37, and used

Mustek's financial statements for the fiscal year ending December 31, 2013 to value

factory overhead, selling, general and administrative expenses, and profit.  Prelim.

Decision Memo at 25; Prelim. Surrogate Value Memo at 8–9.  Commerce determined that

Mustek was a producer of comparable merchandise, Prelim. Surrogate Value Memo at

8–9; see Final Decision Memo at 33, and that respondents' solar module and panel

assembly processes are "more comparable" to Mustek's computer assembly operations

---

[18] Commerce's practice in determining the "best available information" is to "use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data."  See U.S. Dep't Commerce, Non–Market Economy Surrogate Country Selection Process (2004) at 2, available at http://enforcement.trade.gov/policy/bull04-1.html (last visited May 15, 2017).

[19] Although adequate surrogate value data existed on the record for most key inputs from both Thailand and South Africa, Commerce found that the record lacked reliable financial data from Thailand for valuing surrogate financial ratios because each of the Thai companies with financial statements on the record had received countervailable subsidies which Commerce found may be distortive.  Final Decision Memo at 35.  Commerce noted the financial statements on record from Mustek, the South African computer assembly company, did not contain evidence of countervailable subsidies, and determined that the available South African financial data was superior to the financial data from Thailand.  Id. at 36.  Finding that neither country's data was otherwise superior on the basis of specificity or contemporaneity, Commerce concluded that South Africa was the appropriate primary surrogate country.  Id. at 37.  In the Prelim. Decision Memo, Commerce found that any "individual specificity issues in this case are outweighed by the lack of usable Thai financial statements, i.e., financial statements that do not contain evidence of receipt of countervailable subsidies."  Prelim. Decision Memo at 10.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 23 of 44

Consol. Ct. No. 15-00080                                              Page 23
**PUBLIC VERSION**

than to the Thai companies' circuit board manufacturing processes.  Final Decision Memo

at 36.   Commerce emphasized that Mustek and the Thai circuit board companies each

conducted activities that were similar to a single stage of the multistage solar panel

production process:

> [S]olar panel manufacturing consists of casting silicon into ingots, slicing
> ingots into wafers, processing the wafers into cells, and assembling the cells
> into panels.  While circuit board manufacturing may be similar to processing
> wafers into cells, assembling solar cells into panels is also a significant
> stage of solar panel manufacturing. We preliminarily find that the panel
> assembly stage of manufacturing, which involves assembling cells, wires,
> junction boxes and other parts into panels, is more comparable to the
> assembly of computers, which involves assembling circuit boards, wires,
> junction boxes and other parts into a computer, than it is to circuit board
> manufacturing, which involves attaching and connecting electronic
> components and etching conductive tracks, pads and other features from
> copper sheets and laminating them onto a nonconductive substrate.

Prelim. Decision Memo at 9–10.   Reasonably discernible from this analysis is an

acknowledgment by Commerce that none of the companies with financial data on

record—the five Thai circuit board companies and South African computer assembly

company Mustek—constituted an ideal surrogate with which to value financial inputs for

the solar panel production process, as the companies' operations each aligned with only

one stage of the multistage solar panel production process.   It is evident that Commerce

considered these available options and made a reasoned selection based on its analysis

of which stages of solar production are significant and which company's operations align

with those stages.   Id. ("While circuit board manufacturing may be similar to processing

wafers into cells, assembling solar cells into panels is also a significant stage of solar

panel manufacturing.").   Commerce reiterated this evaluation in the Final Determination,

noting:

Case 1:15-cv-00080-CRK  Document 101  Filed 05/26/17  Page 24 of 44

Consol. Ct. No. 15-00080                                                      Page 24
**PUBLIC VERSION**

> While solar cell production is similar to printed circuit board production, the merchandise under consideration is manufactured in an assembly operation, using solar cells manufactured elsewhere. . . . The merchandise under investigation consists of certain panels assembled in the subject country, and we do not find that circuit board production is necessarily more similar to panel assembly than is computer assembly.

Final Decision Memo at 36–37. Commerce also determined that Mustek's financial statements were specific and contemporaneous with the period of review. Id. at 34–35. Regarding specificity, Commerce stated that it understood "distribution" to refer to a selling expense because the term appeared "elsewhere in the Mustek financial statement in conjunction with customer service and support of resellers,"[20] and that "Operating expenses" indicated "non-manufacturing expenses not directly related to production." Final Decision Memo at 37. Regarding contemporaneity, Commerce noted that the Department considers a statement with any amount of overlap with the POI sufficiently contemporaneous for purposes of serving as surrogate value data; there is no preference for a greater overlap. See id. at 35; Def.'s Resp. 25.

