Slip Op. 17-165

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JINKO SOLAR CO., LTD. ET AL.,<br><br>    Plaintiffs and Consolidated Plaintiff,<br><br>and<br><br>YINGLI GREEN ENERGY AMERICAS, INC. ET AL.,<br><br>    Plaintiff-Intervenors,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>SOLARWORLD AMERICAS, INC. ET AL.,<br><br>    Defendant-Intervenors and Consolidated Defendant-Intervenors. | Before: Claire R. Kelly, Judge<br><br>Consol. Court No. 15-00080<br>PUBLIC VERSION |

## OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's remand determination in its antidumping investigation of certain crystalline silicon photovoltaic products from the People's Republic of China.]

Dated: December 13, 2017

Alexander Hume Schaefer, Crowell & Moring, LLP, of Washington, DC, for Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd., and JinkoSolar (U.S.) Inc.

Timothy C. Brightbill and Usha Neelakantan, Wiley Rein, LLP, of Washington, DC, for SolarWorld Americas, Inc.

<u>Neil R. Ellis</u>, <u>Brenda Ann Jacobs</u>, <u>Rajib Pal</u>, and <u>Richard L.A. Weiner</u>, Sidley Austin, LLP, of Washington, DC, for Yingli Green Energy Americas, Inc., Yingli Green Energy Holding Co., Ltd., and Canadian Solar Inc.

<u>Tara Kathleen Hogan</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Reginald T. Blades, Jr.</u>, Assistant Director. Of Counsel on the brief was <u>James Henry Ahrens, II</u>, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

<u>Francis J. Sailer</u>, <u>Andrew Thomas Schutz</u>, and <u>Brandon Michael Petelin</u>, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Hanwha Solarone (Qidong) Co., Ltd. and Hanwha Solarone Hong Kong Limited.

  Kelly, Judge: Before the court for review is the U.S. Department of Commerce's ("Commerce" or "Department") remand determination in the antidumping investigation of certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC" or "China"), filed pursuant to the court's order in <u>Jinko Solar Co., Ltd. v. United States</u>, 41 CIT __, __, 229 F. Supp. 3d 1333, 1361 (2017). <u>See</u> Final Results of Redetermination Pursuant to Court Remand, Aug. 2, 2017, ECF No. 105-1 ("Remand Results"); <u>see also</u> <u>Certain Crystalline Silicon Photovoltaic Products from the [PRC]</u>, 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) ("<u>Final Results</u>") and accompanying Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value, A-570-010, (Dec. 15, 2014), ECF No. 34-5 ("Final Decision Memo").

  On remand, Commerce provided further explanation of its determination to collapse Renesola Jiangsu Ltd. and Renesola Zhejiang Ltd. (collectively "ReneSola group") with Jinko Solar Co., Ltd. and Jinko Solar Import & Export Co., Ltd. (collectively "Jinko group"), treating the ReneSola group and the Jinko group as a single entity for purposes of the antidumping investigation. <u>See</u> Remand Results 8–14, 18–25.

Commerce also provided further explanation of its determination to use South African import data for subheading 8548.10, Harmonized Tariff Schedule ("HTS"), to value respondents' by-product offsets for scrapped solar modules when calculating normal value.[1] See id. at 15–18, 25–29. For the reasons that follow, the court sustains Commerce's determination to collapse the ReneSola and Jinko groups and remands for reconsideration or further explanation, consistent with this opinion, Commerce's selection of South African import data for subheading 8548.10, HTS, for valuing the by-product offset for scrapped solar modules.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the previous opinion, see Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1338–39, and here recounts the facts relevant to the court's review of the Remand Results. In this investigation, Commerce selected Changzhou Trina Solar Energy Co. Ltd. and Renesola Jiangsu Ltd. as mandatory respondents for individual examination in this investigation. See Decision Memorandum for the Preliminary Determination in the Antidumping Duty Investigation of Certain Crystalline Photovoltaic Products from the [PRC] at 3, PD 698,

---

[1] In the prior opinion, the court noted that, while respondent Changzhou Trina Solar Energy Co. Ltd. reported the by-product offset as "module scrap," Commerce referred to the by-product as "scrap solar cells" in the final determination, and requested Commerce to explain on remand its selection of a heading for scrap modules, consistent with the reported by-product. Jinko Solar Co., Ltd., 41 CIT at __ n.24, 229 F. Supp. 3d at 1353 n.24. On remand Commerce clarifies that the offset is for scrapped solar modules, rather than scrapped solar cells. See Remand Results 8 n.28, 15 ("Although the petitioner and the Department have previously referred to the offset as an offset for scrap solar cells, we clarify here that the offset in question is module scrap and should be valued as such." (emphasis in original)).

