Slip Op. 18-61

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| JINKO SOLAR CO., LTD. ET AL., <br><br> Plaintiffs and Consolidated Plaintiff, <br><br> and <br><br> YINGLI GREEN ENERGY AMERICAS, INC. ET AL., <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> SOLARWORLD AMERICAS, INC. ET AL., <br><br> Defendant-Intervenors and Consolidated Defendant-Intervenors. | Before: Claire R. Kelly, Judge <br><br> Consol. Court No. 15-00080 |

## OPINION

[Sustaining the U.S. Department of Commerce's second remand determination in its antidumping investigation of certain crystalline silicon photovoltaic products from the People's Republic of China.]

Dated: May 25, 2018

Alexander Hume Schaefer and Hea Jin Koh, Crowell & Moring, LLP, of Washington, DC, for Plaintiffs Jinko Solar Co., Ltd., Jinko Solar Import & Export Co., Ltd., and JinkoSolar (U.S.) Inc.

Timothy C. Brightbill, Laura El-Sabaawi, and Usha Neelakantan, Wiley Rein, LLP, of Washington, DC, for Consolidated Plaintiff and Defendant-Intervenor SolarWorld Americas, Inc.

Neil R. Ellis, Brenda Ann Jacobs, Rajib Pal, and Richard L.A. Weiner, Sidley Austin, LLP, of Washington, DC, for Plaintiff-Intervenors and Consolidated Defendant-Intervenors Yingli Green Energy Americas, Inc., Yingli Green Energy Holding Co., Ltd., and Canadian Solar Inc.

Tara Kathleen Hogan, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant.  With her on the brief were Chad A. Readler, Acting Assistant Attorney General, and Jeanne E. Davidson, Director.  Of Counsel on the brief was James Henry Ahrens, II, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Francis J. Sailer, Andrew Thomas Schutz, and Brandon Michael Petelin, Grunfeld Desiderio Lebowitz Silverman & Klestadt, LLP, of Washington, DC, for Defendant-Intervenors and Consolidated Defendant-Intervenors Hanwha Solarone (Qidong) Co., Ltd. and Hanwha Solarone Hong Kong Limited.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") second remand determination in the antidumping duty ("ADD") investigation of certain crystalline silicon photovoltaic products from the People's Republic of China ("PRC" or "China"), filed pursuant to the court's order in Jinko Solar Co., Ltd. v. United States, 41 CIT __, __, 279 F. Supp. 3d 1253, 1264–65 (2017) ("Jinko Solar II"). See Final Results of Second Redetermination Pursuant to Court Order, Mar. 13, 2018, ECF No. 134-1 ("Second Remand Results"); see also Certain Crystalline Silicon Photovoltaic Products from the [PRC], 79 Fed. Reg. 76,970 (Dep't Commerce Dec. 23, 2014) (final determination of sales at less than fair value) and accompanying Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value, A-570-010, (Dec. 15, 2014), ECF No. 34-5 ("Final Decision Memo").

On second remand, Commerce reconsidered its selection of South African import data for subheading 8548.10, Harmonized Tariff Schedule ("HTS"), to value the respondent's scrapped solar module by-product offset when calculating normal value.

See Second Remand Results at 5–8. Under protest, Commerce has on second remand discontinued its use of South African import data for HTS 8548.10 and has instead valued the scrapped solar modules using Thai import data for subheading 2804.69, HTS. See id. at 6–9. Commerce has complied with the court's remand order in Jinko Solar II, and the court sustains the Second Remand Results.

## BACKGROUND

The court assumes familiarity with the facts of this case as discussed in the two prior opinions, see Jinko Solar Co., Ltd. v. United States, 41 CIT __, __, 229 F. Supp. 3d 1333, 1338–39 (2017) ("Jinko Solar I"); Jinko Solar II, 41 CIT at __, 279. F. Supp. 3d at 1256–58, and here restates the facts relevant to the court's review of the Second Remand Results.

Changzhou Trina Solar Energy Co., Ltd. ("Trina") and Renesola Jiangsu Ltd. were selected as the mandatory respondents in this investigation. See Decision Mem. for the Prelim. Determination in the [ADD] Investigation of Certain Crystalline Photovoltaic Products from the [PRC] at 3, PD 698, bar code 3217803-01 (July 24, 2014);[1] Section 777A of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2)(B) (2012).[2] Because China is a nonmarket economy country, in the final determination Commerce determined the normal value of the subject merchandise by valuing the respondents' reported factors of production, expenses, profit, and offsets using surrogate values. 19

---

[1] On July 7, 2015, Defendant filed on the docket the indices to the public and confidential administrative records. These indices are located on the docket at ECF No. 34. All further references in this opinion to administrative record documents include the administrative record numbers assigned by Commerce in the indices.