It is also discernible that Commerce's decision to use Mustek's data was heavily impacted by the presence of subsidies in the Thai financial statements. See Prelim. Surrogate Value Memo at 9. Commerce determined there was no adequate surrogate financial data on the record from Thailand in the context of the primary surrogate country selection, see Prelim. Decision Memo at 9; Final Decision Memo at 34, and it is reasonably discernible from this that Commerce selected the Mustek statements to value

---

[20] SolarWorld argues that Mustek's financial statements lacked specificity because the terms "distribution" and "other operating expenses" were ambiguous, and that there was no evidence that the expenses were equivalent to the selling, general, and administrative expenses that Commerce generally measures. SolarWorld Br. 15. In arguing that Commerce cited nothing to support its interpretation, SolarWorld does not point to anything that refutes Commerce's interpretation of the terms as used in the financial statements. See id.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 25 of 44

Consol. Ct. No. 15-00080                                                                Page 25
**PUBLIC VERSION**

the general expenses and profits for the same reason.  <u>See</u> Prelim. Surrogate Value

Memo at 9; Final Decision Memo at 34–35.  Defendant emphasizes that Commerce's

choice to not rely on the Thai statements is "consistent with [agency] practice not to rely

on financial statements when evidence of receipt of countervailable subsidies is present

and other usable financial statements are available."  Def.'s Resp. 21.  SolarWorld's

arguments that the Thai companies' circuit board assembly processes are more similar

to solar cell production than are Mustek's computer assembly processes asks the court

to reweigh the evidence.  Taking into consideration imperfections in the available

evidence, and explaining why it chose the South African data despite those imperfections,

Commerce sufficiently explained its reasoning for determining that Mustek's financial

statements constituted the best available information.  On the record presented,

Commerce's choice is not unreasonable.  Accordingly, it is sustained.

### III. Surrogate Values for Aluminum Frames

SolarWorld also challenges as unsupported by substantial evidence Commerce's

decision to value respondents' aluminum frames for solar modules using heading 7604,

HTS, rather than heading 7616, HTS.[21]  SolarWorld Br. 18–22; Reply Br. of Defendant-

Intervenor SolarWorld Americas, Inc. Confidential Version 6–9, Oct. 27, 2016, ECF No.

68 ("SolarWorld Reply").  SolarWorld contends that heading 7604, HTS, is inappropriate

because the provision applies only to unfinished articles and frames of uniform cross-

section, alleging that respondents' aluminum frames are neither unfinished nor of uniform

cross-section.  SolarWorld Br. 20–22; SolarWorld Reply 7–9.  SolarWorld highlights

United States Customs and Border Protection ("CBP") rulings which support its position.

---

[21] SolarWorld also characterizes Commerce's use of heading 7604, HTS, for valuing respondents' aluminum frames as "unlawful."  <u>See</u> SolarWorld Br. 18–19, 22.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 26 of 44

Consol. Ct. No. 15-00080                                                      Page 26
**PUBLIC VERSION**

SolarWorld Br. 19–21; SolarWorld Reply 7.  Defendant responds that Commerce's use of heading 7604, HTS, is reasonable because the subheading constitutes the best available information to value the aluminum frame inputs.  Def.'s Resp. 27–30.  For the reasons that follow, Commerce's determination is reasonable and is sustained.

As discussed above, Commerce calculates the normal value of subject merchandise from an NME country by valuing factors of production utilized in producing the merchandise.  19 U.S.C. § 1677b(c)(1).  Commerce values each factor of production with the "best available information," using available surrogate data from a comparable market economy country that is a significant producer of comparable merchandise.  19 U.S.C. § 1677b(c)(1).  Commerce calculates certain of these inputs using "import-based, per-unit surrogate values."  See Prelim. Decision Memo at 22.

Here, both respondents reported aluminum frames as a production input, so Commerce sought surrogate value data by which to value the cost of the aluminum frames.  See Final Decision Memo at 48–49; Prelim. Surrogate Value Memo at 3.  Commerce found that the best available information by which to value respondents' aluminum frames was the average value of South African imports under subheading 7604.29.65, HTS ("Aluminum alloy bars, rods and profiles, other than hollow profiles of a maximum cross-sectional dimension not exceeding 370 mm"), rather than Thai imports under subheading 7616.99, HTS, ("Articles of aluminum not otherwise specified or indicated: other") covering a more diverse array of aluminum products.  Final Decision Memo at 48–50; see Prelim. Surrogate Value Memo at 3–4  Commerce determined that "HTS category 7616.99 is a catch-all category that covers many diverse aluminum products–such as reels, cups, bag handles, and cigarette cases–whose value is not

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 27 of 44

Consol. Ct. No. 15-00080                                                    Page 27
**PUBLIC VERSION**

reasonably comparable [to solar panel aluminum frames]." Final Decision Memo at 49. Because the respondents described their aluminum frames as "an aluminum alloy made frame that is an aluminum profile having a cross section of less than 370mm," id. at 48, and Commerce "did not find anything on the record, or during verification, to call into question the accuracy of both respondents' descriptions of their aluminum frames," id. at 48–49, Commerce determined that subheading 7604.29.65, HTS, was the best available information regarding the surrogate market value of respondents' aluminum frames. Id.

Commerce reasoned that subheading 7604.29.65, HTS, encompasses all aluminum profiles and therefore is the best available information to value this FOP. Final Decision Memo at 48–49. The alternative HTS category is a catch all category which Commerce reasoned is not reasonably comparable. Id. Commerce confronted SolarWorld's arguments that various CBP rulings would support using subheading 7616.99, HTS. Id. at 48–50. Commerce noted that the agency is not bound by CBP rulings "when selecting import values from surrogate countries," id. at 49, and emphasized that Commerce is bound instead by its statutory requirement to value inputs using the best available information. Id.; see 19 U.S.C. § 1677b(c)(1); 19 C.F.R. §§ 351.408(a)–(c). Thus CBP's decision that solar panel aluminum frames should be classified under the residual catch-all category does not mean that the values of the myriad diverse goods that fall within that category– such as bag handles and cigarette cases– provide the best approximation of the market value of solar panel aluminum frames. See Final Decision Memo at 49.