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 4 of 20

Consol. Ct. No. 15-00080                                                                                          Page 4
**PUBLIC VERSION**

bar code 3217803-01 (July 24, 2014);[2] Section 777A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2)(B) (2012).[3] Commerce determined that mandatory respondent Renesola Jiangsu Ltd. is affiliated with Renesola Zhejiang, Jinko Solar Co. Ltd., and Jinko Solar Import & Export Co., Ltd., pursuant to 19 U.S.C. § 1677(33)(F), and that these entities should be collapsed and treated as a single entity for the antidumping investigation, pursuant to 19 C.F.R. § 351.401(f) (2014).[4]  See Final Results, 79 Fed. Reg. at 76,971 n.2; Final Decision Memo at 60–67; Mem. Pertaining to Renesola and Jinko Solar Affiliation and Single Entity Status at 7, PD 542, bar code 3207993-01 (June 6, 2014); see 19 C.F.R. § 351.401(f).  Commerce selected South Africa as the primary surrogate country and calculated mandatory respondents' dumping margins using South African import data to value factors of production and offsets for calculating respondents' normal value.  See Final Decision Memo at 29–37.  Pertinent here, Commerce used South African import data for subheading 8548.10, HTS ("Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary and electric storage batteries"), to value respondents' by-product offsets for scrap solar modules.  See id. at 50–51.

---

[2] On July 7, 2015, Defendant filed on the docket the indices to the public and confidential administrative records.  These indices are located on the docket at ECF No. 34.  All further references in this opinion to administrative record documents include the administrative record numbers assigned by Commerce in the indices.

[3] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[4] Further citations to the Code of Federal Regulations are to the 2014 edition.

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 5 of 20

Consol. Ct. No. 15-00080 Page 5
**PUBLIC VERSION**

In the prior decision, the court sustained in part and remanded in part Commerce's determination in this investigation.[5] Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1361. The court determined that Commerce's conclusion that the Jinko entities are affiliated with the ReneSola entities through common control by the Li family grouping[6] was supported by substantial evidence, see id., 41 CIT at __, 229 F. Supp. 3d at 1339–43, but that the agency did not sufficiently support its decision to collapse the affiliated entities. See id., 41 CIT at __, 229 F. Supp. 3d at 1343–47. The court noted that, while the enumerated provisions of Commerce's collapsing regulation require the agency to consider the extent of overlap of individual members on the boards of entities, "the evidence relied upon by Commerce only demonstrates that members of the Li family grouping sat on the boards of both entities." Id., 41 CIT at __, 229 F. Supp. 3d at 1344. Nonetheless the court emphasized that, because the enumerated provisions of the regulation are non-exhaustive, Commerce is not precluded from considering the fact that members of the Li family sat on the boards of the ReneSola and Jinko groups' entities as

---

[5] The court sustained Commerce's determinations: 1) that Mustek's financial statements constitute the best available information to value respondents' general expenses and profit; 2) that import data for articles covered under subheading 7604, HTS, constitutes the best available information for valuing respondents' aluminum frames; 3) to accept, for purposes of adjusting its U.S. prices, the information provided by Changzhou Trina Solar Energy Co. Ltd. during verification related to quality insurance expenses covering the entire period of investigation; and 4) that respondents' antidumping duty cash deposit rate should be offset by the full amount of export subsidy calculated based on adverse facts available in the companion countervailing duty investigation. See Jinko Solar Co., Ltd., 41 CIT, 229 F. Supp. 3d at 1361.