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

U.S.C. § 1677b(c)(1).  Only one surrogate valuation is relevant on second remand: in its final determination, Commerce valued respondent Trina's offset for scrapped solar cells,[3] which Trina reported as a by-product of its solar module production, using import data from South Africa for subheading 8548.10, HTS, covering "Waste and scrap of primary cells, primary batteries and electric storage batteries; spent primary cells, spent primary and electric storage batteries."  Final Decision Memo at 50–51.  Commerce determined that import data under subheading 8548.10, HTS, constituted the best available information with which to value Trina's scrapped solar modules because, as a subheading that "contains only scrapped materials, including scrapped cells," imports within it are more similar to solar cells than are imports within subheading 2804.69, HTS.[4]  Id. at 51.  Commerce emphasized that the only alternative on the record, subheading 2804.69,

---

[3] As noted in the prior opinion, Commerce referred to Trina's by-product in the final determination as "scrap solar cells," see Final Decision Memo at 51, but clarified on first remand that the offset is in fact for scrapped solar modules, rather than cells. See Jinko Solar II, 41 CIT at __, 279 F. Supp. 3d at 1255 n.1; see First Remand Results at 15 ("Although the petitioner and the Department have previously referred to the offset as an offset for scrap solar cells, we clarify here that the offset in question is module scrap and should be valued as such." (emphasis in original)). On second remand, Commerce continues to refer to the by-product as scrapped solar modules. See Second Remand Results at 2 n.7.

[4] On second remand, Commerce notes that, in the course of the second remand proceedings, it discovered that it had throughout these proceedings misstated the nature of the material covered by subheading 2804.69, HTS, referring to it incorrectly as "polysilicon" rather than "silicon," or referring to the two terms interchangeably, at times in the final determination and on first remand:

> Silicon is "made from ordinary sand and quartz."  The polysilicon that is used in the production of solar modules is not classified under HTS 2804.69 because it has a different purity level than silicon.  Thus, Commerce was incorrect when it stated in the [Final Decision Memo] . . . that "the HTS category for polysilicon (HTS subheading 2804.69), … is only specific to one raw material contained in the solar cell – polysilicon . . . ."  Commerce was also incorrect when it stated in [the First Remand Results] . . . that ". . . HTS 2804.69 only accounts for polysilicon, which is merely one of the many raw materials in a solar module."  Rather, the record shows that "[p]hotovoltaic manufacturing starts with polysilicon, a refinement of silicon materials."

Second Remand Results at 7–8.

HTS, "is only specific to one raw material contained in the solar [module] – silicon – and is not specific to scrap materials." Id.

SolarWorld challenged this selection, arguing that it was unreasonable for Commerce to find South African import data for subheading 8548.10, HTS, to be the best available information on this record. See SolarWorld's Rev. Non-Conf. Br. Supp. Rule 56.2 Mot. J. Agency R. at 22–25, Mar. 10, 2017, ECF No. 93. SolarWorld contended that heading 8548, HTS, "has nothing at all to do with photovoltaic products," such as solar modules, and that the products within it differ substantially from solar cells in both manufacturing processes and raw material inputs. Id. at 23. SolarWorld asserted that subheading 2804.69, HTS, constitutes the best available information because it is specific to polysilicon, the primary raw material in the scrap by-product, and because the less-pure nature of the polysilicon covered by that category accounts for the "'scrap' nature" of Trina's by-product. Id. at 25.

In Jinko Solar I, the court sustained in part and remanded in part Commerce's final determination.[5] Jinko Solar I, 41 CIT at __, 229 F. Supp. 3d at 1361. One of two remanded issues was Commerce's selection of South African import data for subheading

---

[5] In Jinko Solar I, the court sustained Commerce's determinations: 1) that Mustek's financial statements constitute the best available information to value respondents' general expenses and profit; 2) that import data for articles covered under subheading 7604, HTS, constitutes the best available information for valuing respondents' aluminum frames; 3) to accept, for purposes of adjusting Trina's U.S. prices, the information provided by Trina during verification related to quality insurance expenses covering the entire period of investigation; and 4) that respondents' ADD cash deposit rate should be offset by the full amount of export subsidy calculated based on adverse facts available in the companion countervailing duty investigation. See Jinko Solar I, 41 CIT at __, 229 F. Supp. 3d at 1361.