Likewise Commerce responded to SolarWorld's claim that respondents' aluminum frames do not meet the definition for "profiles" under heading 7604, HTS, as the frames

are not of uniform cross section along their entire length as required in the Chapter Notes

to Chapter 76.[22]   SolarWorld Br. 21–22.   SolarWorld emphasizes record evidence

demonstrating that respondents' frames possess corners, cut-outs, and holes which,

according to SolarWorld, render the frames' cross-section non-uniform and thus detract

from finding that the selection of heading 7604, HTS, is supported by substantial

evidence.[23]   Commerce noted that the frames' corners "are only a small part of the

aluminum frames used to build solar modules," Final Decision Memo at 50, from which it

is discernible that Commerce considers the corners are not significant to alter the article

from those covered by the subheading.   Although HTS Chapter Notes have the force of

law for classification purposes, the frames are not being classified here; Commerce's

---

[22] SolarWorld also argues that there was evidence before Commerce in this investigation that the respondents' aluminum frames were finished articles, which detracts significantly from Commerce's conclusion that the aluminum frames are more similar to unfinished aluminum articles under heading 7604, HTS. SolarWorld Br. 19–21. SolarWorld argues that heading 7604 is specific to unfinished articles, id., such that an otherwise covered article (i.e., an aluminum bar, rod, or profile) "that has been subsequently worked into a finished, ready-to-use product is no longer described by Heading 7604, but by other headings describing those finished, ready-to-use products – in this case, Heading 7616." SolarWorld Reply 8–9. SolarWorld contends that heading 7604 is limited to unfinished articles due to the absence of record evidence indicating that finished articles fall within the heading. SolarWorld Br. 20–21. Commerce addressed SolarWorld's argument, and determined that the inquiry into finished or unfinished articles was

> not relevant to our decision. While there are CBP rulings on the record which support the use of HTS subheading 7604 and these rulings relate to unfinished aluminum articles, this does not necessarily mean that HTS subheading 7604 would only apply to unfinished aluminum profiles. In fact, the ITC definition of aluminum profiles cited by Petitioner indicates that profiles may be worked after production.  While other HTS categories identify whether they pertain to finished or unfinished items, HTS subheading 7604 does not specify whether it covers finished or unfinished aluminum profiles.

Final Decision Memo at 49.  Defendant emphasizes that the ITC definition indicates that "the aluminum profiles could be finished or unfinished."  Def.'s Resp. 30.

[23] SolarWorld emphasizes that Commerce collected at verification photographs of Trina's aluminum frames, which demonstrated that the frames possess "[[

                                             ]]."  SolarWorld Reply 7.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 29 of 44

Consol. Ct. No. 15-00080                                                          Page 29
**PUBLIC VERSION**

inquiry regards finding the value data that is the closest fit for the frames. Although heading 7604, HTS, may be an imperfect selection, Commerce's determination that it is a closer fit to the frames than SolarWorld's suggested category, heading 7616, HTS–a catch-all provision covering articles that are entirely dissimilar to frames–is not unreasonable. Commerce's inquiry is intended to obtain the most accurate, comparable value data for articles that are the most comparable to respondent's frames. Commerce's implicit concern that the less-specific catch-all provision would yield less accurate data, as the data values less comparable articles. See Universal Camera Corp. v. N.L.R.B., 340 U.S. at 488. Therefore, Commerce's use of subheading 7604.29.65, HTS, to value respondents' aluminum frames is supported by substantial evidence.

### IV. Surrogate Values for Scrap Solar Cells/Modules[24]

SolarWorld also challenges Commerce's use of South African import data under subheading 8548.10, HTS ("Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary and electric storage batteries"), to value respondent's offsets for scrapped solar cells when calculating normal value. SolarWorld Br. 22–25; Final Decision Memo at 51; 19 U.S.C. § 1677b(c).

---

[24] Trina Solar reported the by-product offset was related to its "module scrap," comprised of "completely broken modules." See, e.g., Trina Solar Questionnaire Section D at D-21, CD 394–411, bar code 3202241-01 (May 15, 2014). Commerce referred to the scrap as "scrap modules" in the preliminary determination, when the agency originally selected South African HTS heading 8548 as the appropriate category of import data for valuing the offset. See [AD] Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC]: Preliminary Analysis Memorandum for Changzhou Trina Solar Energy Co., Ltd., Attach. II, All Input Prices, July 24, 2014, ECF No. 97-14. However, Commerce referred to the by-product as "scrap solar cells" in the final determination, without explanation for the change in term. See Final Decision Memo at 50–51. SolarWorld and Defendant likewise each refer to the by-product as "scrap solar cells." See, e.g., SolarWorld Br. 22; Def.'s Resp. 30. Upon remand Commerce must explain its selection of an appropriate HTS subheading for "scrap modules," consistent with Trina Solar's reported by-product.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 30 of 44

Consol. Ct. No. 15-00080                                                    Page 30
**PUBLIC VERSION**

SolarWorld argues that Commerce's selection of subheading 8548.10, HTS, is not supported by substantial evidence, contending that Commerce unreasonably valued the by-product using values that were not representative of the scrap solar cells.  See SolarWorld Br. 22–25.  SolarWorld contends that subheading 2804.69, HTS ("Hydrogen, rare gases, and other nonmetals: Silicon: Other"), is the appropriate subheading for scrap polysilicon of less than 99.99 percent purity, and that Commerce should have valued the offsets for respondent's scrapped solar modules using Thai import data under subheading 2804.69, HTS.  Id.  Defendant responds that Commerce's determination that subheading 8548.10, HTS, constitutes the best available information for valuing the by-product offset is supported by substantial evidence.  Def.'s Resp. 30–32.  For the reasons that follow, this issue is remanded to Commerce to explain or reconsider its selection of subheading 8548.10, HTS, for valuing respondent's scrap solar modules.