[6] Commerce explains that the Li family grouping consists of three brothers and their brother-in-law:

> [T]he founder and CEO of Renesola Ltd. and Renesola Zhejiang, Mr. Li Xianshou, and Mr. Li Xiande, Mr. Li Xianhua, and Mr. Chen Kangping, who are the Chairman of the Board, Vice President, and CEO, respectively, of Jinko Solar and Jinko Solar [Import & Export], are members of the same family. Mr. Li Xianshou, Mr. Li Xiande, and Mr. Li Xianhua are brothers. Mr. Chen Kangping is a brother-in-law of Mr. Li Xianshou.

Remand Results 10.

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 6 of 20

Consol. Ct. No. 15-00080                                                                                          Page 6
**PUBLIC VERSION**

suggestive of a potential for manipulation. Id., 41 CIT at __, 229 F. Supp. 3d at 1344–45. However the court noted that, if Commerce intends to rely on the fact that members of the Li family grouping sat on boards of both groups, Commerce must "explain how this factor creates a significant potential for the manipulation of price or production." Id., 41 CIT at __, 229 F. Supp. 3d at 1345. Additionally, the court determined that Commerce had not explained how the transactions between the ReneSola and Jinko groups were significant to a degree evidencing "intertwined operations" during the period of investigation ("POI"), in light of Commerce's finding that the two groups completed [[     ]] in mutual transactions in 2013 than in 2012 and that Renesola Ltd.'s reported transactions with Jinko group entities comprised a de minimis part of the ReneSola group's overall transactions. Id., 41 CIT at __, 229 F. Supp. 3d at 1345–47. On the basis of these concerns, the court remanded the agency's decision to collapse the ReneSola and Jinko groups. See id., 41 CIT at __, 229 F. Supp. 3d at 1345, 1347.

The court also remanded the agency's selection of South African import data for subheading 8548.10, HTS, to value the by-product offset for scrapped solar modules when calculating normal value. See Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1353–55. The court determined that the selection was unsupported by substantial evidence because Commerce had not considered the fact that the language of the subheading "evidences that the products imported under that heading are specific to electrical batteries" which, according to SolarWorld, "'are produced using a significantly different manufacturing process with completely different raw material inputs than are solar cells.'" Id., 41 CIT at __, 229 F. Supp. 3d at 1354–55 (quoting SolarWorld Br. Supp. Rule 56.2 Mot. J. Agency R. 23, Mar. 21, 2016, ECF No. 42 ("SolarWorld Br.")). The court also determined that Defendant had provided two post hoc rationalizations for

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 7 of 20

Consol. Ct. No. 15-00080                                                                                          Page 7
**PUBLIC VERSION**

Commerce's selection of subheading 8548.10, HTS, and stated that, should Commerce continue to select the subheading on remand and if either reason in fact underlies that selection, "Commerce must make these rationalizations explicit and identify the record evidence that supports them."[7] Id., 41 CIT at __, 229 F. Supp. 3d at 1355.  The court remanded the issue to Commerce to reconsider or further explain its determination that subheading 8548.10, HTS, is the appropriate category with which to value respondent's scrapped solar modules by-product, in light of the arguments to the contrary and the record evidence.  Id.

Commerce published the Remand Results on August 2, 2017.  Jinko Solar argues that, on remand, Commerce has continued to insufficiently explain its finding that the Li family relationship creates the potential for price or production manipulation between the ReneSola and Jinko groups and its finding of a significant level of intertwined operations between the groups' entities.  Comments on Final Results of Redetermination Pursuant to Court Remand Conf. Version 2–5, Sept. 5, 2017, ECF No. 110 ("Jinko Remand Comments").  SolarWorld supports the agency's decision to continue to collapse the ReneSola and Jinko entities, contending that the agency has supported its decision with evidence and explanation of significant potential for manipulation and intertwined operations.  See [SolarWorld]'s Comments on [Commerce]'s Final Results of Redetermination Pursuant to Court Remand Conf. Version 4–6, Sept. 5, 2017, ECF No.