8548.10, HTS, to value Trina's scrapped solar module by-product offset.[6]  See id., 41 CIT at __, __, 229 F. Supp. 3d at 1353–55, 1361.  The court determined that Commerce did not explain why the selection of subheading 8548.10, HTS, is reasonable on this record, given that the category is specific to electrical products and therefore covers imports that are entirely dissimilar to Trina's scrapped solar modules.  Id., 41 CIT at __, 229 F. Supp. 3d at 1354–55.  The court remanded the issue to Commerce to reconsider or further explain its determination that, on this record, it is reasonable to consider subheading 8548.10, HTS, the best available information with which to value Trina's scrapped solar module by-product.  Id.

On first remand, Commerce continued to value Trina's scrapped solar modules with South African import data under HTS 8548.10.  See Final Results of Redetermination Pursuant to Court Remand at 15–18, 25–29, Aug. 2, 2017, ECF No. 105-1 ("First Remand Results").  Commerce explained that there were only two potential surrogate values on the record for this by-product, neither of which was import data for an HTS category that explicitly covers scrapped solar modules.  Id. at 16.  Commerce acknowledged that it was "[f]aced with [two] imperfect options," id., and that, after further review, it continued to find subheading 8548.10, HTS, to be the best available information for valuing this by-product because the alternative, subheading 2804.69, HTS, is not "at all specific to scrap materials."  Id. at 17.  Commerce stated that the scrap materials covered by subheading 8548.10, HTS, "are more akin to" the materials in the scrapped solar modules and "more

---

[6] The court also remanded, for further explanation or reconsideration, Commerce's determination to collapse the affiliated Renesola entities (i.e., Renesola Jiangsu Ltd. and Renesola Zhejiang Ltd. (collectively "ReneSola group")) with the affiliated Jinko entities (i.e., Jinko Solar Co., Ltd. and Jinko Solar Import & Export Co., Ltd. (collectively "Jinko group")), treating these companies as a single entity for purposes of the dumping margin calculation.  See Jinko Solar I, 41 CIT at __, 229 F. Supp. 3d at 1343–47, 1361.

closely reflec[t] the material composition of scrap solar modules, which include wire, metals, glass, and chemical compounds." Id.  Commerce stated that

> [r]ecord information demonstrates that a variety of chemical compounds (e.g., nitride), metals (incorporated on both sides of the cell), special solar glass, junction boxes, and aluminum frames are introduced into solar modules at various stages of production. HTS 8548 covers waste and scrap of primary batteries, electrical accumulators, spent primary batteries and spent electrical accumulators.  These items are engineered products that similarly include metal components and chemicals which, although not identical to the metal and chemical components in solar modules, are nonetheless metals and chemicals used in an engineered product designed to generate electricity that is no longer usable because of breakage, cutting up, wear, or other reasons[.]

First Remand Results at 16 (citations omitted).  Commerce emphasized again, as it had in the final determination, that, while HTS category 2804.69 is specific to raw polysilicon, "solar modules consist of many more raw materials than just polysilicon."  Id. at 16; see Final Decision Memo at 51 (noting that "solar cells consist of many more raw materials than polysilicon.").  Commerce concluded that HTS category 2804.69 "would not fully value the scrap module materials."  First Remand Results at 17.  Accordingly, Commerce continued to value Trina's scrapped solar modules with South African import data under subheading 8548.10, HTS.  See First Remand Results at 15–18, 25–29.

SolarWorld continued to challenge Commerce's selection of this surrogate value as an unreasonable selection that is not supported by the record.  See [SolarWorld]'s Comments on [Commerce]'s Final Results of Redetermination Pursuant to Court Remand Non-Conf. Version at 6–9, Sept. 5, 2017, ECF No. 112.  SolarWorld contended that the selected HTS category 8548.10 is dissimilar to Trina's by-product, as polysilicon is not a material in "primary batteries or electrical accumulators of the sort covered by HTS 8548.10."  Id. at 7.  SolarWorld also argued that it is unreasonable for the agency to reject a subheading on the basis of its conclusion that it is specific to just one material input of

the scrapped modules, when that input is the primary input, in the absence of any "evidence that products under 8548.10 have any raw material whatsoever in common with solar cells." Id. (emphasis in original).  SolarWorld further contended that, contrary to Commerce's suggestion, "polysilicon is reclaimed from the scrap modules, and there is no record evidence that any other materials are reclaimed." Id. at 7–8.  SolarWorld argued that Commerce on remand had again not reasonably explained why it found HTS category 8548.10 to be a better selection than HTS category 2804.69, which is specific to polysilicon, "the primary raw material input into solar cells (and modules) and the raw material that is reclaimed when solar cells (and modules) are scrapped." Id. at 6.