As discussed above, Commerce calculates normal value for NME respondents by valuing FOPs based on surrogate values from producers of comparable merchandise in market economy countries of comparable economic development.   19 U.S.C. § 1677b(c)(1).  In calculating normal value, Commerce may also allow adjustments for normal value via offsets, including scrap material or by-products.  See 19 C.F.R. § 351.401; Am. Tubular Prod., LLC v. United States, 847 F.3d 1354, 1358 (Fed. Cir. 2017) (explaining that "[t]he production of [subject merchandise] may generate [scrap materials], which may be sold for revenue to offset the raw material cost for producing the [subject merchandise] that generated the scrap," and noting that a respondent bears the burden of establishing its entitlement to a scrap offset.).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 31 of 44

Consol. Ct. No. 15-00080                                                    Page 31
**PUBLIC VERSION**

Here, Trina Solar reported generating "module scrap" comprised of "completely broken modules" in the production of its subject merchandise.  Trina Solar Questionnaire Section D at D-21, CD 394–411, bar codes 3202241-01–18 (May 15, 2014).  Trina Solar reported that these broken modules constitute a by-product of the solar module production process, as all of the broken modules are sold, and claimed a by-product offset to normal value for the scrapped modules.  Id. at D-21; see Prelim. Decision Memo at 21.  Commerce accordingly sought representative surrogate data by which to value the scrap generated and sold during the POI for offsetting Trina Solar's normal value.  See Final Decision Memo at 50–51.  Commerce determined that subheading 8548.10, HTS, is "more similar to solar cells than the HTS category for polysilicon (HTS subheading 2804.69), which is only specific to one raw material contained in the solar cell – polysilicon – and is also not specific to scrap materials."  Id. at 51.

SolarWorld argues that Commerce did not consider record evidence which detracts from the reasonableness of a determination that subheading 8548.10, HTS, is the appropriate subheading for valuing scrapped solar cells.  SolarWorld Br. 22–25.  SolarWorld argues that heading 8548, HTS, covering batteries that are produced using different raw materials and a different manufacturing process than solar cells, "has nothing at all to do with photovoltaic products, including scrap solar cells," id. at 23, whereas subheading 2804.69, HTS, covers products that are specific to scrap solar cells, because it captures polysilicon of less than 99.99 percent purity, which "accounts for the 'scrap' nature of the scrap solar cells."  Id. at 25.  SolarWorld argues that polysilicon is "by far the predominant raw material in solar cells, and the raw material that is reclaimed when solar cells are scrapped."  Id.  SolarWorld further argues, as it did before

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 32 of 44

Consol. Ct. No. 15-00080                                                      Page 32
**PUBLIC VERSION**

Commerce, see Case Br. of SolarWorld Americas, Inc. 45, ECF No. 80-5, that heading

8548, HTS, is specific to "batteries and battery parts," particularly those capable of being

recharged, as is clarified by the Chapter 85 Chapter Notes.  SolarWorld Br. 23 (emphases

in original).  Because the value of scrapped solar cells, whose "predominant raw material"

is polysilicon of greater than 99.99 percent purity, will differ from the value of scrapped

lead-acid or nickel-cadmium batteries, SolarWorld argues that Commerce unreasonably

valued scrap solar cells using data for spent batteries, rather than data for scrapped raw

polysilicon.  See id. at 23–25.

         Commerce did not sufficiently address this evidence.  Commerce concluded that

SolarWorld "provided no evidence or basis for finding that imports under HTS subheading

8548.10 would not include scrap solar cells," Final Decision Memo at 51, but the agency

did  not  address  SolarWorld's  argument  that  the  language  of  heading  8548,  HTS,

evidences that the products imported under that heading are specific to electrical batteries

and "are produced using a significantly different manufacturing process with completely

different raw material inputs than are solar cells."   SolarWorld Br. 23; see also Final

Decision Memo at 50–51.  Although Commerce has considerable discretion in selecting

the appropriate data to calculate surrogate values, see Fujitsu General Ltd. v. United

States, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (granting Commerce significant deference in

determinations "involv[ing] complex economic and accounting decisions of a technical

nature"), Commerce "must cogently explain why it has exercised its discretion in a given

manner."  Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S.

29, 48–49 (1983).  Because Commerce did not address SolarWorld's arguments, the

agency has failed to adequately explain how its decision is reasonable in light of the

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 33 of 44

Consol. Ct. No. 15-00080                                                          Page 33
**PUBLIC VERSION**

record as a whole, including the evidence that reasonably detracts from its conclusion.

Universal Camera Corp. v. NLRB, 350 U.S. 474, 488 (1951) ("The substantiality of

evidence must take into account whatever in the record fairly detracts from its weight.").