---

[7] The two rationalizations that the court deemed post hoc are: 1) that Commerce selected subheading 8548.10, HTS, because subheading 2804.69, HTS, would undervalue the costs associated with the additional raw material components that make up solar cells, and 2) that subheading 8548.10, HTS, was selected because both electrical machinery and solar modules are capable of generating electricity.  See Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1355 (citing Def.'s Mem. Opp. Pls.', Pls.-Intervenors', and Def.-Intervenors' Rule 56.2 Mots. J. Upon Agency R. 32, Sept. 23, 2016, ECF No. 59).

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 8 of 20

Consol. Ct. No. 15-00080                                                                                    Page 8
**PUBLIC VERSION**

111. SolarWorld continues to challenge Commerce's use of subheading 8548.10, HTS, to value the by-product offset for scrapped solar modules. See id. at 6–9.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012). Commerce's antidumping determinations must be in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

### I. Commerce's Determination to Collapse the Affiliated Entities

The court remanded for Commerce to explain the agency's determination to collapse the affiliated ReneSola and Jinko groups, treating these companies as a single entity for the antidumping analysis. Jinko Solar Co., Ltd., 41 CIT at __, __, 229 F. Supp. 3d at 1343–47, 1361. For the reasons that follow, Commerce has complied with the court's order and the agency's determination of this issue on remand is sustained.

The statute does not address how Commerce is to treat affiliated entities for purposes of the antidumping analysis. See 19 U.S.C. §§ 1675(a)(2)(A)(ii), 1677b(a). However, the agency's regulations provide that Commerce may treat affiliated producers as a single entity when comparing export price with normal value "where those producers have production facilities for similar or identical products that would not require substantial retooling of either facility in order to restructure manufacturing priorities" and where Commerce "concludes that there is a significant potential for the manipulation of price or

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 9 of 20

Consol. Ct. No. 15-00080                                                                                              Page 9
**PUBLIC VERSION**

production." 19 C.F.R. § 351.401(f)(1). To determine the existence of a "significant potential for manipulation of price or production," Commerce may consider "[t]he level of common ownership" among the entities, "[t]he extent to which managerial employees or board members of one firm sit on the board of directors of an affiliated firm," and "[w]hether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers." Id. § 351.401(f)(2)(i)–(iii). Commerce may also consider non-enumerated factors when determining the existence of a significant potential for manipulation. See id. § 351.401(f)(2) (noting that "the factors [Commerce] may consider include" those factors enumerated in 19 C.F.R. § 351.401(f)(2)(i)–(iii)).

On remand, Commerce continued to determine that the Jinko and ReneSola groups should be collapsed and treated as a single entity pursuant to 19 C.F.R. § 351.401(f), because "the level of common ownership by the Li family of the two groups," "the board memberships and management positions held by members of the Li family," and "the extent to which operations between the two groups are intertwined" suggest significant potential for manipulation between the ReneSola group and the Jinko group. See Remand Results 14. Commerce emphasized that one Li brother was the founder and CEO of the entities within the ReneSola group while two other Li brothers and one brother-in-law each held prominent management and/or board positions of entities within the Jinko group. Id. at 9. Commerce clarified that, while no individual member of the Li family held a position on both a ReneSola entity and a Jinko entity, "the prominent role that the Li family," as a whole, played in the management of these two groups, with members of the family holding prominent positions on both groups, suggests "significant

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 10 of 20

Consol. Ct. No. 15-00080 Page 10
**PUBLIC VERSION**

potential for the manipulation of price or production across the two company groups via the Li family," id., in accordance with 19 C.F.R. § 351.401(f)(1). Id. at 10. Commerce reasoned that, due to the particular Li family relationship, there exists potential to "mak[e] decisions based on considerations beyond normal commercial considerations . . . ." Id. The agency concluded that, through these prominent positions within both groups, the Li family is enabled "to direct outcomes across the companies, and the Li family is positioned to coordinate its actions to direct the Rene[S]ola Group and the Jinko Group to act in concert or out of common interest." Id.