In Jinko Solar II, the court remanded the First Remand Results to Commerce on this one issue.[7]  See Jinko Solar II, 41 CIT at __, 279 F. Supp. at 1261–65.  The court determined that Commerce still had not adequately supported its selection of a surrogate value for the scrapped solar module by-product offset and still had not explained why, on this record, it is reasonable to determine that HTS category 8548.10 is the best available information. Id., 41 CIT at __, 279 F. Supp. at 1262–64.  Specifically, the court found that Commerce had unreasonably relied upon the "scrap nature" of the products covered by HTS subheading 8548.10 and the respondents' solar module by-product to justify its conclusion that HTS category 8548.10 is the best available information. Id., 41 CIT at __, 279 F. Supp. at 1264.  The court found this conclusion unreasonable given the record, which shows that the scrapped materials covered by HTS category 8548.10 differ from the scrapped materials in solar modules; the court emphasized that the word "scrap," on

---

[7] In Jinko Solar II, the court sustained Commerce's determination to collapse the ReneSola group with the Jinko group, treating these companies as a single entity for purposes of the antidumping duty analysis. Jinko Solar II, 41 CIT at __, 279 F. Supp. at 1258–61, 1264.

its own, does not indicate the value of a scrapped material. Id., 41 CIT at __, 279 F. Supp. at 1263–64. The court reasoned that, because all materials that have been scrapped do not share a similar value, the word "scrap," without more, cannot indicate that an HTS subheading with the word "scrap" in it is a reasonable surrogate value, representative of the value of Trina's scrapped solar modules. Id. Further, the court noted that it was similarly unreasonable for Commerce to justify its selection on the fact that the scrapped modules and the products within HTS category 8548.10 are capable of generating electricity, "without some explanation as to why generating electricity relates to the products' value." Id., 41 CIT at __, 279 F. Supp. at 1264. The court remanded so that Commerce could reconsider or further explain why, on this record and in light of these arguments, HTS category 8548.10 provides a reasonable value for Trina's scrapped solar modules by-product offset. See id., 41 CIT at __, 279 F. Supp. at 1262–64.

On second remand, under respectful protest, Commerce did not continue to value the scrapped solar modules using South African import data for HTS category 8548.10, and instead selected Thai import data for HTS category 2804.69, which covers imports of silicon of less than 99.99 percent purity. See Second Remand Results at 5–9. Commerce noted that "there are no changes to the dumping margins for any respondent pursuant to [the Second Remand Results]."[8] Id. at 9. Commerce received no comments

---

[8] Commerce emphasizes specifically that "Trina's calculated margin is unaffected by the change in surrogate value due to the very small per-unit quantity of scrapped solar modules reported by Trina." Second Remand Results at 9 n.34 (citing Analysis Mem. for the Draft Results of Redetermination Pursuant to Second Court Remand in the [ADD] Investigation of Certain Crystalline Silicon Photovoltaic Products from the [PRC], Remand PD 1, bar code 3674144-01 (Feb. 20, 2018) ("Analysis Memo")). The Analysis Memo is filed on the administrative record of the second remand proceedings; on March 13, 2018, Defendant filed the index for the administrative record of the second remand proceedings. See Def.'s Notice of Filing of the Admin. Record, Mar. 13, 2018, ECF No. 135. The Analysis Memo is identified by the bar code and item number assigned by Commerce in the second remand administrative index.

on the draft determination, id. at 8, and no parties submitted comments to the court in opposition to the Second Remand Results.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012). Commerce's antidumping determinations must be in accordance with law and supported by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Commerce determines whether a company is engaged in dumping by comparing the normal value of the subject merchandise with the actual or constructed export price of the merchandise. 19 U.S.C. § 1677b(a). The normal value of the merchandise is the price of the merchandise when sold for consumption in the exporting country. Id. § 1677b(a)(1)(B). However, when the exporting country is, like China, a nonmarket economy country, Commerce calculates the normal value for subject merchandise by valuing inputs including the factors of production utilized in producing the merchandise and "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." Id. § 1677b(c)(1). Commerce selects a surrogate value for each of these inputs from a source in a market economy country that is economically comparable to the nonmarket economy country and is a significant producer of

comparable merchandise.  Id. § 1677b(c)(4)(A)–(B); see 19 C.F.R. § 351.408(b) (2014).[9]