Defendant makes two post hoc rationalizations not discernible in Commerce's

determination.    First, Defendant contends that Commerce selected subheading

8548.10, HTS, because Commerce determined that subheading 2804.69, HTS, "was less

representative of scrap solar cells because it would undervalue the costs associated with

the additional raw material components comprising a cell," as it is a subheading specific

to just one material in the solar cells.  Def.'s Resp. 32.  This reasoning is not discernible

from Commerce's analysis.  Second, Defendant contends that, "Commerce reasonably

determined that solar cells were more similar to the parts of 'electrical machinery' covered

by chapter 85 of the HTS than simple polysilicon because they are capable of generating

electricity."  Id.  Commerce says nothing regarding the ability of solar cells to conduct

electricity, and it is not discernible within Commerce's analysis that the agency considered

the solar cells' ability to generate solar power when determining that the products covered

by subheading 8548.10, HTS, are most similar to respondents' scrapped solar cells.  If

either of these rationalizations informed Commerce's selection of subheading 8548.10,

HTS, on remand Commerce must make these rationalizations explicit and identify the

record evidence that supports them.  See NMB Singapore Ltd. v. United States, 557 F.3d

1316, 1319 (Fed. Cir. 2009) ("Commerce must explain the basis for its decisions; while

its explanations do not have to be perfect, the path of Commerce's decision must be

reasonably discernable to a reviewing court.").  Accordingly, remand is necessary so that

Commerce may reconsider its determination that subheading 8548.10, HTS, is the

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 34 of 44

Consol. Ct. No. 15-00080                                                    Page 34
**PUBLIC VERSION**

appropriate category with which to value respondent's by-product or provide additional

explanation explicitly addressing SolarWorld's arguments and evidence to the contrary.

### V.  Trina Solar's Quality Insurance Indirect Selling Expense

SolarWorld challenges Commerce's determination to accept and use information

provided by Trina Solar during verification to adjust Trina Solar's U.S. prices for quality

insurance expenses,[25] rather than using facts otherwise available under 19 U.S.C. §

1677e(a).  SolarWorld Br. 26–30; see 19 C.F.R. § 351.402(b).  SolarWorld argues that

Commerce should have applied facts available (i.e., Trina Solar U.S.'s quality expense

information for the insurance policy covering the last two months of the POI) to calculate

Trina Solar's quality insurance expenses for the first four months of the POI, rather than

accepting the information Trina Solar provided for the first four months' expenses.  Id. at

26.  Defendant contends that Commerce properly accepted the quality insurance expense

information related to the first two months' policy.  Def.'s Resp. 32–37.  Commerce's

decision to accept and use new information obtained at verification related to Trina Solar's

quality insurance expenses is sustained.

Commerce conducts verification of, inter alia, "producers, exporters, or importers"

in order "to verify the accuracy and completeness of submitted factual information."  19

C.F.R. § 351.307(d).  Consistent with this objective, Commerce accepts new information

at verification under limited circumstances: "only when: (1) the need for that information

was not evident previously; (2) the information makes minor corrections to information

---

[25] The quality insurance expenses relate to the cost of insurance policies purchased by Jinko Solar as a guarantee that the conditions of the company's 25-year warranty would be met.  See Final Decision Memo at 53; Trina Solar Verification Report at 2, 24.   At verification, Trina Solar officials explained that the company [[

]]  Trina Solar Verification Report at 24.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 35 of 44

Consol. Ct. No. 15-00080                                                      Page 35
**PUBLIC VERSION**

already on the record; or (3) the information corroborates, supports, or clarifies information already on the record." Antidumping Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC]: U.S. Verification Agenda at 2, PD 726, bar code 3219163-01 (July 31, 2014) ("Commerce Verification Notification"). Commerce is afforded broad discretion to make such determinations which "involve complex economic and accounting decisions of a technical nature." See Fujitsu Gen. Ltd., 88 F.3d at 1039; Torrington Co. v. United States, 68 F.3d 1347, 1351 (Fed. Cir. 1995); Smith-Corona Group v. United States, 713 F.2d 1568, 1571 (Fed. Cir. 1983), cert. denied, 465 U.S. 1022 (1984). The court addresses whether Commerce's determination is reasonable and within this discretion. See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm, 463 U.S. at 48–49("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–405, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

Here, during verification Commerce accepted as minor corrections Trina Solar's quality insurance expense information covering the POI for the purposes of adjusting U.S. sales price.[26] Final Decision Memo at 53; Verification of Trina Solar (U.S.) Inc. in the [AD]

---

[26] When calculating constructed export price, Commerce is directed to "make certain adjustments to the price to the unaffiliated purchaser in the United States." 19 C.F.R. § 351.402(a). Specifically, the Department will adjust the price of U.S. sales by deducting "expenses associated with commercial activities in the United States that relate to the sale to an unaffiliated purchaser, no matter where or when paid." 19 C.F.R. § 351.402(a). Commerce noted that it made adjustments for the quality insurance expenses covering the entire POI here, even though the insurance expenses for the first four months of the POI were paid by a Trina Solar entity outside the U.S.:

> While a company or companies outside of the United States may have obtained,
> and paid for, part of Trina U.S.' quality insurance during the POI, the insurance

(footnote continued)

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 36 of 44

Consol. Ct. No. 15-00080                                                    Page 36
**PUBLIC VERSION**

Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC] at 2, 24, PD 759, CD 952 (Sept. 26, 2014) ("Trina Solar Verification Report").  Commerce first accepted and verified quality insurance expense information covering the last two months of the POI, reported by Trina Solar U.S. officials during verification as a correction to its indirect selling expense information.  See Trina Solar Verification Report at 2, 24.  Upon receiving this information, Commerce questioned the company's officials as to whether Trina Solar U.S. had similar insurance expenses for the first four months of the POI.  Id.; Final Decision Memo at 53.  Trina Solar U.S. officials explained that a different Trina Solar entity had paid the quality insurance policy covering the earlier part of the POI, and provided Commerce with information related to that policy coverage.[27]  Trina Solar Verification Report at 24; Final Decision Memo at 53.  Commerce verified this new information.  Trina Solar Verification Report at 24; Final Decision Memo at 53.  Commerce ultimately used the information from both policies to value Trina Solar's quality insurance expenses and deducted these expenses from the constructed export price.   Final Decision Memo at 54; see 19 U.S.C. § 1677a(d)(1).