Commerce also addressed the court's concern that the agency had not previously explained how the transactions between the ReneSola and Jinko groups were significant to a degree evidencing intertwined operations, particularly in light of the change in the level of transactions during the POI. Remand Results 10–14; see Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1345–47. Commerce explained that the change in the level of transactions[8] is not an indication of a particular trend in transactions between the two groups, noting that "the record shows that the level of purchases from year to year fluctuates . . . ." Remand Results 10. Commerce concluded that the evidence of transactions between the Jinko and ReneSola groups instead demonstrates "that these companies have an ongoing commercial relationship." Id. at 11. Commerce highlighted in particular the change[9] in raw material purchases from ReneSola entities by a Jinko entity and noted that the year-end consolidated financial statements obtained from the

---

[8] The change was a [[        ]] in the value of purchases between the two groups from 2012 to 2013. See Remand Results 10.

[9] The change was an [[        ]] in raw material purchases from ReneSola entities by a Jinko entity. See Remand Results 11.

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 11 of 20

Consol. Ct. No. 15-00080                                                                                    Page 11
**PUBLIC VERSION**

entities did not reflect a comprehensive picture of the financial interactions between the entities during that calendar year. See id. at 11–12. While objecting to the percentages put forward by Plaintiffs, Jinko Solar Co., Ltd. et al., to suggest that the level of transactions were de minimis, Commerce noted that, "[i]rrespective of the actual percentage of the cost of sales represented by these transactions, we do not believe that over $18 million in purchases is an insignificant level of transactions." Id. at 13. Commerce further explained that the accounts receivable balance put forward by Plaintiffs "represents the amount of money that 'Jinko and its subsidiaries' owed Renesola Ltd. at a single point in time (December 31, 2013)," which "does not necessarily give an indication as to the significance of Renesola Ltd.'s sales to 'Jinko and its subsidiaries' during 2013." Id.

Commerce sufficiently supported its determination to collapse the ReneSola and Jinko groups and treat them as a single entity in this investigation. The agency explained the enumerated and non-enumerated factors that it considered, and why each was relevant to a finding that there exists "a significant potential for the manipulation of price or production" pursuant to 19 C.F.R. § 351.401(f)(1). Commerce took into account the prominent presence of Li family members on the management and boards of Jinko and ReneSola group entities, see Remand Results 8–10, and found in that presence the ability to make business decisions based on considerations "beyond normal commercial considerations" and "out of common interest." Id. at 10. It is reasonable to determine that family members in business relationships may have a common interest and that, because family relationships are relationships beyond the scope of normal commercial relationships, business relationships between family members might be influenced by factors beyond normal commercial factors. It follows from these reasonable assumptions

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 12 of 20

Consol. Ct. No. 15-00080                                                                                                    Page 12
**PUBLIC VERSION**

that family members with a business relationship may be in a position to use those business relationships towards a common interest, in a way that would create the potential for collaboration beyond the scope of a normal commercial relationship. The reasonableness of Commerce's assumption in this case is buttressed by the fact that, by virtue of their positions in the entities, Li family members are "positioned to coordinate" to "act in concert or out of common interest." Id.

Plaintiffs, Jinko Solar Co., Ltd. et al., argue that Commerce did not sufficiently explain its determination to collapse, contending that the agency simply relied on conclusory statements that do not evidence "the level of potential cross-operational control required to justify a collapsing determination." Comments on Final Results of Redetermination Pursuant to Court Remand 2, Sept. 1, 2017, ECF No. 109 ("Jinko Remand Comments"). Plaintiffs contend that, to support a decision to collapse, the entities' "shareholders would effectively have to conspire together to manipulate the activities of their companies [or . . .] other companies ultimately owned by their companies," emphasizing that "[t]here is no evidence of such activity, nor is there any evidence supporting the inference that Jinko and ReneSola, through these shareholders, would share sales information, become involved in each other's production or pricing decisions, or overlap or share facilities or employees." Id. at 3. However, Commerce's regulations do not require such evidence to support a determination to collapse. As discussed above, the regulations provide that Commerce may treat affiliated producers as a single entity where the agency "concludes that there is a significant potential for the manipulation of price or production," 19 C.F.R. § 351.401(f)(1), for which the agency may consider "[t]he level of common ownership" among the entities, "[t]he extent to which managerial employees or board members of one firm sit on the board of directors of an

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 13 of 20

Consol. Ct. No. 15-00080                                                                                          Page 13
**PUBLIC VERSION**

affiliated firm," "[w]hether operations are intertwined, such as through the sharing of sales information, involvement in production and pricing decisions, the sharing of facilities or employees, or significant transactions between the affiliated producers," and any other non-enumerated factors. Id. § 351.401(f)(2). The emphasis in the regulation is on the potential for, not actual, manipulation. Plaintiffs' argument that Commerce has insufficiently supported its conclusion by focusing on potential manipulation therefore fails.