To select a surrogate value for each of these inputs, Commerce uses "the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]."[10]  19 U.S.C. § 1677b(c)(1); see 19 C.F.R. § 351.408(a)–(c).  With "best available information" not defined in the statute, Commerce has discretion to determine what data constitutes the best available information for valuing the inputs.[11]  QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011); Nation Ford Chemical Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Here, on second remand, Commerce reevaluated the record evidence and its selection of a surrogate value for Trina's scrapped solar module by-product.  See Second Remand Results at 5–9.  Under protest,[12] the agency determined that it would not continue to value the solar module by-product using South African import data for HTS 8548.10 and would instead value the by-product using Thai import data for HTS 2804.69.  Id. at 6–7.  Commerce reiterated that the South African import data for HTS 8548.10 and the Thai import data for HTS 2408.69 were the only two potential surrogate values on record and, as "[n]either of these categories explicitly covers scrapped solar modules,"

---

[9] Further citation to the Code of Federal Regulations is to the 2014 edition.

[10] Commerce has a regulatory preference to value all inputs using data from a single surrogate country.  See 19 C.F.R. § 351.408(c)(2).

[11] Commerce's practice in determining the "best available information" is to "use investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data."  See U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process 2 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited May 22, 2018).

[12] By complying with the court's order under protest, Commerce preserves for appeal the arguments and positions it presented in the final determination and First Remand Results.  See Viraj Group, Ltd. v. United States, 343 F.3d 1371, 1376–77 (Fed. Cir. 2003).

the agency had to make a selection based on two imperfect options. Id. at 6. Commerce explained:

> Our previous findings that solar modules were more similar to batteries relied primarily on the fact that both items are engineered products that similarly include metal components and chemicals. We considered the battery and solar module components similar in nature and found that both sets of components were used in an engineered product designed to generate electricity. Thus, we found not only that the function of batteries and solar modules were similar, but also that they consisted of similar components to achieve this function. However, the Court determined that Commerce could not rely on the common function of batteries and solar modules (i.e., electricity generation) without explaining why such a function was relevant to the value of these items. Commerce further noted that HTS 8548.10 consisted of scrapped materials, while HTS 2804.69 did not. However, the Court found the fact that HTS 8548.10 covers scrap materials and HTS 2804.69 does not is not, in itself, indicative of which HTS subheading is an appropriate surrogate value for the scrap solar module offset.

Second Remand Results at 6. Responding to the court's request that the agency explain why its selection is reasonable and why it provides a representative value for Trina's scrapped solar modules, Commerce explained that it would not continue to value Trina's solar module by-product using HTS 8548.10. See id. at 5–8.

Commerce has on second remand complied with the court's order in Jinko Solar II. The court stated that the agency could not, without more, rely on the fact that HTS 8548.10 covers certain materials that, like Trina's solar modules, have been scrapped and are capable of generating electricity. Jinko Solar II, 41 CIT at __, 279 F. Supp. at 1263–64. On second remand Commerce declined to provide an alternate explanation for selecting HTS 8548.10 that did not rely upon those justifications, and instead selected the other available category, import data for subheading 2408.69, HTS, as the best available information for valuing Trina's scrapped solar module by-product. Second Remand Results at 6-7. It is reasonably discernible that Commerce determined that it was unable to support a selection of HTS 8548.10 without focusing on the appearance of the word

"scrap" and the products' ability to generate electricity.  As the court explained in Jinko Solar II, because neither of those characteristics innately relate to the products' value, Commerce must explain how these characteristics nevertheless indicate that import data for subheading 8548.10, HTS, would provide a representative surrogate value for Trina's scrapped solar modules.  Jinko Solar II, 41 CIT at __, 279 F. Supp. at 1263–64.  Commerce's implicit acknowledgement that it could not provide the required explanation to justify the selection of HTS 8548.10 renders its selection of the alternate option, HTS 2804.69, which covers the raw material that makes up the primary input in this by-product, reasonable on this record.  Commerce has complied with the court's order in Jinko Solar II, and the Second Remand Results are sustained.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's determination to use Thai import data under subheading 2804.69, HTS, to value Trina's by-product offset for scrapped solar modules in this investigation.  The Second Remand Results are sustained, and judgment will enter accordingly.


                                             /s/ Claire R. Kelly
                                             Claire R. Kelly, Judge

Dated: May 25, 2018
       New York, New York