Commerce's decision to accept the insurance expense information for the first four months of the POI is reasonable as the new information corrected and clarified the quality

---

covered Trina U.S.' sales.  Thus, the payment outside of the United States was associated with commercial activities in the United States relating to sales to unaffiliated purchasers.  Therefore, the adjustment to U.S. prices for quality insurance expenses should not be limited to only those insurance payments made by Trina U.S.

Final Decision Memo at 53 (internal citations omitted).

[27] The information indicated that Trina Solar U.S. had one quality insurance policy covering the first approximately four months of the POI and a second policy covering the remaining portion of the POI, a period of approximately two months.  Final Decision Memo at 53.  Trina Solar U.S. originally proffered as a minor correction information related to the policy covering the last two months.  Id.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 37 of 44

Consol. Ct. No. 15-00080                                                    Page 37
**PUBLIC VERSION**

insurance expense information already on the record for the last two months of the POI.

<u>See</u> Commerce Verification Notification at 2.  At verification Trina Solar presented quality

insurance expense information for only the last two months of the six month POI, which

Commerce accepted as a minor correction to Trina Solar's reported indirect selling

expenses; Commerce then asked Trina Solar officials whether similar expenses existed

for the first four months of the POI and Trina Solar officials presented documentation of

the requested expenses.  <u>See</u> Trina Solar Verification Report at 24.  Commerce's request

for, and acceptance of, this additional information was reasonable as it led to more

accurate and complete information with which to calculate Trina Solar's indirect selling

expenses.  Commerce's acceptance of the information was consistent with Commerce's

policy to accept new information at verification when that information, inter alia, corrects

or clarifies information already on the record.  <u>See</u> Commerce Verification Notification at

2.  This new information served to clarify that the quality insurance expenses for the last

two months were not representative of the expenses for the entire POI, and to correct the

overall expense data for the POI by including the lower expenses paid during the first four

months.  Had Commerce not accepted the new information, Commerce would have

utilized the higher expenses for the last two months to value the expenses for the entire

POI, which would have been inaccurate.  The new information thus led to a more

complete and accurate picture of the respondent's indirect selling expenses, and

Commerce's acceptance of it was therefore reasonable.  <u>See</u> 19 C.F.R. § 351.307(d).

SolarWorld argues that Commerce was statutorily required to use "facts available"

to value the insurance expenses for the first four months of the POI.  SolarWorld Br. 26–

28; SolarWorld Reply 14–15.  SolarWorld alleges that "Trina withheld [information related

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 38 of 44

Consol. Ct. No. 15-00080                                                      Page 38
**PUBLIC VERSION**

to the insurance policy], failed to provide [it] by the appropriate deadline, in so doing impeded [the] proceeding and, finally, when specifically asked by Commerce at verification, provide[d] the requested information, but with supporting documentation that was incapable of being verified."  SolarWorld Br. 28 (internal citations and quotations to 19 U.S.C. § 1677e(a)(2) omitted).   Commerce explained that, because "[t]he actual expenses for quality insurance covering the entire POI are on the record and were verified by the Department," there was "no reason to resort to facts available pursuant to [19 U.S.C. § 1677e(a)]."  Final Decision Memo at 53.  This statement provides the reasoning underlying Commerce's determination to use the information, see Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm, 463 U.S. at 48–49 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."), and the decision to use the verified information rather than facts available serves Commerce's ultimate objective to achieve an accurate dumping margin.  Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible.").

SolarWorld also argues that Commerce's determination to accept and use the information submitted by Trina Solar in relation to the earlier insurance coverage was not supported by substantial evidence because Trina Solar officials "provided [[


]]" as evidence of the coverage.  See SolarWorld Br. 27– 28.   However, Commerce emphasized that agency verifiers verified the information presented.  Final Decision Memo at 53.  Commerce met with Trina Solar officials and

Case 1:15-cv-00080-CRK Document 101 Filed 05/26/17 Page 39 of 44

Consol. Ct. No. 15-00080                                                                  Page 39
**PUBLIC VERSION**

made credibility determinations in person during the verification procedure, <u>see</u> Trina

Solar Verification Report at 1–2, 24–25, and the court will not substitute its judgment for

that of Commerce.[28]  <u>See</u>, <u>e.g.</u>, <u>De Samo v. Dep't of Commerce</u> 761 F.2d 657, 661 (Fed.

Cir. 1985) ("Where, as here, the presiding official expressly found a witness . . . credible,

this court cannot substitute a contrary credibility determination based on a cold paper

record.").  Commerce's determination to accept the new information provided by Trina

Solar with respect to its quality insurance expenses for the entirety of the POI is sustained.