Plaintiffs also argue that Commerce erred in its analysis by emphasizing that the transactions between the two groups are not insignificant, rather than demonstrating that the transactions "are so significant as to justify a determination that the companies' operations are 'intertwined.'" Jinko Remand Comments 4–5. Plaintiffs contend that "the mere fact of an 'ongoing commercial relationship' (particularly one featuring a volume [and value] of transactions as minimal as [those between the Jinko and ReneSola groups]) is a far cry from the level of 'intertwined operations' that 19 [C.F.R. §] 351.401(f)(iii) contemplates." Id. at 4. Contrary to Plaintiffs' argument, on remand Commerce does focus on the significance of the transactions, rather than the absence of insignificance.[10] Commerce explains that it found that the "history of transactions"

---

[10] In the Remand Results, Commerce does refer to the transactions as, essentially, not insignificant in response to the argument, addressed by the court prior to remand, that a [[          ]] in the values of transactions between the two entities from 2012 to 2013 suggests that the entities were not intertwined. See Remand Results 12–13. In reference to the relative drop in transactions between the two years, Commerce explains that "[i]rrespective of the actual percentage of the cost of sales represented by these transactions, we do not believe that over [[          ]] in purchases is an insignificant level of transactions." Id. at 13. This statement must be viewed in the context of Commerce's explanation that "the record shows that the level of purchases from year to year fluctuates, such that an increase or decrease in one year does not necessarily predict a continuing trend in the level of activity between these companies." Id. at 10. It is apparent from this explanation that Commerce considers the transactions between these entities in the context of their ongoing relationship, which Commerce has found to be significant. See id. at 14.

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 14 of 20

Consol. Ct. No. 15-00080                                                                                            Page 14
**PUBLIC VERSION**

between these two groups indicates "over [[         ]] and [[         ]] in purchases by Renesola Ltd. from 'Jinko and its subsidiaries' in 2012 and 2013, respectively," which the agency found to "demonstrate that, immediately prior to the POI, and in the calendar year overlapping the POI, there was a significant level of transactions between the Rene[S]ola and Jinko Groups," from which the agency concluded "that the potential for manipulation in the future exists." Remand Results 14. For the foregoing reasons, Commerce's determination to collapse the Jinko and ReneSola groups into a single entity for purposes of the antidumping duty analysis is reasonable.

## II. Surrogate Values for Scrap Solar Modules

The court also remanded Commerce's decision to use South African import data for subheading 8548.10, HTS, to value the by-product offset for scrapped solar modules when calculating normal value. Jinko Solar Co., Ltd., 41 CIT at __, 229 F. Supp. 3d at 1353–55, 1361. The court determined that the selection was unsupported by substantial evidence because Commerce did not explain why the selection is reasonable in light of "the language of heading 8548, HTS, [which] evidences that the products imported under that heading are specific to electrical batteries," which are dissimilar to scrapped solar modules in both material and production processes. Id., 41 CIT at __, 229 F. Supp. 3d at 1355 (citations omitted); see also SolarWorld Br. 23 ("Simply put, HTS heading 8548 has nothing at all to do with photovoltaic products, including scrap solar cells. Of course, batteries are produced using a significantly different manufacturing process with completely different raw material inputs than are solar cells."). For the reasons that follow, the court finds that, on remand, Commerce has still not adequately supported its selection of a surrogate value for the respondents' scrapped solar module by-product offsets, and

the issue is remanded to Commerce for further explanation or reconsideration consistent with this opinion.