### VI. Offset for Export Subsidies

Finally, SolarWorld challenges Commerce's practice of offsetting a respondent's

AD duty cash deposit rate in an investigation by the full amount of an export subsidy

calculated based on AFA in the companion CVD investigation as unreasonable and

contrary to law.[29]  <u>See</u> SolarWorld Br. 30–33.  Specifically, SolarWorld argues that

offsetting the full export subsidy, determined through applying an adverse inference,

against the AD cash deposit rate neutralizes the adverse effect by lowering the combined

AD/CVD cash deposit rate.  <u>See id.</u> at 32.  Defendant responds that Commerce has

reasonably determined to offset export subsidies against the AD cash deposit rate in

investigations because Commerce concludes that including estimated the AD and CVD

rates in the cash deposit rate would result in double-application for the same act.  <u>See</u>

---

[28] SolarWorld argues that evidence was fabricated solely for the purpose of Commerce's verification; Commerce concluded otherwise.  <u>See</u> Trina Solar Verification Report at 24. Commerce verified this evidence as credible, <u>see</u> Trina Solar Verification Report at 24, although SolarWorld believes that this was in error.  <u>See</u> SolarWorld Br. 27.

[29] Although 19 U.S.C. § 1677e(a)–(b) and 19 C.F.R. § 351.308(a)–(c) each separately provide for the use of facts otherwise available and the subsequent application of an adverse inference to those facts, Commerce uses the shorthand term "adverse facts available" or "AFA" to refer to Commerce's use of such facts otherwise available with an adverse inference.  <u>See</u>, <u>e.g.</u>, Final Decision Memo at 6 (discussing the circumstances justifying Commerce's application of AFA to respondents who failed to provide information that was in its possession).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 40 of 44

Consol. Ct. No. 15-00080                                                Page 40
**PUBLIC VERSION**

Def.'s Resp. Br. 38–40.  Commerce's practice of offsetting the AD cash deposit rate by an export subsidy, even one based on AFA, in the companion CVD investigation is reasonable because Commerce's practice is calculated to ensure that the adverse inference is applied only once.

If Commerce issues a final determination that subject merchandise is being, or is likely to be sold in the United States at less than fair value, Commerce orders the posting of a cash deposit for each entry of the subject merchandise based on an amount based on the estimated weighted average dumping margin.  See 19 U.S.C. §§ 1673d(a)(1), 1673(c)(1)(B)(i)–(ii).  Neither the statute nor Commerce's regulations otherwise define how the cash deposit is to be calculated in an investigation.  Commerce has discretion to establish a reasonable practice to calculate a cash deposit rate in investigations where there is no clear statutory directive.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009).[30]

Here, Commerce initially calculated a cash deposit rate and then offset that rate by the amount of the export subsidy calculated in the concurrent CVD investigation.  See Final Decision Memo at 38.  Commerce explains that, although the statute does not direct it to reduce the cash deposit rate as it does direct the export price to be increased in an AD administrative review, offsetting the AD cash deposit rate by the export subsidy in the concurrent CVD investigation seeks to avoid the application of AD duties on reduced export prices that result from the same export subsidy that has been remedied by the

---

[30] However, in an AD administrative review, the price used to establish export price and constructed export price must be increased by "the amount of any countervailing duty imposed on the subject merchandise . . . to offset an export subsidy."  19 U.S.C. § 1677a(c)(1)(C).

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 41 of 44

Consol. Ct. No. 15-00080                                           Page 41
**PUBLIC VERSION**

CVD rate.[31]   See id. at 39.   Commerce justifies relying on this practice even where the

export subsidy rate is based on AFA because the offset ensures that, like the offset of a

calculated export subsidy CVD rate, the adverse inference is applied only once in the

form of an increased CVD rate and also through higher AD duties.   Id.   Commerce's

determination that the AFA export subsidy serves as a substitute for a calculated export

subsidy is reasonable.   Commerce's practice in investigations is also reasonable because

fosters consistency in investigations and administrative reviews.   See id. at 39; see also

19 U.S.C. § 1677a(c)(1)(C) (providing that the price used to establish export price and

constructed export price in calculating a dumping margin in an administrative review shall

be increased by the amount of any countervailing duty imposed on the subject

merchandise to offset an export subsidy).   Commerce reasonably exercised its discretion

to offset the AD margin by the AFA CVD rate to avoid estimating duties in the AD cash

deposit rate that are reflected in the CVD cash deposit.   See id.

SolarWorld's claim that Commerce's practice neutralizes the adverse effect of the

AFA rate mischaracterizes the nature of the AFA rate.[32]   See SolarWorld Br. 32.   An

export subsidy calculated using AFA reflects Commerce's determination of the amount of

---

[31] Commerce interprets 19 U.S.C. § 1677a(c)(1)(C) to require that it offset export price in its AD margin calculation in an administrative review by the amount of the export subsidy actually assessed in the countervailing duty proceeding.   See Final Decision Memo at 38.   Although Commerce recognizes that cash deposit rates in investigations are estimates of AD duties, and consequently serve different purposes than assessment rates in that they are subject to modification and only become final where administrative reviews are not requested, Commerce states that cash deposits are, in most respects, "calculated in the same manner as assessment rates determined in reviews." Id. at 38–39.   Since Commerce does not assess AD duties on the portion of the AD margin attributed to export subsidies under 19 U.S.C. § 1677a(c)(1)(C), Commerce concludes there is no reason to require a cash deposit to secure the amount attributable to the export subsidy.   See id. at 39.