Commerce determines whether a company is engaged in dumping by comparing the normal value of the subject merchandise with the actual or constructed export price of the merchandise. 19 U.S.C. § 1677b(a). The normal value of the merchandise is the price of the merchandise when sold for consumption in the exporting country. Id. § 1677b(a)(1)(B). However, when the exporting country is, like China, a nonmarket economy country, Commerce calculates the normal value for subject merchandise by valuing inputs including the factors of production utilized in producing the merchandise and "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." Id. § 1677b(c)(1). Commerce selects a surrogate value for each of these inputs from a source in a market economy country that is economically comparable to the nonmarket economy country and is a significant producer of comparable merchandise. Id. § 1677b(c)(4)(A)–(B); see 19 C.F.R. § 351.408(b). To select a surrogate value for each of these inputs, Commerce uses "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."[11] 19 U.S.C. § 1677b(c)(1); see 19 C.F.R. § 351.408(a)–(c). With "best available information" not defined in the statute, Commerce has discretion to determine what data constitutes the best available information for

---

[11] Commerce has a regulatory preference to value all inputs using data from a single surrogate country. See 19 C.F.R. § 351.408(c)(2) ("[Commerce] normally will value all factors in a single surrogate country.").

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 16 of 20

Consol. Ct. No. 15-00080                                                                                        Page 16
**PUBLIC VERSION**

valuing the inputs.[12]  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

On remand, Commerce continued to rely upon South African import data for subheading 8548.10, HTS, as the best available information for valuing scrapped solar modules.  See Remand Results 15–18.  Commerce explained that, after further consideration, it continues to find that scrapped solar modules "are more similar to the scrap battery materials covered under HTS 8548.10 than the raw polysilicon material covered under HTS 2804.69." Id. at 16.  Commerce explained that the products covered within subheading 8548.10, HTS "similarly include metal components and chemicals which, although not identical to the metal and chemical components in solar modules, are nonetheless metals and chemicals used in an engineered product designed to generate electricity that is no longer usable because of breakage, cutting up, wear, or other reasons[.]" Id. (internal quotation marks omitted).  Noting that both of these subheadings are "imperfect options," id., Commerce emphasized that subheading 8548.10, HTS, "more closely reflects the material composition of scrap solar modules, which include wire, metals, glass, and chemical compounds." Id. at 17.

Commerce's explanation on remand fails to adequately explain why its determination to value the respondents' scrapped modules using import data under subheading 8548.10, HTS, a category specific to scrapped battery cells, is supported by substantial evidence.  It is apparent from Commerce's focus on the scrap nature of the

---

[12] Commerce's practice in determining the "best available information" is to "use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data." See U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process 2 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 7, 2017).

by-product and of the products covered by subheading 8548.10, HTS, that the agency found the scrap nature of the by-product more significant to selecting an appropriate surrogate value than the material components of the by-product.  See, e.g., Remand Results 17 (explaining that Commerce selected subheading 8548.10, HTS, "because it covers scrapped and spent materials and those materials are more akin to scrap solar module materials, whereas HTS 2804.69 covers only silicon; thus, its use would not fully value the scrap module materials, and it is not a subheading at all specific to scrap materials.").  However, Commerce acknowledges that products covered by subheading 8548.10, HTS, do not share any material components with respondent's by-product.  Id. at 16 (noting that the items covered by subheading 8548.10, HTS, "include metal components and chemicals which, although not identical to the metal and chemical components in solar modules, are nonetheless metals and chemicals used in an engineered product designed to generate electricity that is no longer usable . . . .").  It is not evident that any of the components within the selected subheading would be similarly valued to the scrapped modules at issue.[13]  Commerce simply does not explain why its

---

[13] Commerce's argument that the polysilicon heading only covers one component of the solar modules and therefore would likely undervalue the offset, see Remand Results 29, assumes that polysilicon is of lesser value than the other components and further suggests that the scrapped battery category would be more representative.  Commerce fails to explain why its assumption is reasonable, and its position fails to account for the fact that scrapped batteries have no components in common with the scrapped solar modules.  See id. at 16.  Because scrapped batteries and scrapped solar modules do not have common materials, the scrapped battery category could undervalue or overvalue the solar modules and is therefore not necessarily more representative than the heading which covers only one component of the solar modules (polysilicon).  Similarly, Commerce's argument that the weight of polysilicon in the solar module suggests that the scrapped battery category is more representative and also relies upon some unsupported assumptions.  See id. at 28–29.  Commerce suggests that, since other components of the module weigh more than the polysilicon, the polysilicon category would likely undervalue

(footnote continued)

Case 1:15-cv-00080-CRK   Document 131   Filed 12/20/17   Page 18 of 20

Consol. Ct. No. 15-00080                                                                    Page 18
**PUBLIC VERSION**

emphasis on the scrap nature of the by-product achieves a representative surrogate value, given that the selected subheading covers products that do not share any material components with scrapped modules.