[32] Specifically, SolarWorld points out that the practice simultaneously decreases the AD rate by the full AFA rate calculated for the export subsidy, so the deterrent effect of the adverse inference on respondents combined AD and CVD cash deposit rate is neutralized.   See SolarWorld Br. 32.

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 42 of 44

Consol. Ct. No. 15-00080                                                Page 42
**PUBLIC VERSION**

an export subsidy that actually benefited the subject merchandise.  See 19 U.S.C. § 1677e(b)(1)(A) (stating that Commerce may use an adverse inference to reach the "applicable determination").  In calculating an AFA rate, Commerce is guided not only by creating a proper deterrent to non-cooperation, see 19 U.S.C. § 1677e(b), but also by the corroboration requirement in 19 U.S.C. § 1677e(c), which requires that the AFA rate "be a reasonably accurate estimate of the respondent's actual rate."  See F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  It follows from the requirement that "the AFA rate must be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance," see Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (quoting De Cecco, 216 F.3d at 1032), that an export subsidy based on AFA serves as a substitute for a calculated rate.  SolarWorld emphasizes that "when the export subsidy margin is determined on the basis of an adverse inference, the relationship between the export subsidy margin and the 'actual' benefits received breaks down."  SolarWorld Reply Br. 19.  However, although the statute emphasizes two considerations that factor in arriving at an AFA rate, the product of the balancing of deterrence and accuracy is only one AFA rate for the export subsidy program in question. Therefore, Commerce cannot avoid double-counting the export subsidy (i.e., including the export subsidy in the CVD cash deposit rate while also including it in the AD cash deposit rate) without also undermining the deterrent effect of the adverse inference (i.e.,

Case 1:15-cv-00080-CRK   Document 101   Filed 05/26/17   Page 43 of 44

Consol. Ct. No. 15-00080                                                    Page 43
**PUBLIC VERSION**

reducing the combined cash deposit rate).[33]  Commerce is in the best position to balance

deterrence with assuring a reasonable margin, cf. De Cecco, 216 F.3d at 1032, and the

balance favored by Commerce here is reasonable.  Therefore, Commerce's practice of

offsetting the entire export rate calculated through AFA is reasonable and not contrary to

law.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determinations: 1) that

Mustek's financial statements constitute the best available information to value

respondents' general expenses and profit; 2) that import data for articles covered under

subheading 7604, HTS, constitutes the best available information for valuing

respondents' aluminum frames; 3) to accept, for purposes of adjusting Trina Solar's U.S.

prices, the information provided by Trina Solar during verification related to quality

---

[33] SolarWorld wrongly describes the basic economic theory underlying Commerce's offset practice as driven by the notion "that the respondent's export prices were lowered in exact correspondence to the export subsidy benefit."  SolarWorld Br. at 21.  Therefore, SolarWorld posits that the offset is unreasonable where the export subsidy is calculated through AFA because the AFA rate is not an exact approximation of the benefit received by the respondent.  See id. However, Commerce states only that its offset practice stems from the presumption that "the subsidy contributed to lower-priced sales of subject merchandise in the United States market" and that the subsidy are presumed to be "related."  Final Decision Memo at 38.  It is reasonably discernible that Commerce did not mean to imply that its offset practice is premised on a reduction in export price that precisely corresponds to the value of the benefit provided to respondents by the export subsidy.  Moreover, any such inference is belied by Commerce's reference to its final determination in Galvanized Steel and Wire From the People's Republic of China, which describes Commerce's offsetting practice for the AD cash deposit rate as premised only on the concept that domestic subsidies had a symmetrical effect upon export and domestic prices.  See id. at 39 (citing Galvanized Steel and Wire From the People's Republic of China, 77 Fed. Reg. 17,430 (Mar. 26, 2012) and accompanying Antidumping Duty Investigation of Galvanized Steel Wire from the People's Republic of China: Issues and Decision Memorandum for the Final Determination at 18, A-570-975, (Mar. 19, 2012) available at http://ia.ita.doc.gov/frn/summary/prc/2012-7212-1.pdf (last visited May 15, 2017) (explaining that there is no basis for concluding that 19 U.S.C. § 1677a(c)(1)(C) was based on an assumption that the effect of subsidies was to cause a pro rata reduction in export prices, only that domestic subsidies had a symmetrical effect upon export and domestic prices)).

**PUBLIC VERSION**

insurance expenses covering the entire POI; and 4) that respondents' AD cash deposit rate should be offset by the full amount of export subsidy calculated based on AFA in the companion CVD investigation.

This matter is remanded to Commerce for reconsideration or further explanation of the agency's decision to collapse the ReneSola entities with the Jinko entities, treating these companies as a single entity, and of the agency's decision to use South African import data under subheading 8548.10, HTS, to value Trina Solar's by-product offset for scrapped solar cells when calculating normal value.  In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's 1) determination to collapse the ReneSola entities with the Jinko entities, thereby treating these companies as a single entity, and 2) determination to use South African import data under subheading 8548.10, HTS, to value respondents' offsets for scrapped solar cells when calculating normal value, are remanded for further consideration consistent with this opinion.  Commerce shall file its remand determination with the court within 45 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

**ORDERED** that the parties shall have 15 days thereafter to file a reply to comments on the remand determination.

 /s/ Claire R. Kelly
Claire R. Kelly, Judge

Dated: May 18, 2017
New York, New York