Instead, Commerce supports its selection of subheading 8548.10, HTS, as an appropriate surrogate value by reading into the term "scrap" common characteristics of scrapped products that otherwise share no material components. But the term "scrap" does not have meaning on its own in the context of respondent's by-product offset; the term simply serves to indicate that the article has been removed from the normal course of the respondent's solar module production, with the module components extracted and resold or reintroduced into production. Dictionary definitions for "scrap" suggest that the word is used to indicate remnants or fragments of a thing, with at least one relevant definition describing scrap as "manufactured articles or parts rejected or discarded and useful only as material for reprocessing; especially waste and discarded metal." Scrap, Merriam-Webster, available at https://www.merriam-webster.com/dictionary/scrap (last visited Dec. 7, 2017). The respondents reported "module scrap" as a by-product in their questionnaires to indicate that these scrapped modules were removed from production and should be offset when calculating normal value. See, e.g., Changzhou Trina Solar Energy Co. Ltd. Questionnaire Section D at D–21, CD 394–411, bar code 3202241-01 (May 15, 2014); Renesola Questionnaire Section D at 14, CD 377, bar code 3201658-01. What is significant about these scrapped modules for purposes of valuing the offset is the

---

the solar modules because scrap is valued by weight. This argument assumes that scrapped solar modules are purchased for the module components other than polysilicon, because the other components comprise more of the weight of the scrap. It also assumes that scrapped battery cells are representative of the cost of the non-polysilicon components of the solar modules. Again, Commerce does not explain why its assumptions are reasonable.

Case 1:15-cv-00080-CRK    Document 131    Filed 12/20/17    Page 19 of 20

Consol. Ct. No. 15-00080                                                                                    Page 19
**PUBLIC VERSION**

components of the module; the fact that the modules were "scrapped" does not, in itself, indicate what HTS subheading would be an appropriate surrogate value for the offset. As Commerce points out, there is no overlap between the products in a battery cell and a solar module. See Remand Results 16. Commerce cannot simply rely on the appearance of the word "scrap" in subheading 8548.10, HTS, and in the respondents' description of the by-product as indication that this subheading provides the best available information for valuing the by-product. As the term "scrap" does not indicate particular materials or composition, it is not reasonable to value products based on that word alone where it is shown that the covered products are completely different.

Commerce emphasizes that the scrapped modules and the products covered by subheading 8548.10, HTS, are similar in that they are all products that would generate electricity (if not scrapped). See Remand Results 16, 27–28. However, the fact that both battery cells and solar modules could generate electricity does not overcome the fact that the components of the two types of products differ, as it is the components which lend each product value. Generating electricity does not mean that the products are similarly valued. A buyer would not purchase scrapped solar modules if the buyer wanted the components of a battery cell, regardless of the fact that both types of products could generate electricity. Commerce cannot rely on the fact that both types of products generate electricity to support its selection of a surrogate value without some explanation as to why generating electricity relates to the products' value.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determination to collapse the ReneSola entities with the Jinko entities, treating these companies as a single entity for purposes of the antidumping duty analysis. This matter is remanded to

Commerce for reconsideration or further explanation of the agency's decision to use South African import data under subheading 8548.10, HTS, to value the respondents' by-product offsets for scrapped solar cells when calculating normal value.  It is

**ORDERED** that Commerce's determination to use South African import data under subheading 8548.10, HTS, to value respondents' offsets for scrapped solar cells when calculating normal value is remanded for further consideration consistent with this opinion.  Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand determination; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file a reply to comments on the remand determination.

 /s/ Claire R. Kelly  
Claire R. Kelly, Judge

Dated: December 13, 2017  
New York, New York